**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| ROBERT MATOR and NANCY MATOR, individually and as representatives of a class of participants and beneficiaries in and on behalf of the WESCO DISTRIBUTION, INC. RETIREMENT SAVINGS PLAN, | ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| WESCO DISTRIBUTION, INC.; | ) ) |
| and | ) ) |
| THE ADMINISTRATIVE AND INVESTMENT COMMITTEE FOR WESCO DISTRIBUTION, INC. RETIREMENT SAVINGS PLAN; | ) ) ) ) ) |
| and | ) ) |
| JOHN AND JANE DOES 1-30, | ) ) |
| Defendants. | ) ) ) ) ) ) ) |

Civil Action No. 2:21-mc-403

CLASS ACTION

_____

**COMPLAINT**

Plaintiffs Robert Mator and Nancy Mator (collectively "Plaintiffs"), on behalf of the Wesco

Distribution, Inc. Retirement Savings Plan (the "Plan"), themselves as Plan participants, and all

others similarly situated, by and through their attorneys, allege as follows:

**I.    NATURE OF ACTION AND INTRODUCTION**

1.      This is a class action brought pursuant to the Employee Retirement Income Security

Act, 29 U.S.C. §§ 1001-1461 ("ERISA") for the benefit of the Plan and its participants. This action

asserts claims for breaches of fiduciary duties and other violations of 29 U.S.C. §1132(a)(2) and (3) against the Plan's fiduciaries, which include: Wesco Distribution, Inc; the Administrative and Investment Committee for the Wesco Distribution, Inc. Retirement Savings Plan; and John and Jane Does 1-30 (collectively, "Defendants").

2.    Every year, millions of employees entrust their retirement savings to plans established under ERISA. ERISA plans are supposed to be protected by their fiduciaries, who are obligated to act loyally and prudently to protect plan participants and their hard-earned retirement dollars.

3.    As of September 2020, Americans had approximately $9.3 trillion in assets invested in defined contribution plans, such as 401(k) and 403(b) plans. *See* INVESTMENT COMPANY INSTITUTE, *Retirement Assets Total $33.1 Trillion in Third Quarter 2020* (Dec. 16, 2020), https://www.ici.org/research/stats/retirement/ret_20_q3. Defined contribution plans have largely replaced defined benefit plans—or pension plans—that were predominant in previous generations. *See* James McWhinney, *The Demise of the Defined-Benefit Plan*, Investopedia (Updated Nov. 16, 2020), https://www.investopedia.com/articles/retirement/06/demiseofdbplan.asp. Today, only 17% of private sector employees have access to a defined benefit plan, while 64% have access to a defined contribution plan. *Id*.

4.    The essential remedial purpose of ERISA is to protect the beneficiaries of private retirement plans. ERISA fiduciaries have a continuing duty to evaluate fees and expenses being assessed to a plan in order to make sure those charges are reasonable and prudent.

5.    Failures by ERISA fiduciaries to monitor costs for reasonableness have stark financial consequences for retirees. Every extra level of expenses imposed upon plan participants compounds over time and reduces the value of participants' investments available upon retirement.

6.      The potential for imprudence is much greater in defined contribution plans than in defined benefit plans. In a defined benefit plan, the participant is entitled to a fixed monthly pension payment, while the employer is responsible for making sure the plan is sufficiently capitalized, and thus the employer bears all risks related to excessive fees and investment underperformance. Therefore, in a defined benefit plan, the employer and the plan's fiduciaries have every incentive to keep costs low and to remove imprudent investments. But in a defined contribution plan, participants' benefits are limited to the value of their own investment accounts, which is determined by the market performance of contributions, less expenses. Thus, in a defined contribution plan, risks related to high fees and poorly performing investments are borne by the employee.

7.      The table below illustrates how retirement plan services ("RPS") fees impact retirement accounts over time.[1] The table illustrates that when an employee invests $100,000 over 20 years with an assumed 4% annual rate of return and annual fees of 1.00%, the account balance in 20 years will be $180,000. This balance is $30,000 less than the same investment where annual fees are only 0.25%, which would result in a balance of $210,000. This difference of over 14 percent is substantial. In fact, the impact of excessive fees on defined contribution participants is even more substantial given that during most of the past three decades the returns of defined contribution participants have averaged almost double (7%) the 4% in the below SEC example (*see, e.g.*, Net Weighted Geometric Rate of Return of Defined Contribution Plans from 1990-2012 as calculated by the Center for Retirement Research, Investment Returns: Defined Benefit vs. Defined Contribution Plans, December 2015, Number 15-21, p. 3, Table 4. Center for Retirement Research).

---

[1] *See* https://www.sec.gov/files/ib_mutualfundfees.pdf (last visited Mar. 24, 2021).



8.      Indeed, the Third Circuit Court of Appeals recently noted:

> Expenses, such as management or administrative fees, can sometimes significantly reduce the value of an account in a defined-contribution plan . . . by decreasing its immediate value, and by depriving the participant of the prospective value of funds that would have continued to grow if not taken out in fees.[2]

9.      The Defendants are ERISA fiduciaries pursuant to 29 U.S.C. § 1002(21)(A), because they exercise discretionary authority or discretionary control over the Plan, which Defendants sponsor and administer.

10.     ERISA imposes strict fiduciary duties of prudence upon Defendants as Plan fiduciaries, pursuant to 29 U.S.C. § 1104(a). ERISA's fiduciary duties are among "the highest known to the law." *Sweda*, 923 F.3d at 333 (internal citation and quotations omitted). Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B). As fiduciaries to the Plan, Defendants were and are obligated to

---

[2] *Sweda v. Univ. of Pa.*, 923 F.3d 320, 328 (3d Cir. 2019), *cert. denied*, 140 S. Ct. 2565 (2020) (internal citation and quotations omitted).

prudently ensure that Plan fees and expenses are reasonable.

11.    Defined contribution retirement plans are often categorized in terms of the value of the assets in the plan. For example, plans with less than $5 million in assets are often classified as "micro" plans, plans with between $5 and $50 million in assets are considered "small" plans, plans with assets between $50 and $200 million in assets are considered "mid" plans, and plans with greater than $200 million in assets are considered "large" plans.

12.    With 8,870 participants and more than $750 million in net assets as of December 31, 2019, based on publicly-available Form 5500 data, the Plan is larger than 99.60% of defined contribution plans in terms of participants and larger than 99.83% in terms of assets and is thus considered a "large" retirement plan.

13.    The marketplace for RPS is well-established and highly competitive. Having had between $500-$750 million in assets, the Plan was a "large" plan since at least 2015 and, as a result, had tremendous bargaining power to demand low-cost administrative and investment management services.

14.    Prudent plan fiduciaries continuously monitor both (1) investment fees against applicable benchmarks and peer groups, and (2) the market for reasonable RPS fees, in order to identify objectively unreasonable and unjustifiable fees.

15.    But instead of leveraging the Plan's substantial bargaining power to benefit Plan participants and beneficiaries, Defendants caused the Plan to imprudently pay unreasonable and excessive fees for RPS in relation to the services being provided to the Plan.

16.    Upon information and belief, during the Class Period, Defendants breached their duties owed to the Plan, to Plaintiffs, and all other Plan participants by:

      a.    Imprudently failing to monitor the RPS fees paid by the Plan to ensure that

they were reasonable and, as a result, authorizing the Plan to pay objectively unreasonable and excessive RPS fees, relative to the RPS received;

b.     Imprudently failing to understand the methodology by which fee payments such as revenue sharing are paid to RPS providers; and

c.     Imprudently failing to take standard and customary actions to understand the market for RPS in order to monitor for reasonableness the RPS fees paid by the Plan in relation to the RPS received.

17.    The objectively unreasonable RPS fees charged to the Plan by Defendants cannot be justified. During the Class Period, the Plan paid between $159 and $194 per participant annually for RPS. During the Class Period, reasonable RPS fees for a plan of this size would have averaged $41 per participant annually.

