## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ROBERT MATOR and NANCY MATOR, individually and as representatives of a class of participants and beneficiaries in and on behalf of the WESCO DISTRIBUTION, INC. RETIREMENT SAVINGS PLAN,<br><br>Plaintiffs,<br><br>v.<br><br>WESCO DISTRIBUTION, INC.;<br><br>and<br><br>THE ADMINISTRATIVE AND INVESTMENT COMMITTEE FOR WESCO DISTRIBUTION, INC. RETIREMENT SAVINGS PLAN;<br><br>and<br><br>JOHN AND JANE DOES 1-30,<br><br>Defendants. | Civil Action No. 2:21-cv-00403-MJH<br><br>AMENDED COMPLAINT – CLASS ACTION<br><br>JURY TRIAL DEMANDED |

## AMENDED COMPLAINT

1.     Plaintiffs Robert Mator and Nancy Mator (collectively, "Plaintiffs"), on behalf of the Wesco Distribution, Inc. Retirement Savings Plan (the "Plan"),  individually and as representative of a class of participants and beneficiaries, bring this action asserting claims for breaches of fiduciary duties and other violations of 29 U.S.C. §1132(a)(2) and (3) against Wesco Distribution, Inc. ("Wesco"), the Administrative and Investment Committee for the Wesco Distribution, Inc. Retirement Savings Plan (the "Committee"), and John and Jane Does 1-30, (collectively, "Defendants").

## I.    **INTRODUCTION**

2.      Every year, millions of employees entrust their retirement savings to plans established under ERISA. ERISA plans are supposed to be protected by their fiduciaries, who are obligated to act loyally and prudently to protect plan participants and their hard-earned retirement dollars.

3.      As of September 2021, Americans had approximately $10.4 trillion in assets invested in defined contribution plans, such as 401(k) and 403(b) plans.[1] Defined contribution plans have largely replaced defined benefit plans—or pension plans—that were predominant in previous generations.[2] Today, only 17% of private sector employees have access to a defined benefit plan, while 64% have access to a defined contribution plan.  *Id.*

4.      ERISA's fiduciary duties are among "the highest known to the law." *Sweda v. Univ. of Pa.*, 923 F.3d 320, 333 (3rd Cir. 2019), *cert. denied*, 140 S. Ct. 2565 (2020) (internal citation and quotations omitted). Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B).

5.      The essential remedial purpose of ERISA is to protect the beneficiaries of private retirement plans. ERISA fiduciaries have a continuing duty to evaluate fees and expenses assessed to a plan in order to make sure those charges are reasonable and prudent.

6.      Failures by ERISA fiduciaries to monitor costs for reasonableness have stark financial consequences for retirees. Every extra level of expenses imposed upon plan participants compounds over time and reduces the value of participants' investments available upon retirement.

---

[1] *See Retirement Assets Total $37.2 Trillion in Second Quarter 2021,* INVESTMENT COMPANY INSTITUTE (Sept. 27, 2021), https://www.ici.org/statistical-report/ret_21_q2.

[2] *See* James McWhinney, *The Demise of the Defined-Benefit Plan*, INVESTOPEDIA (Updated Nov. 16, 2020), https://www.investopedia.com/articles/retirement/06/demiseofdbplan.asp.

7.       The Plan is a defined contribution plan in which each individual participant has an account where a defined amount can be contributed by the participant, by Wesco, or by both. With 8,284 participants and more than $837 million in net assets as of December 31, 2020, based on publicly-available Form 5500 data,[3] the Plan is larger than 99.60% of defined contribution plans in terms of participants and larger than 99.83% in terms of assets and is thus considered a "large" retirement plan.

8.       The Defendants are ERISA fiduciaries pursuant to 29 U.S.C. § 1002(21)(A), because they exercise discretionary authority or discretionary control over the Plan, which Defendants sponsor and administer. As fiduciaries to the Plan, Defendants were and are obligated to prudently ensure that Plan fees and expenses are reasonable.

9.       The marketplace for retirement plan services is well-established and highly competitive. As a large plan since, at least, 2015, the Plan had tremendous bargaining power to demand low-cost administrative and investment management services.

10.       As a fiduciary to the Plan, Defendants are obligated to limit the Plan's expenses to a reasonable amount, to ensure that each fund in the Plan is a prudent option for participants to invest their retirement savings and priced at a reasonable level for the size of the Plan, and to analyze costs and benefits of alternatives for the Plan's administrative and investment structure. As prudent plan fiduciaries, Defendants must continuously monitor investment fees against applicable benchmarks, peer groups, and  the market, in order to identify objectively unreasonable and unjustifiable fees.

11.       Instead of leveraging the Plan's substantial bargaining power to limit expenses and determine what investments to include in the Plan, Defendants caused the Plan to imprudently pay

---

[3] *See* https://sec.report/Document/0000929008-21-000022/ (last visited Oct. 17, 2021)

unreasonable and excessive fees for retirement plan services.

12.     Defendants breached their fiduciary duties owed to the Plan, to Plaintiffs, and all other Plan participants by imprudently: (a) allowing unreasonable recordkeeping and administrative expenses to be charged to the Plan; and (b) selecting, retaining, and/or otherwise ratifying higher-cost investments, instead of offering more prudent alternative investments when such prudent investments were readily available at the time they were chosen for inclusion within the Plan and throughout the Class Period (defined below).

13.     Plaintiffs were injured by the Defendants' actions because Defendants permitted all Plan participants to be charged excessive recordkeeping and administrative expenses fees, which reduced Plaintiffs' and other Plan participants' account balances and caused them significantly diminished investment returns.

14.     To remedy Defendants' fiduciary breaches, Plaintiffs, individually and as representatives of a class of participants and beneficiaries in the Plan, bring this action on behalf of the Plan under 29 U.S.C. § 1132(a)(2) and (3) to enforce Defendants' personal liability under 29 U.S.C. § 1109(a) to make good to the Plan all losses resulting from each breach of fiduciary duty and to restore to the Plan all losses resulting from each breach of fiduciary duty, as alleged in more detail herein. In addition, Plaintiffs seek such other equitable or remedial relief for the Plan as the Court may deem appropriate.

15.     The allegations in this Complaint are based upon information and belief and an investigation by undersigned counsel, including, but not limited to, review of Plan filings with the United States Department of Labor ("DOL"), other publicly available documents, and other analytical investment data. Defendants have possession of additional material information relating to the claims herein, and Plaintiffs reserve the right to amend this Complaint as those materials

become available in the course of this litigation.

## II.      JURISDICTION AND VENUE

16.      This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331, which provide for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. §§ 1001 *et seq.*

17.      This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, have significant contacts within this District, and because ERISA provides for nationwide service of process.

18.      This District is the proper venue for this action under 29 U.S.C. § 1132(e)(2) because the Plan is administered in this District; the Plan is deemed to reside in this District; some or all of the ERISA violations alleged herein took place in this District; and the Plan can be found in this District. Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## III.      PARTIES

### A.      Plaintiff Robert Mator

19.      Plaintiff Robert Mator is a resident of Cerritos, California. Mr. Mator is a current "participant" in the Plan, as that term is defined under 29 U.S.C §1002(7), because he has a vested account balance in the Plan and his beneficiaries are or may become eligible to receive benefits under the Plan. At all relevant times, Mr. Mator was and is a participant in the Plan. During the Class Period, Mr. Mator paid excessive RPS fees directly and indirectly through revenue sharing.

20.      During the Class Period, Mr. Mator held investments in Plan investment options that paid revenue sharing fees.

21.     Mr. Mator has Article III standing to bring this action on behalf of himself because he suffered an actual injury to his own individual Plan account in which he is still a participant, that injury is fairly traceable to Defendants' breaches of fiduciary duties in violation of ERISA, and the harm is likely to be redressed by a favorable judgment.

22.     The Plan also suffered harm caused by Defendants' fiduciary breaches and remains exposed to harm and continued future losses. The Plan is the victim of a fiduciary breach and will be the recipient of any recovery. Mr. Mator's claims are brought in a representative capacity on behalf of the Plan as a whole and seek remedies under 29 U.S.C. § 1109 to protect the entire Plan. Mr. Mator and all participants and beneficiaries in the Plan suffered ongoing financial harm as a result of Defendants' continued imprudent and unreasonable investment and fee decisions. Those injuries may be redressed by a judgment of this Court in favor of Mr. Mator.

23.     Mr. Mator did not have knowledge of all material facts (including, among other things, the retirement plan services and total cost comparisons to similarly-sized plans) necessary to understand that Defendants breached (and continue to breach) their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed. Mr. Mator lacked actual knowledge of reasonable fee levels and prudent fee alternatives available to the Plan.

**B.      Plaintiff Nancy Mator**

24.     Plaintiff Nancy Mator is a resident of Cerritos, California. Ms. Mator is a current "participant" in the Plan, as that term is defined under 29 U.S.C §1002(7), because she has a vested account balance in the Plan and her beneficiaries are or may become eligible to receive benefits under the Plan. At all relevant times, Ms. Mator was and is a participant in the Plan. During the Class Period, Ms. Mator paid excessive RPS fees directly and indirectly through revenue sharing.

25.     During the Class Period, Ms. Mator held investments in Plan investment options

that paid revenue sharing fees.

26.     Ms. Mator has Article III standing to bring this action on behalf of herself because she suffered an actual injury to her own individual Plan account in which she is still a participant, that injury is fairly traceable to Defendants' breaches of fiduciary duties in violation of ERISA, and the harm is likely to be redressed by a favorable judgment.

27.     The Plan also suffered harm caused by Defendants' fiduciary breaches and remains exposed to harm and continued future losses. The Plan is the victim of a fiduciary breach and will be the recipient of any recovery. Ms. Mator's claims are brought in a representative capacity on behalf of the Plan as a whole and seek remedies under 29 U.S.C. § 1109 to protect the entire Plan. Ms. Mator and all participants and beneficiaries in the Plan suffered ongoing financial harm as a result of Defendants' continued imprudent and unreasonable investment and fee decisions. Those injuries may be redressed by a judgment of this Court in favor of Ms. Mator.

28.     Ms. Mator did not have knowledge of all material facts (including, among other things, the retirement plan services and total cost comparisons to similarly-sized plans) necessary to understand that Defendants breached (and continue to breach) their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed. Ms. Mator lacked actual knowledge of reasonable fee levels and prudent fee alternatives available to the Plan.