18.     Defendants' failures to monitor RPS fees and ensure their reasonableness breached the fiduciary duties they owed to Plaintiffs, Plan participants, and beneficiaries. Prudent fiduciaries of 401(k) plans continuously monitor the market for RPS to ensure the fees paid by the plan are reasonable. Defendants did not engage in prudent decision-making processes, but decided instead to remain with Wells Fargo Bank, N.A. ("Wells Fargo") and not seek competitive bids or otherwise determine the market for RPS. There is no other explanation for why the Plan paid objectively unreasonable fees for RPS.

19.    Plaintiffs were injured by the Defendants' actions because Defendants permitted all Plan participants to be charged excessive RPS fees, which reduced Plaintiffs' and other Plan participants' account balances and caused them significantly diminished investment returns.

20.    To remedy Defendants' fiduciary breaches, Plaintiffs, individually and as representatives of a class of participants and beneficiaries in the Plan, bring this action on behalf

of the Plan under 29 U.S.C. § 1132(a)(2) and (3) to enforce Defendants' personal liability under 29 U.S.C. § 1109(a) to restore to the Plan all losses resulting from each breach of fiduciary duty, as alleged in more detail herein. In addition, Plaintiffs seek such other equitable or remedial relief for the Plan as the Court may deem appropriate.

21.    The allegations in this Complaint are based upon information and belief and an investigation by undersigned counsel, including, but not limited to, review of Plan filings with the United States Department of Labor ("DOL"), other publicly available documents, and other analytical investment data. Defendants have possession of additional material information relating to the claims herein, and Plaintiffs reserve the right to amend this Complaint as those materials become available in the course of this litigation.

## II.    JURISDICTION AND VENUE

22.    This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331, which provide for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. §§ 1001 *et seq.*

23.    This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, have significant contacts within this District, and because ERISA provides for nationwide service of process.

24.    This District is the proper venue for this action under 29 U.S.C. § 1132(e)(2) because the Plan is administered in this District; the Plan is deemed to reside in this District; some or all of the ERISA violations alleged herein took place in this District; and the Plan can be found in this District. Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

III.    **PARTIES**

A.    **Plaintiff Robert Mator**

25.    Plaintiff Robert Mator is a resident of Cerritos, California. Mr. Mator is a current "participant" in the Plan, as that term is defined under 29 U.S.C §1002(7), because he has a vested account balance in the Plan and his beneficiaries are or may become eligible to receive benefits under the Plan. At all relevant times, Mr. Mator was and is a participant in the Plan. During the Class Period, Mr. Mator paid excessive RPS fees directly and indirectly through revenue sharing.

26.    During the Class Period, Mr. Mator held investments in Plan investment options that paid revenue sharing fees.

27.    Mr. Mator has Article III standing to bring this action on behalf of himself because he suffered an actual injury to his own individual Plan account in which he is still a participant, that injury is fairly traceable to Defendants' breaches of fiduciary duties in violation of ERISA, and the harm is likely to be redressed by a favorable judgment.

28.    The Plan also suffered harm caused by Defendants' fiduciary breaches and remains exposed to harm and continued future losses. The Plan is the victim of a fiduciary breach and will be the recipient of any recovery. Mr. Mator's claims are brought in a representative capacity on behalf of the Plan as a whole and seek remedies under 29 U.S.C. § 1109 to protect the entire Plan. Mr. Mator and all participants and beneficiaries in the Plan suffered ongoing financial harm as a result of Defendants' continued imprudent and unreasonable investment and fee decisions. Those injuries may be redressed by a judgment of this Court in favor of Mr. Mator.

29.    Mr. Mator did not have knowledge of all material facts (including, among other things, the retirement plan services and total cost comparisons to similarly-sized plans) necessary to understand that Defendants breached (and continue to breach) their fiduciary duties and engaged

in other unlawful conduct in violation of ERISA until shortly before this suit was filed. Mr. Mator lacked actual knowledge of reasonable fee levels and prudent fee alternatives available to the Plan.

### B.   **Plaintiff Nancy Mator**

30.    Plaintiff Nancy Mator is a resident of Cerritos, California. Ms. Mator is a current "participant" in the Plan, as that term is defined under 29 U.S.C §1002(7), because she has a vested account balance in the Plan and her beneficiaries are or may become eligible to receive benefits under the Plan. At all relevant times, Ms. Mator was and is a participant in the Plan. During the Class Period, Ms. Mator paid excessive RPS fees directly and indirectly through revenue sharing.

31.    During the Class Period, Ms. Mator held investments in Plan investment options that paid revenue sharing fees.

32.    Ms. Mator has Article III standing to bring this action on behalf of herself because she suffered an actual injury to her own individual Plan account in which she is still a participant, that injury is fairly traceable to Defendants' breaches of fiduciary duties in violation of ERISA, and the harm is likely to be redressed by a favorable judgment.

33.    The Plan also suffered harm caused by Defendants' fiduciary breaches and remains exposed to harm and continued future losses. The Plan is the victim of a fiduciary breach and will be the recipient of any recovery. Ms. Mator's claims are brought in a representative capacity on behalf of the Plan as a whole and seek remedies under 29 U.S.C. § 1109 to protect the entire Plan. Ms. Mator and all participants and beneficiaries in the Plan suffered ongoing financial harm as a result of Defendants' continued imprudent and unreasonable investment and fee decisions. Those injuries may be redressed by a judgment of this Court in favor of Ms. Mator.

34.    Ms. Mator did not have knowledge of all material facts (including, among other things, the retirement plan services and total cost comparisons to similarly-sized plans) necessary

to understand that Defendants breached (and continue to breach) their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed. Ms. Mator lacked actual knowledge of reasonable fee levels and prudent fee alternatives available to the Plan.

### C.    Defendants

35.    Defendant Wesco Distribution, Inc. ("Wesco")[3] is a company with a principal place of business located at 225 West Station Square Drive, Suite 700, Pittsburgh, Pennsylvania 15219. Per the Plan's Forms 5500, Wesco is the Plan Administrator under 29 U.S.C. § 1002(16)(A)(i) and the Plan Sponsor under 29 U.S.C. § 1002(16)(B). As the Plan Administrator, Wesco is a fiduciary responsible for day-to-day administration and operation of the Plan, within the meaning of 29 U.S.C. § 1002(21)(A). It has authority and responsibility for the control, management, and administration of the Plan in accordance with 29 U.S.C. § 1102(a). Wesco has responsibility and discretionary authority to control the operation, management, and administration of the Plan, with all powers necessary to enable it to carry out such responsibilities properly, including the selection and compensation of the providers of recordkeeping and administrative services to the Plan. Wesco acted through its officers, directors, and the other Defendants to perform Plan-related fiduciary functions in the course and scope of their business. Wesco appointed other Plan fiduciaries, and accordingly had a concomitant fiduciary duty to monitor and supervise those appointees.

36.    Defendant Administrative and Investment Committee for the Wesco Distribution, Inc. Retirement Savings Plan ("Committee") is, on information and belief, located at 225 West Station Square Drive, Suite 700, Pittsburgh, Pennsylvania 15219. The Committee and its members, in their individual capacities, are fiduciaries within the meaning of 29 U.S.C. § 1002(21)(A).

---

[3] In this Complaint, "Wesco" refers to the named Defendant Wesco Distribution, Inc. and all parent, subsidiary, affiliated, predecessor, and successor entities to which these allegations pertain.

According to the Plan's Forms 5500, the Committee is the Plan administrator.

37.     Defendants John and Jane Does 1-30 are unknown individuals comprised of Defendants the Board of Directors and the Committee; any officers, directors, or employees of Defendant Wesco; or other individuals or entities who are or were fiduciaries to the Plan, within the meaning of 29 U.S.C. § 1002(21)(A), during the Class Period. Plaintiffs reserve the right to seek leave to join these currently unknown individuals into the instant action once their identities are ascertained.