**C.     Defendant Wesco Distribution, Inc.**

29.     Defendant Wesco Distribution, Inc. ("Wesco")[4] is a company with a principal place of business located at 225 West Station Square Drive, Suite 700, Pittsburgh, Pennsylvania 15219. Per the Plan's Forms 5500, Wesco is the Plan Administrator under 29 U.S.C. § 1002(16)(A)(i) and the Plan Sponsor under 29 U.S.C. § 1002(16)(B). As the Plan Administrator, Wesco is a fiduciary

---

[4] In this Complaint, "Wesco" refers to the named Defendant Wesco Distribution, Inc. and all parent, subsidiary, affiliated, predecessor, and successor entities to which these allegations pertain.

responsible for day-to-day administration and operation of the Plan, within the meaning of 29 U.S.C. § 1002(21)(A). It has authority and responsibility for the control, management, and administration of the Plan in accordance with 29 U.S.C. § 1102(a). Wesco has responsibility and discretionary authority to control the operation, management, and administration of the Plan, with all powers necessary to enable it to carry out such responsibilities properly, including the selection and compensation of the providers of recordkeeping and administrative services to the Plan. Wesco acted through its officers, directors, and the other Defendants to perform Plan-related fiduciary functions in the course and scope of their business. Wesco appointed other Plan fiduciaries, and accordingly had a concomitant fiduciary duty to monitor and supervise those appointees.

**D.    Defendant Administrative and Investment Committee for the Wesco Distribution, Inc. Retirement Savings Plan**

30.    Defendant Administrative and Investment Committee for the Wesco Distribution, Inc. Retirement Savings Plan ("Committee") is, on information and belief, located at 225 West Station Square Drive, Suite 700, Pittsburgh, Pennsylvania 15219. The Committee and its members, in their individual capacities, are fiduciaries within the meaning of 29 U.S.C. § 1002(21)(A). According to the Plan's Forms 5500, the Committee is the Plan administrator.

**E.    Defendants John and Jane Does 1-30**

31.    Defendants John and Jane Does 1-30 are unknown individuals comprised of Defendants the Board of Directors and the Committee; any officers, directors, or employees of Defendant Wesco; or other individuals or entities who are or were fiduciaries to the Plan, within the meaning of 29 U.S.C. § 1002(21)(A), during the Class Period. Plaintiffs reserve the right to seek leave to join these currently unknown individuals into the instant action once their identities are ascertained.

32.    All Defendants are Plan fiduciaries because they have exercised and continue to

exercise discretionary authority or discretionary control respecting the management of the Plan and the management and disposition of its assets, and have discretionary authority or discretionary responsibility in the administration of the Plan. 29 U.S.C. § 1002(21)(A).

## IV.   THE WESCO DISTRIBUTION, INC. RETIREMENT SAVINGS PLAN

33.   The name of the Plan is the Wesco Distribution, Inc. Retirement Savings Plan. The Plan's Employer Identification Number (EIN) is 25-1723345 and the Plan has been assigned the three-digit plan number 001.

34.   The Plan is subject to ERISA and is, on information and belief, established and maintained under written documents in accordance with 29 U.S.C. § 1102(a)(1).

## V.   ERISA'S FIDUCIARY STANDARDS

35.   ERISA imposes strict fiduciary duties of loyalty and prudence upon Defendants as fiduciaries of the Plan. 29 U.S. C. §1104(a)(1). The statute states, in relevant part:

[A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and –

(A) for the exclusive purpose of

(i) providing benefits to participants and their beneficiaries; and

(ii) defraying reasonable expenses of administering the plan; [and]

(B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matter would use in the conduct of an enterprise of like character and with like aims.

36.   Under ERISA, fiduciaries that exercise any authority or control over plan assets, including the selection of plan investment and service providers, must act prudently and for the exclusive benefit of the participants in the plan, and not for the benefit of third parties including service providers to the plan such as recordkeepers and those who provide investment products.

Fiduciaries must ensure the amount of fees paid to those service providers is no more than reasonable. DOL Adv. Op. 97-15A; DOL Adv. Op. 97-16A; *see also* 29 U.S.C. §1103(c)(1) (plan assets "shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan").

37.     When making investment decisions, an ERISA fiduciary "is duty- bound 'to make such investments and only such investments as a prudent [person] would make of his own property.'" *In re Unisys Savings Plan Litig*., 74 F.3d 420, 434 (3d Cir. 1996). (quoting Restatement (Second) of Trusts § 227 (1959)). "[T]he duty to conduct an independent investigation into the merits of a particular investment" is "the most basic of ERISA's investment fiduciary duties." *Id.* at 435 A defined contribution plan fiduciary cannot "insulate itself from liability by the simple expedient of including a very large number of investment alternatives in its portfolio and then shifting to the participants the responsibility for choosing among them." *Hecker v. Deere & Co.*, 569 F.3d 708, 711 (7th Cir. 2009). Instead, fiduciaries must "initially determine, and continue to monitor, the prudence of *each* investment option available to plan participants." *DiFelice v. U.S. Airways, Inc*., 497 F.3d 410, 423 (4th Cir. 2007) (emphasis original); *see also* 29 C.F.R. § 2550.404a-1; DOL Adv. Opinion 98-04A; DOL Adv. Opinion 88- 16A. Fiduciaries have "a continuing duty to monitor investments and remove imprudent ones" within a reasonable time. *Tibble v. Edison Int'l*, 575 U.S. 523, 529 (2015).

38.     ERISA also imposes explicit co-fiduciary liabilities on plan fiduciaries. 29 U.S.C. §1105(a) provides a cause of action against a fiduciary for knowingly participating in a breach by another fiduciary and knowingly failing to cure any breach of duty. The statute states, in relevant part, that:

> In addition to any liability which he may have under any other provisions of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary

responsibility of another fiduciary with respect to the same plan in the following circumstances:

> (1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; [or]
>
> (2) if, by his failure to comply with section 1104(a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
>
> (3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

39.     29 U.S.C. §1132(a)(2) authorizes a plan participant to bring a civil action to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. §1109. Section 1109(a) provides in relevant part:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

## VI.     FACTUAL BACKGROUND

40.     In recent decades, the defined contribution plan has become the most common type of employer-sponsored retirement plan. The assets of a defined contribution plan are held by a trustee in a single trust.

41.     Each participant in a defined contribution plan has an individual account, and directs their plan contributions into one or more investment options in a lineup chosen by the plan's fiduciaries. "[P]articipants' retirement benefits are limited to the value of their own individual investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble*, 575 U.S. at 525.

42.     The majority of fees assessed to participants in a defined contribution plan are attributable to two general categories of services: plan administration (including recordkeeping), and investment management. These expenses "can sometimes significantly reduce the value of an account in a defined-contribution plan." *Id.*

43.     The plan's fiduciaries have control over these expenses. The fiduciaries are responsible for hiring administrative service providers, such as a recordkeeper, and negotiating and approving those service providers' compensation. The fiduciaries also have exclusive control over the menu of investment options to which participants may direct the assets in their accounts. Those selections each have their own fees which are deducted from the returns that participants receive on their investments.

44.     These fiduciary decisions have the potential to dramatically affect the amount of money that participants are able to save for retirement. According to the DOL, a 1% difference in fees over the course of a 35-year career makes a difference of *28%* in savings at retirement. U.S. Dep't of Labor, *A Look at 401(k) Plan Fees,* at 1–2 (Aug. 2013).[5] Accordingly, fiduciaries of defined contribution plans must engage in a rigorous process to control these costs and ensure that participants pay no more than a reasonable level of fees. This is particularly true for large plans like the Plan, which have the bargaining power to obtain the highest level of service and the lowest fees. The fees available to large retirement plans are orders of magnitude lower than the much higher retail fees available to small investors.

45.     The entities that provide services to defined contribution plans have an incentive to maximize their fees by putting their own higher-cost funds in plans and collecting the highest amount possible for recordkeeping. For each additional dollar in fees paid to a service provider,

---

[5] *See* http://www.dol.gov/ebsa/pdf/401kfeesemployee.pdf (last visited Oct. 17, 2021).

participants' retirement savings are directly reduced by the same amount, and participants lose the potential for those lost assets to grow over the remainder of their careers. Accordingly, participants' retirement security is directly affected by the diligence used by plan fiduciaries to control, negotiate, and reduce the plan's fees.

46.     Fiduciaries must be cognizant of providers' self-interest in maximizing fees, and not simply accede to the providers' preferred investment lineup—*i.e.*, proprietary funds that will generate substantial fee revenue for the provider—or agree to the provider's administrative fee quotes without negotiating or considering alternatives. In order to act in the exclusive interest of participants and not in the service providers' interest, fiduciaries must negotiate as if their own money was at stake. Instead of simply accepting the investment funds or fees demanded by these conflicted providers, fiduciaries must consider whether participants would be better served by using alternative investment products or services.

47.     The potential for imprudence is much greater in defined contribution plans than in defined benefit plans. In a defined benefit plan, the participant is entitled to a fixed monthly pension payment, while the employer is responsible for making sure the plan is sufficiently capitalized, and thus the employer bears all risks related to excessive fees and investment underperformance. Therefore, in a defined benefit plan, the employer and the plan's fiduciaries have every incentive to keep costs low and to remove imprudent investments. But in a defined contribution plan, participants' benefits are limited to the value of their own investment accounts, which is determined by the market performance of contributions, less expenses. Thus, in a defined contribution plan, risks related to high fees and poorly performing investments are borne by the employee.

48.     The table below illustrates how retirement plan services fees impact retirement

accounts over time.[6] The table illustrates that when an employee invests $100,000 over 20 years

with an assumed 4% annual rate of return and annual fees of 1.00%, the account balance in 20

years will be $180,000. This balance is $30,000 less than the same investment where annual fees

are only 0.25%, which would result in a balance of $210,000. This difference of over 14 percent

is substantial. In fact, the impact of excessive fees on defined contribution participants is even

more substantial given that during most of the past three decades the returns of defined contribution

participants have averaged almost double (7%) the 4% in the below SEC example (*see, e.g.*, Net

Weighted Geometric Rate of Return of Defined Contribution Plans from 1990-2012 as calculated

by the Center for Retirement Research at Boston College, *Investment Returns: Defined Benefit vs.

Defined Contribution Plans* (December 2015, Number 15-21, p. 3, Table 4) https://crr.bc.edu/wp-

content/uploads/2015/12/IB_15-211.pdf).