38.     All Defendants are Plan fiduciaries because they have exercised and continue to exercise discretionary authority or discretionary control respecting the management of the Plan and the management and disposition of its assets, and have discretionary authority or discretionary responsibility in the administration of the Plan. 29 U.S.C. § 1002(21)(A).

## D.      THE WESCO DISTRIBUTION, INC. RETIREMENT SAVINGS PLAN

The name of the Plan is the Wesco Distribution, Inc. Retirement Savings Plan. The Plan's Employer Identification Number (EIN) is 25-1723345 and the Plan has been assigned the three-digit plan number 001.

39.     The Plan is subject to ERISA and is, on information and belief, established and maintained under written documents in accordance with 29 U.S.C. § 1102(a)(1).

## IV.    FACTUAL BACKGROUND

### A.      OVERVIEW OF RETIREMENT PLAN SERVICES IN DEFINED CONTRIBUTION PLANS

40.     In recent decades, the defined contribution plan has become the most common type of employer-sponsored retirement plan. The assets of a defined contribution plan are held by a trustee in a single trust. The plan allocates the trust assets among plan participants through an RPS provider (often referred to generically as a "recordkeeper") that tracks each participant's account,

which consists of his/her share of plan investments and returns.

41.    Fiduciaries of virtually all "large" defined contribution plans hire one RPS provider to provide the essential Recordkeeping & Administrative ("RK&A") services for a plan. RK&A services are necessary for defined contribution plans, and the services often include, but are not limited to, maintaining plan records, tracking participant account balances and investment elections, providing transaction processing, providing call center support and investment education and guidance, providing participant communications, and providing trust and custodial services.

42.    RPS includes the RK&A services as well as fees for other services such as individual transactions and/or services that are utilized only by specific participants, e.g., loan initiation and maintenance fees, Qualified Domestic Relations Order services, etc. The fees charged for participant-specific services typically account for an immaterial portion of the total fees charged for providing RPS.

43.    Some providers of RPS provide purely RK&A, while others are subsidiaries of financial services companies and insurance companies that distribute mutual funds, insurance products, and other investment options.

44.    Since the mid-2000s, the retirement plan services provided to "large" defined contribution plans, like the Plan, have increasingly become viewed by prudent plan fiduciaries as a commodity service. While RPS providers in the defined contribution industry attempt to distinguish themselves through marketing and other means, most RPS providers offer the same bundles and combinations of services as their competitors. As a result, the market for defined contribution retirement plan services is highly competitive, particularly for "large" plans that, like the Plan, have a sizable number of participants and a large amount of assets.

45.    In recent decades, the fee that RPS providers have been willing to accept for

providing retirement plan services has significantly decreased.

46.     By the start of and during the entire Class Period, the level of fees that RPS providers have been willing to accept for providing RPS, including RK&A services, has stabilized, and has not materially changed. In other words, reasonable RPS fees paid in 2018 are representative of the reasonable fees for retirement plan services during the entire Class Period.

47.     RPS providers for larger defined contribution plans, like the Plan, experience advantages that lead to a reduction in the per-participant cost as the number of participants in the plan increases. This is because the marginal cost of adding an additional participant to a recordkeeping platform is relatively low. These economies of scale are inherent in all recordkeeping arrangements for defined contribution plans. When the number of participants increases in a defined contribution plan, the RPS provider can spread the cost of providing retirement plan services over a larger participant base, reducing the average unit cost of delivering services on a per-participant basis.

48.     Moreover, the cost to an RPS provider to provide services to a participant does not materially differ from one participant to another and is not dependent on the balance of the participant's account. In other words, the average cost to provide RPS is materially identical for a participant that has $10,000 and a participant that has $100,000 or $1,000,000 in plan assets.

49.     Therefore, while the total cost to provide RPS increases as more participants join the plan, the cost per participant to deliver the RPS decreases. Prudent plan fiduciaries and their consultants and advisors are aware of this cost structure dynamic for retirement plan providers.

50.     Sponsors of defined contribution plans negotiate and contract for RPS separately from any contracts related to the selection of investment management services provided to plan participants.

51.     Often, a portion of the total expense ratio for the investment options selected by plan fiduciaries is allocated to the provision of services that the RPS provider provides on behalf of the investment manager.

52.     As a result, RPS providers often make separate contractual arrangements with mutual fund providers. RPS providers often collect a portion of the total expense ratio fee of the mutual fund in exchange for providing services that would otherwise have to be provided by the mutual fund. These fees are known in the defined contribution industry as "revenue sharing."

53.     For example, if a mutual fund has a total expense ratio fee of 0.75%, the mutual fund provider may agree to pay the RPS provider 0.25% of the 0.75% total expense ratio fee that is paid by the investor in that mutual fund (in this context the Plan participant). That 0.25% portion of the 0.75% total expense ratio fee is known as the "revenue sharing."

54.     In the context of defined contribution plans, the amount of revenue sharing is deemed to be the amount of revenue paid by participants that is allocable to RPS and, in some cases, other services provided to a plan. The difference between the total expense ratio and the revenue sharing is known as the "net investment expense." When a plan adopts prudent and best practices, the net investment expense is the actual amount a plan participant pays for the investment management services provided by a portfolio manager.

55.     RPS providers typically collect their fees through direct payments from the plan or through indirect compensation such as revenue sharing, or some combination of both.

56.     Regardless of the pricing structure that the plan fiduciaries negotiate with the RPS provider, the amount of compensation paid to the RPS provider must be reasonable.

57.     As a result, plan fiduciaries must understand the total dollar amounts being paid to their RPS provider(s) and be able to determine whether the compensation is reasonable by

evaluating what the market is for the RPS being received by the plan.

58.     Because RPS fees are actually paid in dollars and because of the cost dynamic noted above, the fees paid for RPS are evaluated and compared on a dollars-per-participant basis.

59.     It is axiomatic in the RPS industry that, all else being equal, a plan with more participants can and will receive a lower effective per-participant fee when evaluated on a per-participant basis, and that as participant counts increase, the effective per-participant RPS fee should decrease, assuming the same services are provided.

## B.     STANDARD OF CARE FOR PRUDENT FIDUCIARIES SELECTING AND MONITORING RPS PROVIDERS

60.     Plan fiduciaries are required to fully understand all sources of revenue received by RPS providers. Fiduciaries must regularly monitor the revenue being paid to RPS providers to ensure that the compensation received is and remains reasonable in view of the services being provided.

61.     The DOL has identified that employers are held to a "high standard of care and diligence" and must, among other duties, "[e]stablish a prudent process for selecting . . . service providers"; "[e]nsure that fees paid to service providers and other plan expenses are reasonable in light of the level and quality of services provided"; and "[m]onitor . . . service providers once selected to make sure they continue to be appropriate choices."[4]

62.     The duty to evaluate and monitor plan service provider fees includes those fees directly paid by participants, because "[a]ny costs not paid by the employer, which may include administrative, investment, legal, and compliance costs, effectively are paid by plan participants."[5]

---

[4] *See* United States Dep't of Labor, *A Look at 401(k) Plan Fees*, at 2 *(Sept. 2019),* https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf.
[5] Investment Company Institute, *The Economics of Providing 401(k) Plans: Service, Fees, and Expenses*, at 4-5 (June 2018), https://www.ici.org/pdf/per24-04.pdf.

63. Prudent fiduciaries will ensure that a plan is paying no more than reasonable fees for RPS by soliciting competitive bids from other RPS providers to perform the same services currently being provided to the plan. This process is not difficult or complex and is performed regularly by prudent plan fiduciaries. For plans with many participants, like the Plan, most RPS providers would require only the number of participants and the amount of the assets to provide a quote for RPS, while others might only require the number of participants.

64. Prudent fiduciaries have all of this information readily available and can easily receive a quote from other RPS providers to determine if the current level of fees being charged to the plan is reasonable.