49.     Indeed, the Third Circuit Court of Appeals recently noted:

Expenses, such as management or administrative fees, can sometimes significantly

---

[6] *See Mutual Fund Fees and Expenses*, SECURITIES AND EXCHANGE COMMISSION OFFICE OF INVESTOR EDUCATION AND ADVOCACY (SEC Pub. No. 162 (5/14), https://www.sec.gov/files/ib_mutualfundfees.pdf.

reduce the value of an account in a defined-contribution plan . . . by decreasing its immediate value, and by depriving the participant of the prospective value of funds that would have continued to grow if not taken out in fees.[7]

## A. **Recordkeeping**

50.     Recordkeeping services are necessary for every defined contribution plan. Fiduciaries of virtually all large defined contribution plans hire one recordkeeper to provide the essential recordkeeping and administrative services for a plan. These services often consist of maintaining plan records, tracking participant account balances and investment elections, providing transaction processing, providing call center support and investment education and guidance, providing participant communications, and providing trust and custodial services. These services are largely commodities, and the market for recordkeeping services is highly competitive.

51.     Since the mid-2000s, the retirement plan services provided to large defined contribution plans, like the Plan, have increasingly become viewed by prudent plan fiduciaries as a commodity service. While recordkeepers in the defined contribution industry attempt to distinguish themselves through marketing and other means, most recordkeepers offer the same combinations of services as their competitors. As a result, the market for defined contribution retirement plan services is highly competitive, particularly for large plans that, like the Plan, have a sizable number of participants and a large amount of assets.

52.     In recent decades, the fee that recordkeepers have been willing to accept for providing retirement plan services has significantly decreased. Large recordkeepers view recordkeeping and administration as an opportunity to generate additional revenue through proprietary investment management, managed accounts, IRA rollovers and cross-selling retail financial products.

---

[7] *Sweda*, 923 F.3d at 328 (internal citation and quotations omitted).

53.     Recordkeepers for larger defined contribution plans, like the Plan, experience advantages that lead to a reduction in the per-participant cost as the number of participants in the plan increases. This is because the marginal cost of adding an additional participant to a recordkeeping platform is relatively low. These economies of scale are inherent in all recordkeeping arrangements for defined contribution plans. When the number of participants increases in a defined contribution plan, the recordkeeper can spread the cost of providing retirement plan services over a larger participant base, reducing the average unit cost of delivering services on a per-participant basis.

54.     Moreover, the cost to a recordkeeper to provide services to a participant does not materially differ from one participant to another and is not dependent on the balance of the participant's account. The cost does not depend on the asset balance of the plan or the amount of savings held in a participant's account. In other words, the average cost to provide  recordkeeping and administrative services to a plan is materially identical whether a participant has $10,000  or a $100,000 average account balance.

55.     Therefore, large plans, like the Plan, possess tremendous economies of scale for recordkeeping and administrative  services. As the number of participants in the plan increases, the cost per participant to deliver the recordkeeping and administrative services decreases. Prudent plan fiduciaries and their consultants and advisors are aware of this cost structure dynamic for retirement plan providers.

56.     Some recordkeepers  provide only recordkeeping and administrative services, while others provide both recordkeeping services and investment products. The latter has an incentive to place their own proprietary products in the plan in order to maximize revenues from servicing  the  plan.  As  explained  below,  when  faced  with  such  conflicted  fund

recommendations, fiduciaries must independently assess whether the provider's investment product is the best choice for the plan, or whether the purpose of providing benefits to participants would be better accomplished by considering other investment managers who may offer superior funds at a better price.

**B.**     **Investment Options**

57.     Defined contribution fiduciaries determine the available investment options in a plan. Each investment option is typically a pooled investment product, such as a mutual fund, and invests in a diversified portfolio of securities in a broad asset class such as fixed income, bonds, or equities.

58.     Investment options can be passively or actively managed. In a passively managed or "index" fund, the investment manager attempts to match the performance of a given benchmark index by holding a representative sample of securities in that index, such as the S&P 500. In an actively managed fund, the investment manager uses her judgment in buying and selling individual securities (*e.g.*, stocks, bonds, etc.) in an attempt to generate investment returns that surpass a benchmark index, net of fees. Because no stock selection or research is necessary for the manager to track the index and trading is limited, passively managed investments charge significantly lower fees than actively managed funds.

59.     Mutual fund fees are usually expressed as a percentage of assets under management, or "expense ratio." For example, if the mutual fund deducts 1% of fund assets each year in fees, the fund's expense ratio would be 1%, or 100 basis points (bps).[8] The fees deducted from a mutual fund's assets reduce the value of the shares owned by fund investors.

60.     Many mutual funds offer their investors different share classes. Retail share classes

---

[8] One basis point equals $1/100^{th}$ of one percent (0.01%).

are marketed to individuals with small amounts to invest. Institutional share classes are offered to investors with large amounts to invest, such as large retirement plans. The different share classes of a given mutual fund have the identical manager, are managed identically, and invest in the same portfolio of securities. The only difference is that the retail shares charge significantly higher fees, resulting in retail class investors receiving lower returns. The share classes are otherwise identical in all respects.

61.     Some mutual funds engage in a practice known as "revenue sharing." In a revenue-sharing arrangement, a mutual fund pays a portion of its expense ratio to the entity providing administrative and recordkeeping services to a plan, putatively as compensation for providing those services. The difference in fees between a mutual fund's retail and institutional share classes is often attributable to revenue sharing.

62.     For example, if a mutual fund has a total expense ratio fee of 0.75%, the mutual fund provider may agree to pay the recordkeeper 0.25% of the 0.75% total expense ratio fee that is paid by the investor in that mutual fund (in this context the Plan participant). That 0.25% portion of the 0.75% total expense ratio fee is known as the revenue sharing. The presence of revenue sharing thus provides an incentive for recordkeepers to recommend that the fiduciary select higher cost funds, including in-house funds of the administrative service provider that pay the provider revenue sharing. "[V]ery little about the mutual fund industry," including revenue sharing practices, "can plausibly be described as transparent." *Leimkuehler v. Am. United Life Ins. Co.*, 713 F.3d 905, 908 (7th Cir. 2013).

63.     In the context of defined contribution plans, the amount of revenue sharing is deemed to be the amount of revenue paid by participants that is allocable to retirement plan services and, in some cases, other services provided to a plan. The difference between the total

expense ratio and the revenue sharing is known as the "net investment expense." When a plan adopts prudent and best practices, the net investment expense is the actual amount a plan participant pays for the investment management services provided by a portfolio manager.

64.     The importance of fees in prudent investment selection cannot be overstated. The prudent investor rule developed in the common law of trusts, which informs ERISA's fiduciary duties, emphasizes "the duty to avoid  unwarranted costs[.]" Restatement (Third) of Trusts ch. 17, intro. note (2007); *see Tibble*, 575 U.S. at 529 (discussing Restatement (Third) of Trusts §90 in finding a continuing duty to monitor under ERISA). As the Restatement explains, "cost- conscious management is fundamental to prudence in the investment function." Restatement (Third) of Trusts § 90 cmt. b. While a fiduciary may consider higher- cost, actively-managed mutual funds as an alternative to index funds, "active management strategies involve investigation expenses and other transaction costs ... that must be considered, realistically, in relation to the likelihood of increased return from such strategies." Restatement (Third) of Trusts ch. 17, intro. note; *id*. § 90 cmt. h(2).

65.     Academic and financial industry literature demonstrates that high expenses are not correlated with superior investment management. As discussed in University of Pennsylvania's law review, numerous studies show that "the most consistent predictor of a fund's return to investors is the fund's expense ratio." Jill E. Fisch, *Rethinking the Regulation of Securities Intermediaries*, 158 U. Pa. L. Rev. 1961, 1993 (2010). Indeed, funds with high fees on average perform worse than less expensive funds even on a *pre-fee basis*. Javier Gil-Bazo & Pablo Ruiz-Verdu, *When Cheaper is Better: Fee Determination in the Market for Equity Mutual Funds*, 67 J. Econ. Behav. & Org. 871, 873 (2008). The empirical evidence shows that "low-quality funds charge higher fees," such that "[p]rice and quality thus seem to be *inversely related* in the market

for actively managed mutual funds." *Id*. at 883. (emphasis added).

66.     In light of this effect of fees on expected returns, fiduciaries must carefully consider whether the added cost of actively-managed funds is realistically justified by an expectation of higher returns. Restatement (Third) of Trusts ch. 17, intro. note; *id*. § 90 cmt. h(2). A prudent investor will not select higher-cost actively managed funds without analyzing whether a particular investment manager is likely to beat the overwhelming odds against outperforming its benchmark index over time, net of the fund's higher investment expenses.

## C.     Revenue Sharing: A Practice That Can Lead to Excessive Fees if Not Properly Monitored and Capped

67.     There are two primary methods for defined contribution plans to pay for recordkeeping and administrative services:  "direct" payments from plan assets, and "indirect" revenue sharing payments from plan investments such as mutual funds. Plans may use one method or the other exclusively, or may use some combination of both direct and indirect payments.

68.     In a typical direct payment arrangement, the fiduciary contracts with the recordkeeper to obtain services in exchange for a flat annual fee based upon the number of participants for which the recordkeeper will be providing services, for example $30 per participant. Large defined contribution plans possess significant bargaining power due to the economies of scale for the purposes of recordkeeping and administrative fees. A plan with 20,000 participants can obtain a much lower fee on a per-participant basis than a plan with 2,000 participants.

69.     A recordkeeper's cost for providing services depends on the number of participants in the plan, not the amount of assets in the plan or in an individual account. The cost of recordkeeping a $75,000 account balance is the same as a $7,500 account. Accordingly, a flat price based on the number of participants in the plan ensures that the compensation is tied to the actual

services provided and does not grow based on matters that have nothing to do with the services provided, such as an increase in plan assets due to market growth or greater plan contributions by the employee.

70.     Such a flat per-participant agreement does not necessarily mean, however, that every participant in the plan must pay the same $30 fee from his or her account. The fiduciary could reasonably determine that it is equitable to charge each participant the same $30 (for example, through a quarterly charge of $7.50 to each account in the plan). Alternatively, the fiduciary could conclude that assessing the same fee to all investors would discourage participants with relatively small accounts from participating in the plan, and that, once the aggregate flat fee for the plan has been determined, a proportional asset-based charge would be best. In that case, the flat per-participant rate of $30 per participant multiplied by the number of participants would simply be converted to an asset-based charge, such that every participant pays the same percentage of his or her account balance. For the $2 billion plan in this example, each participant would pay a direct administrative fee of 0.03% of her account balance annually for recordkeeping ($600,000/$2,000,000,000 = 0.0003). If plan assets increase thereafter, the percentage would be adjusted downward so that the plan is still paying the same $600,000 price that was negotiated at the plan level for services to be provided to the plan.