65. Having received bids, a prudent fiduciary can negotiate with its current provider for a lower fee or move to a new RPS provider to provide the same (or better) services for a competitive (or lower) reasonable fee. Prudent fiduciaries follow this same process to monitor the fees of retirement plan advisors and/or consultants as well as any other covered service providers.

66. After the revenue requirement is negotiated, the plan fiduciary determines how to pay the negotiated RPS fee. The employer/plan sponsor can pay the RPS fees on behalf of participants, which is the most beneficial to plan participants. If the employer were paying the fee, the employer would have an interest in negotiating the lowest fee a suitable RPS provider would accept. Typically, however, the employer decides to have the plan (i.e., participants) pay the RPS fees. If the RPS fees are paid by participants, the fiduciaries can allocate the negotiated RPS fees among participant accounts at the negotiated per-participant rate, or pro rata based on account values, among other less common ways.

67. In other words, if a plan negotiates a per-participant revenue threshold, e.g., $50.00, the plan does not need to require that each participant pay $50.00. Rather, the fiduciaries could

determine that an asset-based fee is more appropriate for participants and allocate the RPS fees pro rata to participants. For example, a 10,000-participant plan with a $50.00 revenue threshold would pay $500,000 in RPS fees. If the Plan had $500,000,000 in assets, then the $500,000 would work out to 10 basis points. Accordingly, the Plan could allocate the $500,000 in fees to participants by requiring that each participant pay 10 basis points.

68.    In an asset-based pricing structure, the amount of compensation received by the service provider is based on a percentage of the total assets in the plan. This structure creates situations in which the services provided by the RPS provider do not change but, because of market appreciation and contributions to the plan, the revenue received by the RPS provider increases. This structure was historically preferred by RPS providers because it allowed RPS providers to obtain an increase in revenue without having to ask the client to pay a higher fee.

69.    In a revenue sharing arrangement, a mutual fund or other investment vehicle directs a portion of the expense ratio—the asset-based fees it charges to investors—to the 401(k) plan's RPS provider putatively for all RPS including, e.g., providing marketing, RK&A, and sometimes other retirement plan services on behalf of the mutual fund. These fees include: 12b-1 fees, which are paid by the funds to the RPS provider as compensation for its services and expenses in connection with the sale and distribution of fund shares; shareholder service fees; and sub-transfer agency fees.

70.    Because revenue sharing payments are asset based, they bear no relation to the actual cost to provide services or the number of plan participants and can result in payment of unreasonable RPS fees.

71.    Because revenue sharing arrangements pay RPS providers asset-based fees, prudent fiduciaries monitor the total amount of revenue sharing an RPS provider receives to ensure that it

is not receiving unreasonable compensation at the expense of the plan or plan participants. A prudent fiduciary ensures that the RPS provider rebates to the plan all revenue from any source (including revenue sharing payments) that exceeds a reasonable retirement plan service fee based on the market rate for the same services.

72.    By 2013, prior to the class period, the impact of the 2012 Fee Disclosure regulations was incorporated into the standard of care and was well known, understood, and established among prudent plan fiduciaries based on the DOL guidelines, case law, and best practices as shared by retirement plan professionals. For example, in its 2013 publication, "DC Fee Management – Mitigating Fiduciary Risk and Maximizing Plan Performance," Mercer LLC summarized the standard of care exercised by prudent retirement plan professionals and plan fiduciaries as follows:

1. Price administrative fees on a per-participant basis.
2. Benchmark and negotiate recordkeeping and investment fees separately.
3. Benchmark and negotiate investment fees regularly, considering both fund vehicle and asset size.
4. Benchmark and negotiate recordkeeping and trustee fees at least every other year.
5. Negotiate vendor contracts to ensure that service standards and liability provisions are in the best interests of plan participants and beneficiaries.
6. Monitor actual fees paid against contractual requirements.
7. Review services annually to identify opportunities to reduce administrative costs.[6]

73.    Prudent fiduciaries implement three related processes to prudently manage and control a plan's RPS costs.

74.    First, fiduciaries must pay close attention to the recordkeeping fees being paid by the plan. A prudent fiduciary tracks the RPS provider's expenses by demanding documents that

---

[6] *DC Fee Management — Mitigating Fiduciary Risk and Maximizing Plan Performance*, Mercer LLC, at 3-4 (2013).

summarize and contextualize the RPS provider's compensation, such as fee transparencies, fee analyses, fee summaries, relationship pricing analyses, cost-competitiveness analyses, and multi-practice and standalone pricing reports.  This would include information from all revenue, not just retirement plan services revenue, that is generated by providers through their relationship with the plan.

75.    Second, to make an informed evaluation as to whether an RPS or other service provider is receiving no more than a reasonable fee for the services provided to a plan, a prudent hypothetical fiduciary must identify all fees, including direct compensation and revenue sharing being paid to the plan's RPS provider. To the extent that a plan's investments pay asset-based revenue sharing to the RPS provider, prudent fiduciaries monitor the amount of the payments to ensure that the RPS provider's total compensation from all sources does not exceed reasonable levels and require that any revenue-sharing payments that exceed a reasonable level be returned to the plan and its participants.

76.    Third, a hypothetical plan fiduciary must remain informed about overall trends in the marketplace regarding the fees being paid by other plans, as well as the RPS rates that are available. This will often include conducting a request for proposal ("RFP") process at reasonable intervals. In fact, the best practice standard of care is to undergo a formal RFP process once every three to five years.

77.    On the other hand, however, even without conducting a formal RFP process, as noted above,  by merely soliciting bids from other RPS providers, plan fiduciaries can quickly and easily gain an understanding of the current market for materially identical retirement plan services and determine a starting point for negotiation. Accordingly, the only way to determine the true

market price at a given time is to obtain competitive bids through some process, be it formal or informal, that provides an incentive to RPS providers to provide a competitive bid.

78.     All of these standards are accepted and understood by prudent plan fiduciaries and were, or should have been, understood by Defendants at all times during the Class Period. This is because prudent fiduciaries understand that excessive fees significantly impact the value of participants' retirement accounts.

C.     **DEFENDANTS IMPRUDENTLY PERMITTED THE PLAN TO PAY EXCESSIVE RPS FEES**

79.     From 2015 through 2019 the Plan's RPS provider was Wells Fargo Bank, N.A.. During the Class Period, Wells Fargo charged the Plan fees that were excessive relative to the RPS received by the Plan when compared with other similar-sized plans. These excessive fees led to lower net returns, eating into and substantially reducing Plaintiffs' and Plan participants' retirement savings. In approximately June 2020, the Plan switched to Fidelity Investments as its RPS provider.  The Plan's 2020 Form 5500 is not yet publicly available.

80.     During the Class Period, Plan participants paid a portion of the fees for retirement plan services directly through deductions from their accounts.  During the Class Period, the Plan disclosed payment of the following RPS fees to Wells Fargo, as seen in Schedule C of the Plan's Forms 5500:

| Compensation to Wells Fargo (source: Forms 5500, Schedule C) | | | |
|---|---|---|---|
| **Plan Year** | **Direct** | **Service Codes** | **Service Code Explanations** |
| 2015 | $ 957,923 | 15, 21, 37, 50, 62, 64 | Recordkeeping and information management (computing, tabulating, data processing, etc.); Trustee (bank, trust company, or similar financial institution); Participant loan processing; Direct Payment from Plan; Float revenue; Recordkeeping |

| | | | |
|---|---|---|---|
| 2016 | $720,243 | | fees |
| 2017 | $ 811,317 | | |
| 2018 | $ 803,716 | | |
| 2019 | $ 585,681 | | |
| **Total** | $ 3,878,880 | | |

81.     Additionally, the Plan (i.e., the participants) paid RPS fees indirectly through revenue sharing. The following table shows the total RPS fees paid to Wells Fargo, including direct and indirect compensation.

| Year | Direct RPS Fees | Indirect RPS Fees | Total RPS Fees |
|---|---|---|---|
| 2015 | $ 957,923 | $692,065 | $1,649,988 |
| 2016 | $720,243 | $714,513 | $1,434,756 |
| 2017 | $ 811,317 | $769,885 | $1,581,202 |
| 2018 | $ 803,716 | $696,779 | $1,500,495 |
| 2019 | $ 585,681 | $849,850 | $1,435,531 |
| Total | $ 3,878,880 | $3,723,092 | $7,601,972 |

82.     Based upon a review of the Plan's Forms 5500, and upon information and belief, the Plan did not rebate any of the monies received from revenue sharing back to Plan participants to offset the RPS fees paid by the participants.