71.     Defendant has used both direct compensation and indirect, revenue sharing compensation as the method of paying its recordkeeper for the Plan. Revenue sharing, while not a *per se* violation of ERISA, can lead to excessive fees if not properly monitored and capped.

72.     In a revenue sharing arrangement, the mutual fund pays the plan's recordkeeper putatively for providing recordkeeping and administrative services for the fund. However, because revenue sharing payments are asset-based, the fees can grow to unreasonable levels

if plan assets grow while the number of participants, and thus the services provided, has not increased at a similar rate. The opposite is generally not true. If plan assets decline, participants will not receive a sustained benefit of paying lower fees, because the recordkeeper will demand that the plan make up the shortfall through additional direct payments.

73.     Regardless of the pricing structure that the plan fiduciaries negotiate with the recordkeepers, the amount of compensation paid to the recordkeeper must be reasonable.

74.     As a result, plan fiduciaries must understand the total dollar amounts paid to their recordkeeper and be able to determine whether the compensation is reasonable by evaluating what the market is for the retirement plan services received by the plan.

## VII.   PRUDENT FIDUCIARY STANDARDS OF SELECTING AND MONITORING RECORDKEEPERS

75.     Plan fiduciaries are required to fully understand all sources of revenue paid to recordkeepers. Fiduciaries must regularly monitor the revenue paid to recordkeepers to ensure that the compensation received is and remains reasonable in view of the services provided.

76.     The DOL has identified that employers are held to a "high standard of care and diligence" and must, among other duties, "[e]stablish a prudent process for selecting . . . service providers"; "[e]nsure that fees paid to service providers and other plan expenses are reasonable in light of the level and quality of services provided"; and "[m]onitor . . . service providers once selected to make sure they continue to be appropriate choices."[9]

77.     The duty to evaluate and monitor plan service provider fees includes those fees directly paid by participants, because "[a]ny costs not paid by the employer, which may include

---

[9] See United States Dep't of Labor, *A Look at 401(k) Plan Fees*, at 2 (Sept. 2019), https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf.

administrative, investment, legal, and compliance costs, effectively are paid by plan participants."[10]

78.     Prudent fiduciaries will ensure that a plan is paying reasonable recordkeeping and administrative services fees by soliciting competitive bids from other recordkeepers to perform the same services currently provided to the plan. This process is not difficult or complex and is performed regularly by prudent plan fiduciaries. For plans with many participants, like the Plan, most recordkeepers would require only the number of participants and the amount of the assets to provide a quote for fees, while others might only require the number of participants.

79.     Prudent fiduciaries have all of this information readily available and can easily receive a quote from other recordkeepers to determine if the current level of fees charged to the plan is reasonable.

80.     Having received bids, a prudent fiduciary can negotiate with its current provider for a lower fee or move to a new recordkeeper to provide the same (or better) services for a competitive (or lower) reasonable fee. Prudent fiduciaries follow this same process to monitor the fees of retirement plan advisors and/or consultants as well as any other covered service providers.

81.     After the revenue requirement is negotiated, the plan fiduciary determines how to pay the negotiated recordkeeping and administrative services fees. The employer/plan sponsor can pay the fees on behalf of participants, which is the most beneficial to plan participants. If the employer were paying the fee, the employer would have an interest in negotiating the lowest fee a suitable recordkeeper provider would accept. Typically, however, the employer decides to have the plan (i.e., participants) pay the recordkeeping and administrative fees. If the fees are paid by participants, the fiduciaries can allocate the negotiated fees among participant accounts at the

---

[10] Investment Company Institute, *The Economics of Providing 401(k) Plans: Service, Fees, and Expenses*, at 4-5 (June 2018), https://www.ici.org/pdf/per24-04.pdf.

negotiated per-participant rate, or pro rata based on account values, among other less common ways.

82.      In other words, if a plan negotiates a per-participant revenue threshold, e.g., $50.00, the plan does not need to require that each participant pay $50.00. Rather, the fiduciaries could determine that an asset-based fee is more appropriate for participants and allocate the fees pro rata to participants. For example, a 10,000-participant plan with a $50.00 revenue threshold would pay $500,000 in fees. If the Plan had $500,000,000 in assets, then the $500,000 would work out to 10 basis points. Accordingly, the Plan could allocate the $500,000 in fees to participants by requiring that each participant pay 10 basis points.

83.      Because revenue sharing arrangements provide indirect, asset-based compensation for the recordkeeper – recordkeeping expense calculated as a percentage of total plan assets – prudent fiduciaries monitor the total amount of revenue sharing a recordkeeper receives to ensure that the recordkeeper's compensation is reasonable based upon the services provided. A prudent fiduciary must ensure that the recordkeeper rebates to the plan all revenue sharing payments that exceed a reasonable, negotiated recordkeeping fee.

84.      In such an asset-based pricing structure, since the amount of compensation received by the recordkeeper is based on a percentage of the total assets in the plan, this structure creates situations in which the services provided by the recordkeeper do not change but, because of market appreciation and contributions to the plan, the revenue received by the recordkeeper increases.

85.      Moreover, because revenue sharing payments are asset based, they bear no relation to the actual cost to provide reasonable recordkeeping and administrative services and can result in payment of unreasonable fees.

86.      By 2013, prior to the Class Period, the impact of the 2012 Fee Disclosure

regulations was incorporated into the standard of care and was well known, understood, and established among prudent plan fiduciaries based on the DOL guidelines, case law, and best practices as shared by retirement plan professionals. For example, in its 2013 publication titled *DC Fee Management – Mitigating Fiduciary Risk and Maximizing Plan Performance*, Mercer LLC summarized the standard of care exercised by prudent retirement plan professionals and plan fiduciaries as follows:

1. Price administrative fees on a per-participant basis.
2. Benchmark and negotiate recordkeeping and investment fees separately.
3. Benchmark and negotiate investment fees regularly, considering both fund vehicle and asset size.
4. Benchmark and negotiate recordkeeping and trustee fees at least every other year.
5. Negotiate vendor contracts to ensure that service standards and liability provisions are in the best interests of plan participants and beneficiaries.
6. Monitor actual fees paid against contractual requirements.
7. Review services annually to identify opportunities to reduce administrative costs.[11]

87.     If a fiduciary decides to use revenue sharing to pay for recordkeeping, prudent fiduciaries: (a) determine and monitor the amount of the revenue sharing and any other sources of compensation that the provider has received, (b) compare that amount to the price that would be available on a flat per-participant basis, and (c) control the amount of fees paid through recordkeeping by obtaining rebates of any revenue sharing amounts that exceed the reasonable level of fees.

88.     First, fiduciaries must pay close attention to the recordkeeping and administrative services fees paid by the plan. A prudent fiduciary monitors the recordkeeper's expenses by demanding documents that summarize and contextualize the recordkeeper's compensation, such

---

[11] *DC Fee Management — Mitigating Fiduciary Risk and Maximizing Plan Performance*, Mercer LLC, at 3-4 (2013).

as fee transparencies, fee analyses, fee summaries, relationship pricing analyses, cost-competitiveness analyses, and multi-practice and standalone pricing reports. This would include information from all revenue, not just retirement plan services revenue, generated by providers through their relationship with the plan.

89.     To make an informed evaluation as to whether a recordkeeper is receiving a reasonable fee for the services provided to the plan, a prudent fiduciary must identify all fees, including direct compensation and indirect revenue sharing, paid to the plan's recordkeeper. To the extent that a plan's investments pay asset-based revenue sharing to the recordkeeper, prudent fiduciaries must monitor the amount of the payments to ensure that the recordkeeper's total compensation from all sources does not exceed reasonable levels.

90.     Second, in determining the price that would be available on a flat per participant basis, prudent fiduciaries making such an assessment for a large plan recognize that it is necessary to solicit bids from competing providers. In large plans with thousands of participants, such as the Plans, benchmarking based on fee surveys alone is inadequate. Recordkeeping fees for large plans have declined significantly in recent years due to increased technological efficiency, competition, and increased attention to fees by sponsors of other plans such that fees that may have been reasonable at one time may have become excessive based on current market conditions. Accordingly, the only way to determine the true market price at a given time is to obtain a competitive bid. *See George v. Kraft Foods Global, Inc.*, 641 F.3d 786, 800 (7th Cir. 2011) (a 401(k) excessive fee case which denied summary judgment based in part on the opinion of an independent consultant that "'without an actual fee quote comparison' – i.e., a bid from another service provider – [consultant] 'could not comment on the competitiveness of [recordkeeper's] fee amount for the services provided").

91.     Conducting a competitive bid, called a request for proposal ("RFP"), must be done at reasonable intervals. In fact, the best practice standard of care is to undergo a formal RFP process once every three to five years. On the other hand, however, even without conducting a formal RFP process, as noted above,  by merely soliciting bids from other recordkeepers, plan fiduciaries can quickly and easily gain an understanding of the current market for materially identical retirement plan services and determine a starting point for negotiation. Accordingly, the only way to determine the true market price at a given time is to obtain competitive bids through some process, be it formal or informal, that provides an incentive to recordkeepers to provide a competitive bid.

92.     Third, a prudent fiduciary must require that any revenue-sharing payments that exceed a reasonable level be returned to the plan and its participants.

93.     All of these standards are accepted and understood by prudent plan fiduciaries and were, or should have been, understood by Defendants at all times during the Class Period. This is because prudent fiduciaries understand that excessive fees significantly impact the value of participants' retirement accounts.

## VIII.   DEFENDANTS BREACHED THEIR FIDICIARY DUTIES

### A.   Defendants Imprudently Permitted the Plan to Pay Unreasonable Excessive Recordkeeping and Administrative Services Fees

94.     From at least 2009 through 2020,[12] the Plan's recordkeeper was Wells Fargo Bank, N.A. ("Wells Fargo"). As such, Wells Fargo was responsible for holding the Plan's assets in trust, tracking contributions, earnings and investments for the  participants' accounts and executing trades requested by Plan participants.