83.     Prudent plan fiduciaries monitor and limit the amount of indirect compensation, such as 12b-1 and sub-transfer agency fees, to make sure that plan participants are not overcharged for recordkeeping, and require that excessive fees be rebated to plan participants. Here, Defendants failed to properly monitor the indirect compensation paid to Wells Fargo, which caused the Plan to pay excessive RPS fees for the Class Period.

84.     During the Class Period, Plaintiffs and Plan participants each paid between $159 and $194 per year in RPS expenses. The table below shows the actual and average yearly per-participant RPS fees paid by participants, including by direct charges to their accounts and indirect payments made by the Plan:

| Retirement Plan Service (RPS) Fees Per-Participant Cost (source: Forms 5500) | | | | | | |
|---|---|---|---|---|---|---|
| | Plan Year | | | | | |
| | **2015** | **2016** | **2017** | **2018** | **2019** | *Average* |
| Participants | 8,486 | 9,043 | 8,179 | 8,232 | 8,870 | **8,562** |
| | | | | | | |
| Total RPS Fees | $1,649,988 | $1,434,756 | $1,581,202 | $1,500,495 | $1,435,531 | **$1,520,394** |
| | | | | | | |
| Per-Participant RPS Fee | $194 | $159 | $193 | $182 | $162 | **$178** |

85.     The table illustrates that the Plan had on average 8,562 participants and paid an average effective annual RPS fee of approximately $1,520,394, which equates to an average of approximately $178 per participant, per year. This fee is exorbitant and unreasonable. Defendants' decision to maintain this RPS relationship with Wells Fargo in which Plan participants were paying on average $178 per person per year, was imprudent. This high per-participant RPS expense is not in line with the fees paid by participants in other similar plans administered by prudent fiduciaries.

86.     The Plan's fiduciaries were required to continuously monitor RPS fees, and to regularly solicit competitive bids to ensure fees being paid to Wells Fargo were reasonable. However, Defendants failed to employ prudent processes for ensuring that fees were and remained reasonable. To the extent there was a process in place that was followed by Defendants, it was imprudent and ineffective given the objectively unreasonable RPS fees paid.

87.     Due to Defendants' fiduciary failures and the absence of prudent fiduciary

processes to monitor fees for reasonableness, the Plan's RPS fees were significantly higher than they would have been had Defendants engaged in prudent processes, and they were significantly higher than RPS fees assessed to participants in similar plans. The table below illustrates the effective annual per-participant RPS fees paid in 2018 by other comparable plans with similar numbers of participants derived from Form 5500 filings, compared to the average effective annual per-participant retirement plan service fee paid by the Plan from 2015 through 2019 (as identified in the table above) during the Class Period.

**Comparable Plans' RPS Fees Based on Publicly Available Information from Form 5500[1]**

| Plan | Participants | Assets | RPS Price | RPS Price /pp | Recordkeeper | Graph Color |
|---|---|---|---|---|---|---|
| Healthfirst Profit Sharing 401(K) Plan | 4,950 | $227,721,800 | $201,889 | $41 | Vanguard | Blue |
| Smithfield Foods, Inc. Salaried 401(K) Plan | 6,149 | $500,178,777 | $278,907 | $45 | Great-West | Blue |
| Genesis Health System Retirement Savings Plan | 6,260 | $231,793,794 | $325,894 | $52 | Transamerica | Blue |
| Flowserve Corporation Retirement Savings Plan | 6,395 | $892,435,613 | $263,380 | $41 | T. Rowe Price | Blue |
| St. Luke's Health Network 403(B) Plan | 7,142 | $241,600,647 | $333,578 | $47 | Transamerica | Blue |
| Memorial Health System Defined Contribution Retirement Savings Plan | 7,318 | $221,242,194 | $385,754 | $53 | Transamerica | Blue |
| The Boston Consulting Group, Inc. Employees' Savings Plan And Profit Sharing Retirement | 8,067 | $894,454,060 | $336,660 | $42 | Vanguard | Blue |
| **Wesco Plan Average Fee** | **8,562** | **$670,742,749** | **$1,520,394** | **$178** | **Wells Fargo** | **Red** |
| Children's Medical Center Of Dallas Employee Savings Plan 403(B) | 9,356 | $349,335,673 | $337,416 | $36 | Fidelity | Blue |
| Ralph Lauren Corporation 401(K) Plan | 9,389 | $552,586,935 | $290,066 | $31 | T. Rowe Price | Blue |
| Vibra Healthcare Retirement Plan | 9,750 | $107,652,510 | $277,532 | $28 | Great-West | Blue |
| Centerpoint Energy Savings Plan | 9,802 | $2,108,802,293 | $442,946 | $45 | Voya | Blue |
| Republic National 401(K) Plan | 9,922 | $671,989,837 | $324,171 | $33 | Great-West | Blue |

| | | | | | |
|---|---|---|---|---|---|
| Edward- Elmhurst Healthcare Retirement Savings Plan | 10,263 | $618,238,970 | $446,836 | $44 | Fidelity | Blue |
| Southern California Permanente Medical Group Tax Savings Retirement Plan | 10,770 | $773,795,904 | $333,038 | $31 | Vanguard | Blue |
| Sutter Health Retirement Income Plan | 13,248 | $406,000,195 | $460,727 | $35 | Fidelity | Blue |
| Fortive Retirement Savings Plan | 13,502 | $1,297,404,611 | $472,673 | $35 | Fidelity | Blue |
| DHL Retirement Savings Plan | 14,472 | $806,883,596 | $483,191 | $33 | Fidelity | Blue |

[1]Except for the Plan, price calculations are based on 2018 Form 5500 information.

88.     Similarly, the graph below illustrates the average annual RPS fee paid by the Plan compared to the effective annual per participant RPS fee paid by the plans identified in the table above, with the white data points representing RPS fees that RPS providers offered to (and were accepted by) comparable Plans for the materially identical level of services.



89.     As the above graph makes clear, during the Class Period, both plans with fewer

participants (for which the reasonable per-participant RPS fees are higher), and plans with a similar number of participants, paid a significantly lower effective per-participant RPS fee than the Plan paid.

90.     This graph illustrates that other RPS providers would have accepted much lower RPS fees for materially identical services to those provided to the Plan by Wells Fargo.

91.     The level and quality of service provided by Wells Fargo as the Plan RPS provider did not justify paying on average more than two-and-a-half times the reasonable market rate for retirement plan services.

92.     Because revenue sharing payments are asset-based, the already-excessive compensation paid to the Plan's RPS provider became even more excessive as the Plan's assets grew, even though the administrative services provided to the Plan remained the same. Defendants could have capped the amount of revenue sharing to ensure that any excessive amounts were returned to the Plan as other prudently administered plans do, but failed to do so.

93.     Had Defendants been acting in the exclusive best interest of the Plan's participants and engaged in prudent processes for selecting and negotiating with RPS providers, rather than Plan participants paying an effective average of approximately $178 per participant per year in RPS fees from 2015-2019, the Defendants would have identified one of the many RPS providers that would have accepted on average around $40 per participant per year for the Plan.

94.     The $178 per-participant-per-year average is more than four times the amount charged to participants in similar plans where prudent fiduciaries have established and maintained a prudent process for selecting and monitoring the fees of RPS providers. Prudent fiduciaries would have never initially agreed to the RPS fees being assessed to the Plan participants starting in 2015, nor would prudent fiduciaries have permitted the unreasonable RPS fees to continue in

perpetuity.