95.     Plaintiffs do not have access to the recordkeeping agreement between Wells Fargo

---

[12] Form 5500s for the Plan are not available prior to the fiscal year ended 12/31/2009.

and Wesco and so lack knowledge regarding that agreement. However, Plaintiffs and other Plan participants received or had access to the following Plan services from Wells Fargo: Internet access to their accounts through the Plan website maintained by Wells Fargo; transaction processing (buying and selling Plan investments); quarterly participant statements; participant communications, including Plan investment disclosures and periodic participant newsletters; retirement education services, including various tools such as retirement income calculators available on the Plan website; and a telephone support to answer questions or give assistance to Plan participants. Wells Fargo also offered a brokerage window that allowed Plan participants to invest in securities that were not Plan investment options.

96.     During the Class Period, Wells Fargo charged the Plan direct and indirect (revenue sharing) fees that were excessive relative to the type and quality of the services received by the Plan when benchmarked against other similar-sized plans for similar recordkeeping and administrative services. These excessive fees led to lower net returns, eating into and substantially reducing Plaintiffs' and Plan participants' retirement savings.

97.     Annual returns on Form 5500s provide substantial evidence of the Plan's imprudence. Form 5500s are essentially the Plan's annual tax returns. DOL rules expressly require that plan service providers report all direct and indirect compensation received for the year in connection with those services.

98.     Wells Fargo charged a direct fee for its recordkeeping and administrative services that was paid by participants through deductions from their accounts. As shown in the Table below, during the Class Period, Plaintiffs and Plan participants each paid between $82 and $50 per year in direct recordkeeping and administrative fees, for an average of $68 per year:

| Direct Recordkeeping and Administrative Services Compensation Per-Participant Cost (source: Forms 5500) | | | | | | |
|---|---|---|---|---|---|---|
| | **Plan Year** | | | | | |
| | **2015** | **2016** | **2017** | **2018** | **2019** | *Average* |
| Participants | 8,486 | 9,043 | 8,179 | 8,232 | 8,870 | **8,562** |
| | | | | | | |
| Direct Fees | $ 614,032 | $651,150 | $ 671,304 | $ 539,003 | $ 443,714 | **$583,840** |
| | | | | | | |
| **Direct Per-Participant Fee** | $ 72 | $72 | $82 | $78 | $50 | **$68** |

99.     In addition to the direct payments described above, Wells Fargo also received indirect payments from the mutual fund companies. Plaintiffs calculate the Plan paid Wells Fargo at least the following indirect compensation through revenue sharing between 2015 and 2019:

| Year | Indirect Fees Paid to Wells Fargo by Mutual Fund Companies |
|---|---|
| 2015 | $752,446 |
| 2016 | $773,658 |
| 2017 | $840,637 |
| 2018 | $731,513 |
| 2019 | $917,662 |
| **Total** | **$4,015,916** |

100.    Based upon a review of the Plan's Forms 5500, and upon information and belief, the Plan did not rebate any of the monies received from revenue sharing back to Plan participants to offset the recordkeeping fees paid by the participants.[13]

101.    The following table shows the total fees paid to Wells Fargo through both direct

---

[13] Two notices sent to plan participants in 2018 and 2019 (ECF 28-19 and 28-20) indicate a credit was given, but do not provide any information regarding the dates covered by the notice, the amount of the credit or how it was calculated. No such notices were provided for 2015-2017.

and indirect compensation:

| Year | Direct Fees | Indirect  Fees | Total Fees |
|------|-------------|----------------|------------|
| 2015 | $ 614,032 | $752,446 | $1,366,478 |
| 2016 | $651,150 | $773,658 | $1,424,808 |
| 2017 | $671,304 | $840,637 | $1,511,941 |
| 2018 | $539,003 | $731,513 | $1,270,516 |
| 2019 | $443,714 | $917,662 | $1,361,376 |
| **Total** | **$2,919,203** | **$4,015,916** | **$6,935,119** |

102.    During the Class Period, Plaintiffs and Plan participants each paid between $153

and $185 per year in total retirement plan services expenses. The table below shows the actual and

average yearly per-participant retirement plan services fees paid by participants, including by

direct charges to their accounts and indirect payments made by the Plan:

| Retirement Plan Service ("RPS") Fees<br>Per-Participant Cost (source: Forms 5500) | | | | | | |
|---|---|---|---|---|---|---|
| | Plan Year | | | | | |
| | **2015** | **2016** | **2017** | **2018** | **2019** | *Average* |
| Participants | 8,486 | 9,043 | 8,179 | 8,232 | 8,870 | **8,562** |
| | | | | | | |
| Total Fees | $1,366,478 | $1,424,808 | $1,511,941 | $1,270,516 | $1,361,376 | **$1,387,024** |
| | | | | | | |
| **Per-Participant Fee** | $161 | $157 | $185 | $154 | $153 | **$162** |

103.    NEPC, a consulting group, recently conducted its 14th Annual Survey titled the

NEPC 2019 Defined Contribution Progress Report (referenced above) which took a survey of

various defined contribution plan fees as of December 31, 2018. *See* Report at 1.[14] Notably, Wells

---

[14] *See*

https://cdn2.hubspot.net/hubfs/2529352/2019%20DC%20Plan%20and%20Fee%20Survey%20(progress

Fargo assisted in assembling the data used in the survey. *Id*. The sample size and respondents included 121 Defined Contribution Plans broken up as follows: 71% Corporate; 20% Healthcare, and 9% Public, Not-for-Profit and other. The average plan had $1.1 billion in assets and 12,437 participants. The median plan had $512 million in assets and 5,440 participants. *Id*. NEPC's survey found that the range of total RPS fees for plans with between 5,000 and 10,000 participants was between $40 and $60 per participant as of December 31, 2018, and no plan in that range paid more than $90 per participant in total recordkeeping, trust and custody fees. *Id*. at 10.

104.    Because the level of fees that recordkeepers have been willing to accept for providing retirement plan services, including recordkeeping and administrative services, has stabilized, and has not materially changed during the Class Period, reasonable recordkeeping and administrative fees paid in 2018 are representative of the reasonable fees for retirement plan services during the entire Class Period. The table above illustrates that in 2018 the Plan had 8,232 participants and paid total fees of $1,387,024, which equates to an average of approximately $154 per participant. This fee far exceeded the NEPC average of $40-$60 per participant for similarly sized plans in 2018.

105.    The Plan's fees were also excessive compared to other defined contribution plans of comparable size. The DOL encourages plan sponsors to "[a]sk each prospective provider to be specific about which services are covered for the estimated fees and which are not. Compare the information you receive, **including fees and expenses to be charged by the various providers for similar services**."[15] (Emphasis added). Although the DOL notes that cost is only one factor to be considered when selecting a recordkeeper, and a plan sponsor is not required to pick the least

---

%20report)/2019%20NEPC%20DC%20Plan%20Progress%20Report.pdf (last visited Oct. 17, 2021).

[15] *See* https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/fact-sheets/tips-for-selecting-and-monitoring-service-providers.pdf.

costly provider, "the law … does require that fees charged to a plan be 'reasonable.'"[16]

106.    Had the Defendants followed the guidance of the DOL, they could have easily determined it was not reasonable for the Plan to pay average recordkeeping and administrative fees to Wells Fargo in excess of $100 per participant per year.

107.    The Table below illustrates an apples-to-apples comparison of the annual per-participant recordkeeping and administrative services fees, for direct compensation, paid in 2018 by other comparable plans in contrast to that paid by the Plan. The plans provide a reasonable benchmark to the Plan, yet they paid total fees (direct and indirect) that were far lower than the fees paid by the Plan for recordkeeping, custodian and directed trustee services that were far lower than the fees paid by the Plan:[17]

| Plan | Participants | Assets | RPS Price | RPS Price/ pp | Recordkeeper |
|------|-------------|--------|-----------|--------------|--------------|
| Healthfirst Profit Sharing 401(K) Plan | 4,950 | $234,755,239 | $201,889 | $41 | Vanguard |
| Genesis Health System Retirement Savings Plan | 6,260 | $231,793,794 | $325,894 | $52 | Transamerica |
| Flowserve Corporation Retirement Savings Plan | 6,395 | $892,435,613 | $263,380 | $41 | T. Rowe Price |
| St. Luke's Health Network 403(B) Plan | 7,142 | $241,600,647 | $333,578 | $47 | Transamerica |
| Memorial Health System Defined Contribution Retirement Savings Plan | 7,318 | $221,242,194 | $385,754 | $53 | Transamerica |
| The Boston Consulting Group, Inc. Employees' | 8,067 | $894,454,060 | $336,660 | $42 | Vanguard |

---

[16] *See* https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/meeting-your-fiduciary-responsibilities.pdf.

[17] Plaintiffs calculated indirect compensation by reviewing  the investments listed in Schedule H, Part IV, Line 4(i) of Form 5500, reviewing Schedule C, Part I, Line 3 to see if any revenue sharing rates were disclosed, using publicly available revenue sharing rates to determine the appropriate revenue sharing rate for each investment option, then multiplying the year-end assets for each investment option from Schedule H by the appropriate revenue sharing rate to determine the total amount of indirect compensation. Plaintiffs also reviewed the notes to the Audited Financial Statements attachment to Form 5500 to determine additional information about the Plan's pricing structure and whether any revenue sharing was allocated back to the Plan and/or plan participants.

| | | | | | |
|---|---|---|---|---|---|
| Savings Plan And Profit Sharing Retirement | | | | | |
| **Wesco Distribution, Inc. Retirement Savings Plan (2018)** | **8,562** | **$670,742,749** | **$1,270156** | **$154** | **Wells Fargo** |
| Children's Medical Center Of Dallas Employee Savings Plan 403(B) | 9,356 | $349,335,673 | $337,416 | $36 | Fidelity |
| Ralph Lauren Corporation 401(K) Plan | 9,389 | $552,586,935 | $290,066 | $31 | T. Rowe Price |
| Centerpoint Energy Savings Plan | 9,802 | $2,108,802,293 | $442,946 | $45 | Voya |
| Edward- Elmhurst Healthcare Retirement Savings Plan | 10,263 | $618,238,970 | $446,836 | $44 | Fidelity |
| Fortive Retirement Savings Plan | 13,502 | $1,297,404,611 | $472,673 | $35 | Fidelity |

108.     Chart 2 below demonstrates that other comparable plans using Wells Fargo as an RPS provider paid Wells Fargo total fees (direct and indirect) for recordkeeping, custodian and directed trustee services that were far lower than the fees paid by the Plan:

| Plan | Participants | Assets | RPS Price | RPS Price /pp | Recordkeeper |
|---|---|---|---|---|---|
| Rackspace US, Inc. 401(K) Plan | 6,556 | $289,943,564 | $339238 | $52 | Wells Fargo |
| Carlisle, LLC Employee Incentive Plan | 8,465 | $539,303,700 | $348,150 | $41 | Wells Fargo |
| **Wesco Distribution, Inc. Retirement Savings Plan (2018)** | **8,562** | **$670,742,749** | **$1,270156** | **$154** | **Wells Fargo** |
| Jeld-Wen 401(K) Retirement Savings Plan | 12,668 | $280,294,753 | $477,797 | $37 | Wells Fargo |
| CenturyLink Union 401(K) Plan | 14,558 | $1,512,882,258 | $495,211 | $34 | Wells Fargo |

109.     The average cost for recordkeeping, custodian and directed trustee services charged to other similarly sized plans in Chart 1 above (excluding Wesco) by other large recordkeepers was $42 per participant while the average cost for recordkeeping, custodian and directed trustee

services charged to other similarly sized plans in Chart 2 above (excluding Wesco) by Wells Fargo was $41 per participant. Based on the two charts above – which together with the NEPC Survey form a reasonable benchmark for retirement plan services fees for the Plan – a reasonable fee for retirement plan services for the Plan would have been $40 per participant, not the $154 per participant paid by the Plan.