95.    Defendants did not regularly and/or prudently assess the Plan's RPS fees being paid to Wells Fargo. Defendants did not engage in any regular and/or reasonable examination and competitive comparison of the RPS fees it paid to Wells Fargo vis-à-vis the fees that other RPS providers would charge for the same services from, at least, 2015 through 2019. Had Defendants done so, they would have saved the Plan and its participants millions in lost retirement savings. Upon information and belief, the Plan fiduciaries did not conduct a prudent evaluation of reasonable market rates for RPS services when it transitioned to Fidelity Investments and, as a result, is now continuing to pay unreasonable RPS fees to Fidelity.

96.    Defendants knew or should have known that ERISA's duties of loyalty and prudence required them to consider and seek quotes from RPS providers other than Wells Fargo in view of the fees Wells Fargo was charging, and to engage in processes to evaluate the reasonableness of the Plan's RPS fees, but Defendants simply failed to do so. Had Defendants done so, they would have concluded that the Plan was compensating Wells Fargo unreasonably and inappropriately in view of the Plan's size and scale, passing these objectively unreasonable and excessive fee burdens to Plaintiffs and Plan participants, and that the fees were excessive relative to the services received.

97.    Defendants' failure to recognize that the Plan and its participants were grossly overcharged for RPS fees, and their failure to take effective remedial actions, shows a lack of, or a complete disregard for, a prudent process, and was a breach of their fiduciary duties to Plaintiffs and the Plan participants.

98.    Defendants imprudently failed to monitor and control the compensation paid by the Plan for RPS, including direct compensation, sub-transfer agency fees, and asset-based revenue

sharing paid to Wells Fargo. Had Defendants monitored the compensation paid to Wells Fargo and ensured that participants were only charged reasonable RPS fees, Plan participants would not have lost millions of dollars in their retirement savings over the last six years.

D.    **DEFENDANTS IMPRUDENTLY CHOSE MUTUAL FUND SHARE CLASSES WITH HIGHER COSTS EVEN THOUGH LESS EXPENSIVE SHARES OF THE SAME FUNDS WERE AVAILABLE**

99.    On average, there are lower expense ratios for 401(k) participants than those for other investors. *See* Investment Company Institute ("ICI"), *The Economics of Providing 401(k) Plans: Services, Fees, and Expenses, 2015*, (July 2016) at 11, https://ici.org/pdf/per22-04.pdf. ERISA-mandated monitoring of investments leads prudent and impartial plan sponsors to continually evaluate performance and fees, resulting in great competition among mutual funds in the marketplace. Furthermore, the large average account balances of 401(k) plans, especially the largest ones as measured by assets managed, lead to economies of scale and special pricing within mutual funds. *See id* at 10.

100.    Many mutual funds offer multiple classes of shares in a single mutual fund that are targeted at different investors. Generally, more expensive share classes are targeted at smaller investors with less bargaining power, while lower-cost shares are targeted at institutional investors with more assets, generally $1 million or more, and therefore greater bargaining power. There is no difference between share classes other than cost—the funds hold identical investments and have the same manager.

101.    Large defined contribution plans such as the Plan have sufficient assets to qualify for the lowest cost share class available. Even when a plan does not yet meet the investment minimum to qualify for the cheapest available share class, it is well-known among institutional investors that mutual fund companies will typically waive those investment minimums for a large

plan adding the fund in question to the plan as a designated investment alternative. Simply put, a fiduciary to a large defined contribution plan such as the Plan can use its asset size and negotiating power to invest in the cheapest share class available. For this reason, prudent retirement plan fiduciaries will search for and select the lowest-priced share class available.

102.    One 2016 article written by the head of a fiduciary consulting firm described the failure to investigate the availability of and subsequently utilize the lowest-cost share class as an "egregious fiduciary breach[]" that is responsible for "[w]asting plan assets" in a manner that is "clearly imprudent." Blaine F. Aikin (exec. chairman of fi360 Inc.), *Recent Class-Action Surge Ups the Ante for 401(k) Advice*, INVESTMENTNEWS (Feb. 18, 2016), https://www.investmentnews.com/recent-class-action-surge-ups-the-ante-for-401k-advice-66056. Indeed, in 2017 a court observed that "[b]ecause the institutional share classes are otherwise *identical* to the retail share classes, but with lower fees, a prudent fiduciary would know immediately that a switch is necessary. Thus, the 'manner that is reasonable and appropriate to the particular investment action, and strategies involved ... in this case would mandate a prudent fiduciary – who indisputably has knowledge of institutional share classes and that such share classes provide identical investments at lower costs – to switch share classes immediately." *Tibble v. Edison Int'l*, No. 07-5359 SVW (AGRx), 2017 WL 3523737 *12 (C.D. Cal. Aug. 16, 2017).

103.    Here, the Defendants consistently chose mutual fund share classes with higher operating expenses when identical lower-cost shares of the same funds were available. The following table compares the operating expense paid for Plan investment options with lower-priced share classes offered by the same mutual fund:

| Fund in Plan | 2020 Exp. Ratio | Lower Cost Share Class | 2020 Exp. Ratio | Difference |
|---|---|---|---|---|
| American Funds AMCAP Fund® Class R-5 | 0.39% | Class R-6 | 0.34% | 0.05% |

| | | | | |
|---|---|---|---|---|
| Artisan Mid Cap Fund Investor Class | 1.18% | Advisor | 1.05% | 0.13% |
| T. Rowe Price QM U.S. Small-Cap Growth Equity Fund | 0.79% | I | 0.65% | 0.14% |
| Loomis Sayles Investment Grade Bond Fund Class A | 0.81% | N | 0.45% | 0.36% |
| American Funds American Balanced Fund Class R-5 | 0.31% | R-6 | 0.26% | 0.05% |
| MFS Value Fund Class R3 | 0.83% | R-6 | 0.47% | 0.35% |
| JPMorgan Mid Cap Value Fund Class L | 0.84% | R-6 | 0.74% | 0.10% |
| Lazard International Strategic Equity Portfolio Open Share | 1.06% | Institutional | 0.80% | 0.26% |
| American Funds Retirement Income Portfolio -Conservative Class R-5 | 0.35% | R-6 | 0.31% | 0.04% |
| American Funds 2015 Target Date Retirement Fund Class R-5E | 0.45% | R-6 | 0.31% | 0.14% |
| American Funds 2020 Target Date Retirement Fund Class R-5E | 0.45% | R-6 | 0.31% | 0.14% |
| American Funds 2025 Target Date Retirement Fund Class R-5E | 0.48% | R-6 | 0.33% | 0.15% |
| American Funds 2030 Target Date Retirement Fund Class R-5E | 0.50% | R-6 | 0.35% | 0.15% |
| American Funds 2035 Target Date Retirement Fund® Class R-5E | 0.52% | R-6 | 0.37% | 0.15% |
| American Funds 2040 Target Date Retirement Fund Class R-5E | 0.53% | R-6 | 0.38% | 0.15% |
| American Funds 2045 Target Date Retirement Fund Class R-5E | 0.54% | R-6 | 0.38% | 0.16% |
| American Funds 2050 Target Date Retirement Fund Class R-5E | 0.54% | R-6 | 0.39% | 0.15% |
| American Funds 2055 Target Date Retirement Fund® Class R-5E | 0.54% | R-6 | 0.40% | 0.14% |
| American Funds 2060 Target Date Retirement Fund Class R-5E | 0.55% | R-6 | 0.41% | 0.14% |

104.    In this case, there is no justification for the Plan fiduciaries to choose the more expensive share classes because the direct compensation paid to Wells Fargo greatly exceeded a reasonable fee for the RPS provided by Wells Fargo. This is further evidence of the fiduciaries' imprudence in the administration of the Plan.