110.    Upon knowledge and belief, Wells Fargo did not offer any services to the Plan that were so unique or of such markedly higher quality so as to justify paying more than four times the reasonable RPS rate for those services. In fact, in 2018 the Jeld-Wen 401(K) Retirement Savings Plan paid Wells Fargo $477,797, or $37 per participant, for the same recordkeeping, custodian and directed trustee services, including the same participant services described in Paragraph 95 above, that Plan paid $154 per participant even though the Jeld-Wen Plan had less than one-half the assets as the Plan.

111.    In 2018, Fidelity, Vanguard and Empower were the top three recordkeepers by number of plans for plans with assets in excess of $200 million (the highest asset amount); Wells Fargo was fourth, T. Rowe Price was tied for fifth and Voya was tenth.[18] During the Class Period, Fidelity, Vanguard, Empower, T. Rowe Price, Voya and Transamerica all offered identical or similar packages of services of the same or similar quality as those provided by Wells Fargo to the Plan, namely: Directed trustee or custodian services; transaction processing; quarterly participant statements; website access to participant accounts; participant communications, including call centers to handle customer service; plan disclosures; periodic newsletters; participant education services; annual discrimination testing; Form 5500 preparation; and auto enrollment.

---

[18] 2019 Recordkeeping Survey, PLANSPONSOR (July 18, 2019),
https://www.plansponsor.com/research/2019-recordkeeping-
survey/?pagesec=9#topTotal%20401(k)%20Plans%20with%20%3E$200MM%3Csup%3E%E2%80%A0
%3C/sup%3E%20in%20Assets.

112.     On July 1, 2020, the Plan switched to Fidelity Investments as its recordkeeper. Plan participants now pay a per participant fee of $53 per year.[19] After the transition, Plaintiffs and other Plan participants received the same services from Fidelity that they received from Wells Fargo. Plaintiffs and other Plan participants did not experience a reduction in the level or quality of retirement plan services as a result of the transition to Fidelity. Defendants never told Plan participants that Fidelity's services were in any way inferior to those provided by Wells Fargo even though they had a duty to do so; in fact, just the opposite. This further confirms that the services offered by Fidelity (and other large recordkeepers) are substantially similar in all material respects to the services offered by Wells Fargo.

113.     Defendants also breached their fiduciary duties by failing to determine and monitor the amount of indirect compensation paid to Wells Fargo. In addition to the direct payments described above, Wells Fargo received indirect payments in the form of revenue sharing from the mutual fund companies based on a percentage of the Plan's assets invested. Yet, none of the Plan's Form 5500s filed during the Class Period disclose the amounts of indirect compensation received by Wells Fargo. The total amount of indirect compensation received by Wells Fargo in revenue-sharing amounts to tens of thousands of dollars per year, based upon the expense ratios as indicated in the required participant disclosures. However, the Plan was not transparent about this indirect compensation and the dollar figures were not made known to the Plan participants. Moreover, rather than accepting a flat fee per fund in revenue sharing, the Plan imprudently paid a percentage of the fund's assets, allowing Wells Fargo to obtain increasing fees with increasing assets for the same services provided.

---

[19] Plaintiffs contend the Fidelity direct compensation fee of $53 is excessive, but more reasonable than the fees paid to Wells Fargo.

114.    Defendants further breached their fiduciary duties by failing to understand and disclose to Plan participants the amounts Wells Fargo retained versus the amounts reallocated, *if any*, for 2015 through 2019, in indirect revenue sharing fees. Moreover, upon information and belief, Wells Fargo retained all amounts and no reallocations to Plan participants were made until December 18, 2018, thereby reducing the amounts that should have otherwise gone back to Plan participants. Wells Fargo had been the Plan's recordkeeper since at least 2009 until July 2020 when the Plan retained Fidelity as its recordkeeper. Upon knowledge and belief, Defendants failed to conduct an RFP from at least 2009 through 2019 even though prudent practice dictates such a request should be conducted every three to five years.

115.    Defendants further acted imprudently by failing to conduct an RFP process from at least 2009 through 2019 in order to determine if another recordkeeper could provide more competitive rates for recordkeeping and administrative services or to be able to negotiate with Wells Fargo to reduce the fees it charged the Plan for recordkeeping and administrative services.

116.    Had Defendants conducted an RFP for recordkeeping services, they would have learned (as demonstrated by the Charts above) that other recordkeeping providers, as well as Wells Fargo, offered the same or similar recordkeeping and administrative services provided by Wells Fargo for less than half of what the Plan paid in direct compensation. Defendants' failure to conduct an RFP for over 10 years was a breach of their fiduciary duty to prudently monitor Plan fees and assure such fees were reasonable, and caused harm to the Plan and its participants.

117.    Defendants' failure to conduct an RFP process, or otherwise obtain comparative quotes from other recordkeepers, further kept the Plan in the dark as to competitive revenue sharing rates or alternative flat fee rates for indirect compensation.

118.    Defendants should have been able to leverage the Plan's size to obtain recordkeeping and administrative services for significantly lower fees than the amounts paid by the Plan. Defendants' failure to do so was a breach of their fiduciary duty to prudently monitor Plan fees and assure such fees were reasonable, and caused harm to the Plan and its participants.

119.    Based on fees paid by other large plans receiving similar recordkeeping and administrative services, some of which used the same service provider, it is reasonable to infer that the Plan fiduciaries failed to follow a prudent process to ensure that the Plan was paying only reasonable fees. In light of the amounts remitted to Wells Fargo throughout the Class Period, Defendants clearly either engaged in virtually no examination, comparison, or benchmarking of the recordkeeping and administrative fees of the Plan to those of other similarly sized defined contribution plans, or were complicit in paying grossly excessive fees.

120.    Defendants' failure to recognize that the Plan and its participants were grossly overcharged for retirement plan services and their failure to take effective remedial actions amounts to a breach of their fiduciary duties to the Plan. To the extent Defendants had a process in place, it was imprudent and ineffective given the objectively unreasonable level of fees the Plan paid for recordkeeping and administrative services. Had Defendants appropriately monitored the compensation paid to Wells Fargo and ensured that participants were only charged reasonable recordkeeping fees, Plan participants would not have lost millions of dollars in their retirement savings over the last six-plus years.

**B.    Defendants Imprudently Chose Mutual Fund Share Classes with Higher Costs Even Though Less Expensive Shares of the Same Funds Were Available**

121.    Large retirement plans have massive bargaining power to negotiate low fees for investment management services. If a plan invests in mutual funds, fiduciaries must review and consider the available share classes. Because the only difference between the various share classes

is fees, selecting a higher-cost share class results in the plan paying wholly unnecessary fees. Accordingly, absent some compelling reason to opt for the higher-cost version, prudent fiduciaries will select the lowest-cost share class available to the plan. As a prominent legal counsel to defined contribution fiduciaries explained:

> The fiduciaries also must consider the size and purchasing power of their plan and select the share classes (or alternative investments) that a fiduciary who is knowledgeable about such matters would select under the circumstances. In other words, the "prevailing circumstances"—such as the size of the plan—are a part of a prudent decision making process. The failure to understand the concepts and to know about the alternatives could be a costly fiduciary breach.

Fred Reish, *Classifying Mutual Funds*, PLANSPONSOR (Jan. 2011).

122.    On average, there are lower expense ratios for 401(k) participants than those for other investors. *See* Investment Company Institute ("ICI"), *The Economics of Providing 401(k) Plans: Services, Fees, and Expenses, 2015*, (July 2016) at 11.[20] ERISA-mandated monitoring of investments leads prudent and impartial plan sponsors to continually evaluate performance and fees, resulting in great competition among mutual funds in the marketplace. Furthermore, the large average account balances of 401(k) plans, especially the largest ones as measured by assets managed, lead to economies of scale and special pricing within mutual funds. *See id.* at 10.

123.    An expense ratio is a measure of what it costs to operate an investment, expressed as a percentage of its assets, as a dollar amount, or in basis points. These are costs the investor pays through a reduction in the investment's rate of return, and are required to be disclosed to participants.

124.    Many mutual funds offer multiple classes of shares in a single mutual fund that are targeted at different investors. Generally, more expensive share classes are targeted at smaller investors with less bargaining power, while lower-cost shares are targeted at institutional investors

---

[20] *See* https://ici.org/pdf/per22-04.pdf (last visited Oct. 17, 2021).

with more assets, generally $1 million or more, and therefore greater bargaining power. There is no difference between share classes other than cost—the funds hold identical investments and have the same manager.

125.    Given that defined contribution plan fiduciaries are held to the standard of a knowledgeable financial expert, a fiduciary should know the basic principle that asset size matters, and must review a fund's prospectus to determine if a lower-cost share class of the same fund is available, to avoid saddling the plan with unnecessary fees. Large defined contribution plans such as the Plan have sufficient assets to qualify for the lowest cost share class available. Even when a plan does not yet meet the investment minimum to qualify for the cheapest available share class, it is well-known among institutional investors that mutual fund companies will typically waive those investment minimums for a large plan adding the fund in question to the plan as a designated investment alternative. Simply put, a fiduciary to a large defined contribution plan such as the Plan can use its asset size and negotiating power to invest in the cheapest share class available. For this reason, prudent retirement plan fiduciaries will search for and select the lowest-priced share class available.