105.    Although the higher fees charged by the more expensive share classes may appear

small, the higher fees cost the Plan participants hundreds of thousands of dollars per year. For example, in 2019 alone the Plan participants who invested in MFS Value Fund Class R3 shares paid more than $100,000 in excess mutual fund operating expenses over what they would have paid for the same fund if they invested in the available R-6 share class. Overall, the Plan participants paid excess costs of more than $600,000 per year because Defendants imprudently failed to offer available lower-cost share classes.

## V.    **ERISA'S FIDUCIARY STANDARDS**

106.    Under ERISA, a person is a fiduciary to the extent he or she: (1) exercises any discretionary authority or control over management of the Plan or the management or disposition of its assets; (2) renders investment advice regarding Plan assets for a fee or other direct compensation, or has the authority or responsibility to do so; or (3) has any discretionary authority or control over Plan administration. ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

107.    As set forth above and herein, Defendants are Plan fiduciaries. ERISA imposes strict fiduciary standards of loyalty and prudence on Defendants as Plan fiduciaries. 29 U.S.C. § 1104(a)(1) provides in relevant part:

(1)    . . . a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and –

(A)  for the exclusive purpose of:

(i) providing benefits to participants and their beneficiaries; and

(ii) defraying reasonable expenses of administering the plan; [and]

(B)  with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;

* * *

(D)  in accordance with the documents and instruments governing

> the plan insofar as such documents and instruments are
> consistent with [ERISA].

108.    29 U.S.C. § 1103(c)(1) provides in relevant part:

> [T]he assets of a plan shall never inure to the benefit of any employer and shall be
> held for the exclusive purposes of providing benefits to participants in the plan and
> their beneficiaries and defraying reasonable expenses of administering the plan.

109.    ERISA fiduciary duties are the highest known to the law and must be performed

with an eye exclusively to the interests of participants. ERISA fiduciaries exercising authority or

control over plan assets, including the selection of plan service providers, must act prudently and

for the exclusive benefit of participants in the plan, and not for the benefit of others, including RPS

providers to the Plan or firms who provide investment products and services. Fiduciaries must

ensure that the amount of fees paid to those service providers is no more than reasonable. DOL

Adv. Op. 97-15A; DOL Adv. Op. 97-16A; *see also* 29 U.S.C. §1103(c)(1). Defendants' fiduciary

duties apply continuously in the administration of the Plan and do not abate upon the engagement

of service providers. Fiduciaries must ensure that the amount of fees paid to service providers is

reasonable, and they have an ongoing duty to monitor fees being paid to plan service providers for

reasonableness.

110.    ERISA also imposes co-fiduciary liabilities on Plan fiduciaries. 29 U.S.C. §

1105(a) provides a cause of action against a fiduciary for knowingly participating in a breach by

another fiduciary and knowingly failing to cure any breach of duty:

> In addition to any liability which he may have under any other provisions of this
> part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary
> responsibility of another fiduciary with respect to the same plan in the following
> circumstances:
>
>> (1) if he participates knowingly in, or knowingly undertakes to conceal, an act
>> or omission of such other fiduciary, knowing such act or omission is a breach;
>> [or]

> (2) if, by his failure to comply with section 1104(a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
>
> (3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

111.    29 U.S.C. §1132(a)(2) of ERISA authorizes a participant to bring a civil action under 29 U.S.C. §1109(a), which provides:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary. A fiduciary may also be removed for a violation of section 1111 of this title.

112.    Section 1132(a)(3) authorizes a participant to bring a civil action "(A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan."

## VI.    CLASS ACTION ALLEGATIONS

113.    Pursuant to 29 U.S.C. § 1132(a)(2), ERISA authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. § 1109(a).

114.    In acting in this representative capacity and to enhance the due process protections of unnamed participants and beneficiaries of the Plan, as an alternative to direct individual actions on behalf of the Plan under 29 U.S.C. § 1132(a)(2) and (3), Plaintiffs seek to certify this action as a class action on behalf of all participants and beneficiaries of the Plan. Plaintiffs seek to certify, and to be appointed as the representatives of, the following class (the "Class"):

All participants in and beneficiaries to the Wesco Distribution, Inc. Retirement Savings Plan from March 26, 2015, through the date of judgment.

115.    Excluded from the Class are Defendants and any Plan fiduciaries. Plaintiffs reserve the right to modify, change, or expand the Class definition based upon discovery and further investigation.

116.    This action meets the requirements of Rule 23 of the Federal Rules of Civil Procedure and is certifiable as a class action for the following reasons:

117.    **Numerosity**: The Class is so numerous that joinder of all members is impracticable. While the exact number and identities of individual members of the Class is unknown at this time, such information being in the sole possession of Defendants and obtainable by Plaintiffs only through the discovery process, Plaintiffs believe, and on that basis allege, that many thousands of persons comprise the Class. Per Form 5500 filed with the DOL for the Plan year ending December 31, 2019, the Class includes at least 9,867 individual current Plan participants.

118.    **Existence and Predominance of Common Questions of Law and Fact:** Common questions of law and fact exist as to all members of the Class because Defendants owed fiduciary duties to the Plan and to all Plan participants and beneficiaries, and took the actions and omissions alleged herein as to the Plan and not as to any individual participant. These questions predominate over the questions affecting individual Class members. These common legal and factual questions include, but are not limited to:

a.    whether the fiduciaries are liable for the remedies provided by 29 U.S.C. § 1109(a);

b.    whether Defendants were fiduciaries to the Plan under ERISA;

c.    whether Defendants breached fiduciary duties to the Plan in violation of ERISA;

d.      whether the Plan and Plan participants are entitled to damages or monetary relief as a result of Defendants' breaches of fiduciary duties;

e.      if so, the amount of damages or monetary relief that should be provided to the Plan and its participants;

f.      what Plan-wide equitable and other relief the Court should impose in light of Defendants' breaches; and

g.      whether the Plan and its participants are entitled to any other relief as a result of Defendants' breaches and conduct alleged herein.

119.    Given that Defendants have engaged in a common course of conduct as to Plaintiffs and the Class, similar or identical injuries and violations are involved, and common questions far outweigh any potential individual questions.

120.    **Typicality**: All of Plaintiffs' claims are typical of the claims of the Class because Plaintiffs were, and are, Plan participants during the Class Period and all Plan participants were harmed by the uniform acts and conduct of Defendants discussed herein. Plaintiffs, all Class members, and the Plan sustained monetary and economic injuries including, but not limited to, ascertainable losses in retirement income and retirement account value, arising out of Defendants' breaches of their fiduciary duties to the Plan.

121.    **Adequacy:** Plaintiffs are adequate representatives for the Class because Plaintiffs' interests do not conflict with the interests of the Class that they seek to represent; Plaintiffs were Plan participants during the Class Period and continue to participate in the Plan; and Plaintiffs are committed to vigorously representing the Class. Plaintiffs have retained counsel who are competent and highly experienced in complex class action litigation – including ERISA and other complex financial class actions – and counsel intend to prosecute this action vigorously. The

interests of the Class will be fairly and adequately protected by Plaintiffs and Plaintiffs' counsel.

122.    **Superiority:** A class action is the superior method for the fair and efficient adjudication of this controversy because joinder of all participants and beneficiaries is impracticable, the losses suffered by individual participants and beneficiaries may be small, and it would be impracticable for individual members to enforce their rights through individual actions. Even if Class members could afford individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, an economy of scale, and comprehensive supervision by a single court. Upon information and belief, members of the Class can be readily identified and notified based on, *inter alia*, the records (including databases, e-mails, etc.) that Defendants maintain regarding the Plan. Given the nature of the allegations, no Class member has an interest in individually controlling the prosecution of this matter, and Plaintiffs are aware of no difficulties likely to be encountered in the management of this matter as a class action.

123.    Defendants have acted or refused to act on grounds generally applicable to Plaintiffs and the other members of the Class, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Class as a whole.