126.    One 2016 article written by the head of a fiduciary consulting firm described the failure to investigate the availability of and subsequently utilize the lowest-cost share class as an "egregious fiduciary breach[]" that is responsible for "[w]asting plan assets" in a manner that is "clearly imprudent." Blaine F. Aikin (exec. chairman of fi360 Inc.), *Recent Class-Action Surge Ups the Ante for 401(k) Advice*, INVESTMENTNEWS (Feb. 18, 2016).[21] Indeed, in 2017 a court observed that "[b]ecause the institutional share classes are otherwise *identical* to the retail share classes, but with lower fees, a prudent fiduciary would know immediately that a switch is

---

[21] Blaine F. Aikin, *Recent class-action surge ups the ante for 401(k) advice*, INVESTMENT NEWS (Feb. 18, 2016), https://www.investmentnews.com/recent-class-action-surge-ups-the-ante-for-401k-advice-66056.

necessary. Thus, the 'manner that is reasonable and appropriate to the particular investment action, and strategies involved ... in this case would mandate a prudent fiduciary – who indisputably has knowledge of institutional share classes and that such share classes provide identical investments at lower costs – to switch share classes immediately." *Tibble v. Edison Int'l*, No. 07-5359 SVW (AGRx), 2017 WL 3523737, at *12 (C.D. Cal. Aug. 16, 2017).

127.    As further support of the routine waiver of investment minimums for large institutional investors, fiduciaries of other defined contribution plans have successfully negotiated on behalf of their plan less expensive institutional share classes for a particular mutual fund option despite that fund not meeting the minimum investment threshold.

128.    Indeed, Wells Fargo's own *A Guide to Investing in Mutual Funds*[22] states:

> From time to time, fund families may institute fee waivers for certain funds and/or share classes. Such waivers are voluntary arrangements to lower shareholder fees, which directly increase shareholder returns.

129.    Defendants knew or should have known that Wells Fargo would have allowed the Plan to provide lower-cost share classes to participants if Defendants had asked.

130.    Defendants breached their fiduciary duties by not selecting lower-cost share classes of mutual fund investment options that were readily available to the Plan. Rather, despite these far lower-cost options that were available, Defendants selected and continue to retain Plan investment options with far higher costs than were available for the Plan based on their size. Moreover, Defendants saddled the Plan with unnecessary fees by using much higher-cost share classes, when a lower-cost share class of the *exact same mutual fund option* was available that was identical in every way except that it charged lower fees. The following table sets forth each higher-cost mutual

---

[22] *See*
https://saf.wellsfargoadvisors.com/emx/dctm/marketing/marketing_materials/mutual_funds/e6244.pdf
(last visited Oct. 17, 2021).

fund share class that was included in the Plan during the proposed class period for which a

significantly lower-cost, but otherwise identical, share class of the same mutual fund was available:

| Fund in Plan | Available Lower Cost Share Class & Expense Ratio[23] | | Difference |
|---|---|---|---|
| | 2019 | | |
| American Funds AMCAP Fund | R5 0.41% | R6 0.36% | 0.05% |
| Artisan Mid Cap | Inv 1.18% | Adv 1.04% or Instl 0.96% | 0.14% or 0.22% |
| T. Rowe Price QM U.S. Small-Cap Growth Equity | Inv 0.80% | I 0.69% | 0.10% |
| Loomis Sayles Investment Grade Bond | Y 0.57% | N 0.46% | 0.11% |
| American Funds American Balanced | R5 0.33% | R6 0.28% | 0.05% |
| MFS Value | R4 0.58% | R6 0.48% | 0.10% |
| JPMorgan Mid Cap Value | L 0.87% | R6 0.75% | 0.12% |
| Templeton Global Bond Fund | Adv 0.77% | R6 0.57% | 0.20% |
| American Funds Retirement Income Portfolio-Conservative | R5E 0.49% | R6 0.31% | 0.19% |
| American Funds 2015 Target Date Ret. | R5E 0.47% | R6 0.33% | 0.14% |
| American Funds 2020 Target Date Ret. | R5E 0.48% | R6 0.34% | 0.14% |
| American Funds 2025 Target Date Ret. | R5E 0.50% | R6 0.36% | 0.14% |
| American Funds 2030 Target Date Ret. | R5E 0.52% | R6 0.38% | 0.14% |
| American Funds 2035 Target Date Ret. | R5E 0.53% | R6 0.39% | 0.14% |

---

[23] From each fund's 2019 prospectus, which investment options and difference in expense ratios are not materially different from 2015-2019.

| American Funds 2040 Target Date Ret. | R5E 0.54% | R6 0.40% | 0.14% |
|---|---|---|---|
| American Funds 2045 Target Date Ret. | R5E 0.54% | R6 0.40% | 0.14% |
| American Funds 2050 Target Date Ret. | R5E 0.55% | R6 0.41% | 0.14% |
| American Funds 2055 Target Date Ret. | R5E 0.56% | R6 0.42% | 0.14% |
| American Funds 2060 Target Date Ret. | R5E 0.58% | R6 0.44% | 0.14% |

131.    First, the more expensive share classes do not offer potential for higher returns. In fact, as disclosed in the prospectuses of the various funds, all of the institutional class shares outperformed the higher cost alternatives, often by the difference in the operating expenses.

132.    Second, as disclosed in the fund prospectuses, the level of risk and the risk factors for the higher cost alternatives are the same as for the institutional class shares.

133.    Third, the institutional class shares (unlike collective trusts) are mutual funds registered by the mutual fund companies with the Securities and Exchange Commission and, like the more expensive shares, publicly traded. Fourth, the level of services offered by the mutual fund companies is irrelevant, given that the Plan participants do not invest directly through the mutual fund companies but instead through the Plan's recordkeeping platform, which buys the shares in bulk and allocates them to the participant accounts.

134.    Finally, selecting higher cost share classes to pay for Plan administrative expenses is not justified in this case. As set forth above, the Plan paid an average of $68 per participant in **direct** recordkeeping and administrative services fees to Wells Fargo between 2015 and 2019. Because those direct fees alone were almost double the $40 per participant reasonable fee for the Plan, there was no prudent reason to include the higher cost share classes to defray Plan administrative costs.

135.     Although the higher fees charged by the more expensive share classes may appear small, the higher fees cost the Plan participants hundreds of thousands of dollars per year. For example, in 2019 alone the Plan participants who invested in MFS Value Fund Class R4 shares paid more than $100,000 in excess mutual fund operating expenses over what they would have paid for the same fund if they invested in the available R6 share class. Overall, the Plan participants paid excess costs of between $700,000 and $900,000 per year because Defendants imprudently failed to offer available lower-cost share classes.

136.     Under trust law, one of the responsibilities of the Plan's fiduciaries is to "avoid unwarranted costs" by being aware of the "availability and continuing emergence" of alternative investments that may have "significantly different costs." Restatement (Third) of Trusts, Ch. 17, intro. note (2007); *see also* Restatement (Third) of Trusts, § 90 cmt. B (2007) ("Cost-conscious management is fundamental to prudence in the investment function."). Adherence to these duties requires regular performance of an "adequate investigation" of existing investments in a plan to determine whether any of the plan's investments are "improvident" or if there is a "superior alternative investment" to any of the plan's holdings. *Pension Ben. Gaur. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt.*, 712 F.3d 705, 718-19 (2d Cir. 2013).

137.     As indicated above, the lower cost share classes of the identical mutual funds for the Plan have been available since at least 2015, some dating back much further.

138.     Because the share classes have identical portfolio manager, underlying investment, and asset allocations, but differ only in cost, Defendants' failure to select the lower cost share classes for the Plan's mutual funds options demonstrates that Defendants failed to prudently consider and use the size and purchasing power of the Plan when selecting the Plan's investment options. Their failure to do so cost the Plan participants millions of dollars in lost retirement

savings.

## IX.    CLASS ACTION ALLEGATIONS

139.    Pursuant to 29 U.S.C. § 1132(a)(2), ERISA authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. § 1109(a).

140.    In acting in this representative capacity and to enhance the due process protections of unnamed participants and beneficiaries of the Plan, as an alternative to direct individual actions on behalf of the Plan under 29 U.S.C. § 1132(a)(2) and (3), Plaintiffs seek to certify this action as a class action on behalf of all participants and beneficiaries of the Plan. Plaintiffs seek to certify, and to be appointed as the representatives of, the following class (the "Class"):

> All participants in and beneficiaries to the Wesco Distribution, Inc. Retirement Savings Plan from March 26, 2015, through the date of judgment (the "Class Period").

141.    Excluded from the Class are Defendants and any Plan fiduciaries. Plaintiffs reserve the right to modify, change, or expand the Class definition based upon discovery and further investigation.

142.    This action meets the requirements of Rule 23 of the Federal Rules of Civil Procedure and is certifiable as a class action for the following reasons:

143.    **Numerosity**: The Class is so numerous that joinder of all members is impracticable. While the exact number and identities of individual members of the Class is unknown at this time because such information is in the sole possession of Defendants and obtainable by Plaintiffs only through the discovery process, Plaintiffs believe, and on that basis allege, that many thousands of persons comprise the Class. Per Form 5500 filed with the DOL for the Plan year ending December 31, 2019, the Class includes at least 9,867 individual current Plan participants.

144.     **Existence and Predominance of Common Questions of Law and Fact:** Common questions of law and fact exist as to all members of the Class because Defendants owed fiduciary duties to the Plan and to all Plan participants and beneficiaries, and took the actions and omissions alleged herein as to the Plan and not as to any individual participant. These questions predominate over the questions affecting individual Class members. These common legal and factual questions include, but are not limited to:

     a.     whether the fiduciaries are liable for the remedies provided by 29 U.S.C. § 1109(a);

     b.     whether Defendants were fiduciaries to the Plan under ERISA;

     c.     whether Defendants breached fiduciary duties to the Plan in violation of ERISA;

     d.     whether the Plan and Plan participants are entitled to damages or monetary relief as a result of Defendants' breaches of fiduciary duties;

     e.     if so, the amount of damages or monetary relief that should be provided to the Plan and its participants;

     f.     what Plan-wide equitable and other relief the Court should impose in light of Defendants' breaches; and

     g.     whether the Plan and its participants are entitled to any other relief as a result of Defendants' breaches and conduct alleged herein.