## VII.    CAUSES OF ACTION

**COUNT I**
**Breach of Duty of Prudence Under ERISA:**
**Imprudent and Unreasonable RPS Fees and Excessive Mutual Fund**
**Operating Costs**
**(Plaintiffs, individually and on behalf of the Class)**

124.    Plaintiffs incorporate the above allegations as if fully set forth herein.

125.    Defendants are fiduciaries of the Plan under 29 U.S.C. §§ 1002(21) and/or 1102(a)(1).

126.    29 U.S.C. § 1104 imposes fiduciary duties of prudence upon Defendants in their administration of the Plan.

127.    Defendants, as fiduciaries of the Plan, are responsible for selecting an RPS provider that charges reasonable retirement plan service fees.

128.    During the Class Period, Defendants had a fiduciary duty to do all of the following:

      a.    ensure that the Plan's retirement plan service fees were reasonable;

      b.    manage the assets of the Plan for the sole and exclusive benefit of Plan participants and beneficiaries;

      c.    defray reasonable expenses of administering the Plan; and

      d.    act with the care, skill, diligence, and prudence required by ERISA.

129.    During the Class Period, Defendants had a continuing duty to regularly monitor and evaluate the Plan's RPS provider to make sure it was providing the contracted services at reasonable costs, given the highly competitive market surrounding recordkeeping services and the significant bargaining power the Plan had to negotiate the best fees.

130.    During the Class Period, Defendants had a continuing duty to lower the Plan's costs by regularly monitoring and evaluating the Plan's investment options to make sure it was offering mutual fund share classes with the lowest available operating expenses.

131.    During the Class Period, Defendants breached their fiduciary duty of prudence to Plan participants, including Plaintiffs, by:

a.    Allowing the Plan to pay multiples of the reasonable per-participant amount for the Plan's retirement plan service fees;

b.    Failing to properly disclose the fees charged to Plan participants in their quarterly statements or fee disclosures;

c.    Failing to defray reasonable expenses of administering the Plan;

d.    Failing to investigate the availability of lower-cost share classes of certain mutual funds in the Plan; and

e.    Failing to act with the care, skill, diligence, and prudence required by ERISA.

132.    During the Class Period, Defendants breached their duty to Plan participants, including Plaintiffs, by failing to employ or follow a prudent process to critically or objectively evaluate the cost and performance of the Plan's RPS provider in comparison to other RPS options.

133.    During the Class Period, Defendants breached their duty to Plan participants, including Plaintiffs, by failing to employ or follow a prudent process to critically or objectively evaluate the availability of lower-cost share classes of certain mutual funds in the Plan.

134.    Through these actions and omissions, Defendants breached their fiduciary duties of prudence with respect to the Plan in violation of 29 U.S.C. § 1104(a)(1)(A).

135.    Defendants failed to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of a like character and with like aims, thus breaching their duties under 29 U.S.C. § 1104(a)(1)(B).

136.    As a result of Defendants' breach of fiduciary duties, Plaintiffs and Plan participants suffered objectively unreasonable and unnecessary monetary losses.

137.    Defendants are liable under 29 U.S.C. §§ 1109(a) and 1132(a)(2) to make good to the Plan the losses resulting from the breaches, to restore to the Plan any profits Defendants made through the use of Plan assets, and to restore to the Plan any profits resulting from the breaches of fiduciary duties alleged in this Count. In addition, Defendants are subject to other equitable relief pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2) and (3).

**COUNT II**
**Failure to Adequately Monitor Other Fiduciaries Under ERISA:**
**Imprudent and Unreasonable RPS Fees**
**(Plaintiffs, individually and on behalf of the Class)**

138.    Plaintiffs incorporate the above allegations as if fully set forth herein.

139.    Defendants had the authority to appoint and remove individuals responsible for retirement plan service fees for the Plan and knew or should have known that these fiduciaries had critical responsibilities for the Plan.

140.    In light of this authority, Defendants had a duty to monitor those individuals responsible for overseeing retirement plan service fees for the Plan to ensure that they were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that these individuals were not fulfilling those duties.

141.    Defendants had a duty to ensure that the individuals responsible for Plan administration possessed the needed qualifications and experience to carry out their duties (or used qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analyses respecting Plan decisions; and reported regularly to Defendants.

142.    Defendants breached their fiduciary duties by, among other things:

        a.      Failing to monitor and evaluate the performance of individuals responsible for retirement plan service fees for the Plan, or have a system in place for doing so, standing

idly by as the Plan suffered significant losses in the form of unreasonably high retirement plan service fee expenses;

b.      Failing to monitor the process by which the Plan RPS provider was evaluated and failing to investigate the availability of lower-cost RPS providers;

c.      Failing to remove individuals responsible for RPS fees for the Plan whose performance was inadequate in that these individuals continued to pay the same RPS fees even though benchmarking and using other similar comparators would have shown that maintaining Wells Fargo as the RPS provider altogether or at the current level of fees being paid to it was imprudent and excessively costly, all to the detriment of the Plan and Plan participants' retirement savings;

f.      Failing to monitor the process by which the Plan investigated the availability of lower-cost share classes of certain mutual funds in the Plan; and

g.      Failing to remove individuals responsible for excessive mutual fund operating expenses for the Plan whose performance was inadequate in that these individuals continued to offer the same higher-cost share classes even though a review of the fund prospectus would have shown that lower-cost share classes were available, and that maintaining the Plan investment options in the current share classes was imprudent and excessively costly, all to the detriment of the Plan and Plan participants' retirement savings.

143.    As consequences of the foregoing fiduciary breaches, Plaintiffs and Plan participants suffered unreasonable and unnecessary monetary losses.

144.    Pursuant to 29 U.S.C. §§1109(a) and 1132(a)(2), Defendants are liable to restore to the Plan all losses caused by their failure to adequately monitor individuals responsible for

retirement plan service fees for the Plan. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief.

## VIII.    PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray that judgment be entered against Defendants on all claims and request that the Court award the following relief:

A.    A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative Rule 23(b)(2), of the Federal Rules of Civil Procedure;

B.    Designate Plaintiffs as Class Representatives and Plaintiffs' counsel as Class Counsel;

C.    A declaration stating that Defendants have breached their fiduciary duties under ERISA;

D.    An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of fiduciary duty, including restoring to the Plan all losses resulting from the failure to properly monitor and control RPS fees, and restoring to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

E.    An Order enjoining Defendants from any further violation of their ERISA fiduciary responsibilities, obligations, and duties;

F.    Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of Plan fiduciaries deemed to have breached their fiduciary duties;

G.    An award of pre-judgment interest;

H.    An award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

I.    Such other and further relief as the Court deems equitable and just.

## IX.    NOTICE PURSUANT TO ERISA SECTION 502(h)

To ensure compliance with the requirements of ERISA § 502(h), 29 U.S.C. § 1132(h), the undersigned affirms, that upon this filing of this Class Action Complaint with redactions as

approved by the Court, a true and correct copy of this Class Action Complaint will be served upon

the Secretary of Labor and the Secretary of Treasury by certified mail, return receipt requested.

Dated: March 26, 2021                By: */s/ Alex M. Kashurba*
                                     Steven A. Schwartz (PA ID No. 50579)
                                     Alex M. Kashurba (PA ID No. 319003)
                                     CHIMICLES SCHWARTZ KRINER
                                     & DONALDSON-SMITH LLP
                                     361 W. Lancaster Avenue
                                     Haverford, PA 19041
                                     Tel: (610) 642-8500
                                     Fax: 610-649-3633
                                     Email: sas@chimicles.com

                                     Paul R. Wood (*pro hac vice* forthcoming)
                                     Timothy Foster (*pro hac vice* forthcoming)
                                     FRANKLIN D. AZAR & ASSOCIATES, P.C.
                                     14426 East Evans Avenue
                                     Aurora, CO 80014
                                     Telephone: (303) 757-3300
                                     Fax: (720) 213-5131
                                     Email: woodp@fdazar.com
                                     fostert@fdazar.com

                                     *Counsel for Plaintiffs*