145.     Given that Defendants have engaged in a common course of conduct as to Plaintiffs and the Class, similar or identical injuries and violations are involved, and common questions far outweigh any potential individual questions.

146.     **Typicality**: All of Plaintiffs' claims are typical of the claims of the Class because

Plaintiffs were, and are, Plan participants during the Class Period and all Plan participants were harmed by the uniform acts and conduct of Defendants discussed herein. Plaintiffs, all Class members, and the Plan sustained monetary and economic injuries including, but not limited to, ascertainable losses in retirement income and retirement account value, arising out of Defendants' breaches of their fiduciary duties to the Plan.

147. **Adequacy:** Plaintiffs are adequate representatives for the Class because Plaintiffs' interests do not conflict with the interests of the Class that they seek to represent; Plaintiffs were Plan participants during the Class Period and continue to participate in the Plan; and Plaintiffs are committed to vigorously representing the Class. Plaintiffs have retained counsel who are competent and highly experienced in complex class action litigation – including ERISA and other complex financial class actions – and counsel intend to prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiffs and Plaintiffs' counsel.

148. **Superiority:** A class action is the superior method for the fair and efficient adjudication of this controversy because joinder of all participants and beneficiaries is impracticable, the losses suffered by individual participants and beneficiaries may be small, and it would be impracticable for individual members to enforce their rights through individual actions. Even if Class members could afford individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, an economy of scale, and comprehensive supervision by a single court. Upon information and belief, members of the Class can be readily identified and notified based on, *inter alia*, the records

(including databases, e-mails, etc.) that Defendants maintain regarding the Plan. Given the nature of the allegations, no Class member has an interest in individually controlling the prosecution of this matter, and Plaintiffs are aware of no difficulties likely to be encountered in the management of this matter as a class action.

149.    Defendants have acted or refused to act on grounds generally applicable to Plaintiffs and the other members of the Class, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Class as a whole.

## X.    CAUSES OF ACTION

### COUNT I
**Breach of Duty of Prudence Under ERISA:**
**Imprudent and Unreasonable RPS Fees and Excessive Mutual Fund**
**Operating Costs**
**(Plaintiffs, individually and on behalf of the Class)**

150.    Plaintiffs incorporate the above allegations as if fully set forth herein.

151.    Defendants are fiduciaries of the Plan under 29 U.S.C. §§ 1002(21) and/or 1102(a)(1).

152.    29 U.S.C. § 1104 imposes fiduciary duties of prudence upon Defendants in their administration of the Plan.

153.    Defendants, as fiduciaries of the Plan, are responsible for selecting an RPS provider that charges reasonable retirement plan service fees.

154.    During the Class Period, Defendants had a fiduciary duty to do all of the following:

 a.    ensure that the Plan's retirement plan service fees were reasonable;

 b.    manage the assets of the Plan for the sole and exclusive benefit of Plan participants and beneficiaries;

 c.    defray reasonable expenses of administering the Plan; and

       d.      act with the care, skill, diligence, and prudence required by ERISA.

155.    During the Class Period, Defendants had a continuing duty to regularly monitor and evaluate the Plan's RPS provider to make sure it was providing the contracted services at reasonable costs, given the highly competitive market surrounding recordkeeping services and the significant bargaining power the Plan had to negotiate the best fees.

156.    During the Class Period, Defendants had a continuing duty to lower the Plan's costs by regularly monitoring and evaluating the Plan's investment options to make sure it was offering mutual fund share classes with the lowest available operating expenses.

157.    During the Class Period, Defendants breached their fiduciary duty of prudence to Plan participants, including Plaintiffs, by:

       a.      Allowing the Plan to pay multiples of the reasonable per-participant amount for the Plan's retirement plan service fees;

       b.      Failing to properly disclose the fees charged to Plan participants in their quarterly statements or fee disclosures;

       c.      Failing to defray reasonable expenses of administering the Plan;

       d.      Failing to investigate the availability of lower-cost share classes of certain mutual funds in the Plan; and

       e.      Failing to act with the care, skill, diligence, and prudence required by ERISA.

158.    During the Class Period, Defendants breached their duty to Plan participants, including Plaintiffs, by failing to employ or follow a prudent process to critically or objectively evaluate the cost and performance of the Plan's RPS provider in comparison to other RPS options

by conducting a request for proposal or properly benchmarking the Plan's RPS fees and failing to leverage the Plan's size to obtain lower fees.

159.    During the Class Period, Defendants breached their duty to Plan participants, including Plaintiffs, by failing to employ or follow a prudent process to critically or objectively evaluate the availability of lower-cost share classes of certain mutual funds in the Plan without any valid reason to keep the higher priced shares as Plan investment options.

160.    Through these actions and omissions, Defendants breached their fiduciary duties of prudence with respect to the Plan in violation of 29 U.S.C. § 1104(a)(1)(A).

161.    Defendants failed to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of a like character and with like aims, thus breaching their duties under 29 U.S.C. § 1104(a)(1)(B).

162.    As a result of Defendants' breach of fiduciary duties, Plaintiffs and Plan participants suffered objectively unreasonable and unnecessary monetary losses.

163.    Defendants are liable under 29 U.S.C. §§ 1109(a) and 1132(a)(2) to make good to the Plan the losses resulting from the breaches, to restore to the Plan any profits Defendants made through the use of Plan assets, and to restore to the Plan any profits resulting from the breaches of fiduciary duties alleged in this Count. In addition, Defendants are subject to other equitable relief pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2) and (3).

**COUNT II**
**Failure to Adequately Monitor Other Fiduciaries Under ERISA:**
**Imprudent and Unreasonable RPS Fees**
**(Plaintiffs, individually and on behalf of the Class)**

164.    Plaintiffs incorporate the above allegations as if fully set forth herein.

165.    Defendants had the authority to appoint and remove individuals responsible for retirement plan service fees for the Plan and knew or should have known that these fiduciaries had critical responsibilities for the Plan.

166.    In light of this authority, Defendants had a duty to monitor those individuals responsible for overseeing retirement plan service fees for the Plan to ensure that they were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that these individuals were not fulfilling those duties.

167.    Defendants had a duty to ensure that the individuals responsible for Plan administration possessed the needed qualifications and experience to perform their duties (or used qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analyses respecting Plan decisions; and reported regularly to Defendants.

168.    Defendants breached their fiduciary duties by, among other things:

a.      Failing to monitor and evaluate the performance of individuals responsible for retirement plan service fees for the Plan, or have a system in place for doing so, standing idly by as the Plan suffered significant losses in the form of unreasonably high retirement plan service fee expenses;

b.      Failing to monitor the process by which the Plan RPS provider was evaluated and failing to investigate the availability of lower-cost RPS providers;

c.      Failing to remove individuals responsible for RPS fees for the Plan whose performance was inadequate in that these individuals continued to pay the same RPS fees even though benchmarking and using other similar comparators would have shown that maintaining Wells Fargo as the RPS provider altogether or at the current level of fees paid

to it was imprudent and excessively costly, all to the detriment of the Plan and Plan participants' retirement savings;

      f.     Failing to monitor the process by which the Plan investigated the availability of lower-cost share classes of certain mutual funds in the Plan; and

      g.     Failing to remove individuals responsible for excessive mutual fund operating expenses for the Plan whose performance was inadequate in that these individuals continued to offer the same higher-cost share classes even though a review of the fund prospectus would have shown that lower-cost share classes were available, and that maintaining the Plan investment options in the current share classes was imprudent and excessively costly, all to the detriment of the Plan and Plan participants' retirement savings.

169.    As consequences of the foregoing fiduciary breaches, Plaintiffs and Plan participants suffered unreasonable and unnecessary monetary losses.

170.    Pursuant to 29 U.S.C. §§1109(a) and 1132(a)(2), Defendants are liable to restore to the Plan all losses caused by their failure to adequately monitor individuals responsible for retirement plan service fees for the Plan. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief.

## XI.    <u>PRAYER FOR RELIEF</u>

**WHEREFORE**, Plaintiffs pray that judgment be entered against Defendants on all claims and request that the Court award the following relief:

    A.    A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative Rule 23(b)(2), of the Federal Rules of Civil Procedure;

    B.    Designate Plaintiffs as Class Representatives and Plaintiffs' counsel as Class Counsel;

C.      A declaration stating that Defendants have breached their fiduciary duties under ERISA;

D.      An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of fiduciary duty, including restoring to the Plan all losses resulting from the failure to properly monitor and control RPS fees, and restoring to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

E.      An Order enjoining Defendants from any further violation of their ERISA fiduciary responsibilities, obligations, and duties;

F.      Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of Plan fiduciaries deemed to have breached their fiduciary duties;

G.      An award of pre-judgment interest;

H.      An award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

I.      Such other and further relief as the Court deems equitable and just.

Dated: October 18, 2021        By: */s/ Paul R. Wood*
                      Paul R. Wood (*pro hac vice*)
                      Franklin D. Azar (*pro hac vice*)
                      Timothy Foster (*pro hac vice*)
                      Margeaux R. Azar (*pro hac vice*)
                      FRANKLIN D. AZAR & ASSOCIATES, P.C.
                      14426 East Evans Avenue
                      Aurora, CO 80014
                      Telephone: (303) 757-3300
                      Fax: (720) 213-5131
                      *woodp@fdazar.com*
                      *azarf@fdazar.com*
                      *fostert@fdazar.com*
                      *azarm@fdazar.com*

                      Steven A. Schwartz (PA ID No. 50579)
                      Beena McDonald (PA ID No. 83315)
                      CHIMICLES SCHWARTZ KRINER
                       & DONALDSON-SMITH LLP

361 W. Lancaster Avenue
Haverford, PA 19041
Tel: (610) 642-8500
Fax: 610-649-3633
*sas@chimicles.com*
*bmm@chimicles.com*

*Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I, Paul R. Wood, hereby certify that on October 18, 2021, I authorized the electronic filing of the foregoing, AMENDED COMPLAINT – CLASS ACTION, using the CM/ECF system, which will send notification of such filing to the e-mail addresses denoted on the Electronic Mail Notice List maintained by this Court.


*/s/ Paul R. Wood*
Attorney for Plaintiff