# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ROBERT MATOR, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civil Action No. 2:21-cv-00403-MJH |
| v. | ) | |
| | ) | Judge Marilyn J. Horan |
| WESCO DISTRIBUTION, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

Stephanie R. Reiss
MORGAN, LEWIS & BOCKIUS LLP
One Oxford Centre, 32nd Fl.
Pittsburgh, PA 15219-6401
Telephone: 412.560.3378
Fax:  412.560.7001
stephanie.reiss@morganlewis.com

Deborah S. Davidson (*pro hac vice*)
MORGAN, LEWIS & BOCKIUS LLP
110 North Wacker Drive,
Chicago, IL 60606
Telephone:  312. 324.1000
Fax:  312.324.1001
Deborah.davidson@morganlewis.com

Matthew J. Sharbaugh (*pro hac vice*)
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, N.W.
Washington, DC 20004
Telephone:  202.739.5623
Fax:  202.739.3001
matthew.sharbaugh@morganlewis.com

## TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ........................................................................................................ 1

II.    FACTUAL BACKGROUND ...................................................................................... 3

   A.    Key Features Of The Plan. ................................................................................. 3

   B.    The Plan's Fees And Expenses. ........................................................................ 4

   C.    Plaintiffs' Claims. .............................................................................................. 7

III.   ARGUMENT ............................................................................................................... 7

   A.    Plaintiffs' Amended Complaint Fails To State A Viable Claim Under ERISA. ......... 7

      1.    Plaintiffs Fail To State A Viable Claim For Breach Of ERISA's Duty Of Prudence. ........................................................................................................ 8

         a.    Plaintiffs' Challenge To The Plan's Administrative And Recordkeeping Fee Structure Fails To State A Viable Claim. ....................... 8

            (i)    Conclusory Allegations On Services Are Insufficient. ........................... 11

            (ii)    Plaintiffs Do Not Point To Appropriate Benchmarks On RPS Fees. ...... 13

            (iii)    Plaintiffs Make Apples-To-Oranges Comparisons By Different Calculations of Fees. .......................................................................... 15

            (iv)    Plaintiffs Made No Attempt to Exhaust Investigatory Avenues Available To Them At the Pleadings Stage. ........................................ 17

         b.    Plaintiffs' Preference For Lower-Cost Share Classes Of Certain Funds Fails To State A Viable Claim. ...................................................... 18

         c.    Sweda Still Does Not Save Plaintiffs' Claim. ................................................. 20

      2.    Plaintiffs' Derivative Failure-To-Monitor Claims Fails. ..................................... 21

   B.    Plaintiffs' Second Amended Complaint Should Be Dismissed With Prejudice. ........ 21

IV.    CONCLUSION ............................................................................................................. 22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Aetna, Inc. Sec. Litig.*,
  No. 07-4451, 2009 WL 1619636 (E.D. Pa. June 9, 2009)........................................................5

*Albert v. Oshkosh Corp.*,
  No. 20-901, 2021 WL 3932029 (E.D. Wis. Sept. 2, 2021)....................................................14

*Ashcroft v. Iqbal*,
  556 U.S. 663 (2009)..............................................................................................................7

*Brown v. Daikin Am., Inc.*,
  No. 18-cv-11091, 2021 WL 1758898 (S.D.N.Y. May 4, 2021) .................................10, 14, 20

*Buck v. Hampton Twp. Sch. Dist.*,
  452 F.3d 256 (3d Cir. 2006)..................................................................................................3

*Ca. Public Employees' Ret. Sys. v. Chubb Corp.*,
  394 F.3d 126 (3d Cir. 2004)................................................................................................22

*Del Castillo v. Cmty. Child Care Council of Santa Clara Cty., Inc.*,
  No. 17-cv-07243, 2019 WL 6841222 (N.D. Cal. Dec. 16, 2019)...........................................15

*In re Eaton Vance Mut. Funds Fee Litig.*,
  380 F. Supp. 2d 222 (S.D.N.Y. 2005)...................................................................................22

*Edgar v. Avaya, Inc.*,
  503 F.3d 340 (3d Cir. 2007)................................................................................................21

*In re Fidelity ERISA Fee Litig.*,
  990 F.3d 50 (1st Cir. 2021)...................................................................................................3

*Fifth Third Bancorp v. Dudenhoeffer*,
  573 U.S. 409 (2014).........................................................................................................7, 8

*Foman v. Davis*,
  371 U.S. 178 (1962)............................................................................................................21

*Forman v. TriHealth, Inc.*,
  --- F. Supp. 3d ---, 2021 WL 4346764 (S.D. Ohio Sept. 24, 2021)........................................9

*Franks v. Food Ingredients Int'l, Inc.*,
  No. 09-3649, 2010 WL 3046416 (E.D. Pa. July 30, 2010) ...................................................22

*Grayson v. Mayview State Hosp.*,
    293 F.3d 103 (3d Cir. 2002).............................................................................21

*Hecker v. Deere & Co.*,
    556 F.3d 575 (7th Cir. 2009) .........................................................................3

*Hecker v. Deere & Co.*,
    569 F.3d 708 (7th Cir. 2009) ....................................................................9, 12

*Hughes v. Northwestern University*,
    142 S. Ct. 737 (2022).................................................................................7, 19

*ING Inv. Plan Servs. v. Solberg*,
    No. 09-01517, 2010 WL 582347 (D. Colo. Feb. 16, 2010).........................3

*Johnson v. Radian Grp., Inc.*,
    No. 08-2007, 2010 WL 2136562 (E.D. Pa. May 26, 2010).......................21

*Krantz v. Prudential Invs.*,
    305 F.3d 140 (3d Cir. 2002).........................................................................22

*Kurtz v. Vail Corp.*,
    511 F. Supp. 3d 1185 (D. Colo. 2021).........................................................20

*Leimkuehler v. Am. United Life Ins. Co.*,
    713 F.3d 905 (7th Cir. 2013) .........................................................................5

*Matney v. Barrick Gold of N. Am., Inc.*,
    No. 20-275, 2022 WL 1186532 (D. Utah Apr. 21, 2022)................15, 19, 20

*Mator v. Wesco Distr., Inc.*,
    No. 21-403, 2022 WL 1046439 (W.D. Pa. Apr. 7, 2022)................. *passim*

*Mator v. Wesco Distribution, Inc.*,
    No. 21-403, 2021 WL 4523491 (W.D. Pa. Oct. 4, 2021) ................ *passim*

*Nat'l Credit Union Admin. Bd. v. U.S. Bank Nat'l Ass'n*,
    898 F.3d 243 (2d Cir. 2018).........................................................................21

*Nicolas v. Trs. Of Princeton Univ.*,
    No. 17–3695, 2017 WL 4455897 (D.N.J. 2017) ..................................21

*Patterson v. Morgan Stanley*,
    No. 16-6568, 2019 WL 4934834 (S.D.N.Y. Oct. 7, 2019).........................3

*PBGC ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*,
    712 F.3d 705 (2d Cir. 2013).......................................................................8, 9

*Renfro v. Unisys Corp.*,
    671 F.3d 314 (3d Cir. 2011)........................................................................2, 4, 8, 9

*Sacerdote v. N.Y. Univ.*,
    328 F. Supp. 3d 273 (S.D.N.Y. 2018)..................................................................12

*Santiago v. Warminster Twp.*,
    629 F.3d 121 (3d Cir. 2010).................................................................................7

*Spear v. Fenkell*,
    No. 13-02391, 2015 WL 3643571 (E.D. Pa. June 12, 2015)...............................21

*Sweda v. Univ. of Penn.*,
    923 F.3d 320 (3d Cir. 2019)...........................................................................8, 20

*In re Unisys Sav. Plan Litig.*,
    74 F.3d 420 (3d Cir. 1996)...................................................................................8

*White v. Chevron Corp.*,
    752 F. App'x 453 (9th Cir. 2018) ......................................................................18

*White v. Chevron Corp.*,
    No. 16-cv-0793, 2016 WL 4502808 (N.D. Cal, Aug. 29, 2016) .........................15

*White v. Chevron Corp.*,
    No. 16-cv-0793, 2017 WL 2352137 (N.D. Cal, May 31, 2017).....................18, 19

*Wilcox v. Georgetown Univ.*,
    No. 18-0422, 2019 WL 132281 (D.D.C. Jan. 8, 2019)........................................10

*Young v. Gen. Motors Inv. Mgmt. Corp.*,
    325 F. App'x 31 (2d Cir. 2009) ...............................................................10, 12, 15

**Statutes**

29 U.S.C. § 1002(34) ..................................................................................................3

29 U.S.C. § 1024(b)(4) ........................................................................................1, 17

29 U.S.C. § 1104(a)(1)(B) ......................................................................................7, 8

**Other Authorities**

Dep't of Labor EBSA, 2018 Instructions for Form 5500, available at:
    https://www.dol.gov/sites/dolgov/files/EBSA/employers-and-advisers/plan-
    administration-and-compliance/reporting-and-filing/form-5500/2018-
    instructions.pdf (last visited May 17, 2022) ......................................................13

Dep't of Labor, A Look at 401(k) Plan Fees (Sept. 2019),
https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited May 17, 2022) .................................................................................................9

Dep't of Labor, Employee Benefits Security Administration, *Tips for Selecting and Monitoring Service Providers for Your Employee Benefit Plan*, https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/fact-sheets/tips-for-selecting-and-monitoring-service-providers.pdf (last visited May 17, 2022). ...............................................9

Dep't of Labor, Understanding Retirement Plan Fees and Expenses (Sept. 2021), https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/understanding-retirement-plan-fees-and-expenses.pdf (last visited May 17, 2022) .........................................................4

https://www.ici.org/401k (last visited May 17, 2022) ..................................................14

NEPC 2019 Defined Contribution Progress Report, https://cdn2.hubspot.net/hubfs/2529352/2019%20DC%20Plan%20and%20Fee%20Survey%20(progress%20report)/2019%20NEPC%20DC%20Plan%20Progress%20Report.pdf..............................................................................................14

I.     **INTRODUCTION**

On April 7, 2022, this Court considered "whether Plaintiffs' Amended Complaint ha[d] cured the pleading deficiencies identified in this Court's October 4, 2021 Opinion and Order," *Mator v. Wesco Distr., Inc.*, No. 21-403, 2022 WL 1046439, at *3 (W.D. Pa. Apr. 7, 2022) ("*Mator II*"), and determined that it did not.  The Court therefore dismissed Plaintiff's claims in their entirety once again.  Now, having twice failed to state plausible claims, Plaintiffs make a **third** attempt to assert viable claims challenging the WESCO Distribution, Inc. Retirement Savings Plan's (the "Plan") expenses for retirement plan services ("RPS") and certain investment share-class offerings.  But Plaintiffs change very little in their Second Amended Complaint, focusing again on the same flawed theories and the same flawed allegations that this Court has rejected twice over.  Because the Second Amended Complaint does not cure the deficiencies previously identified by this Court, it is subject to dismissal for the same reasons.

Specifically, in its most recent opinion, the Court explained that dismissal was appropriate because the "Amended Complaint still offers a mere price tag to price tag comparison, accompanied by conclusory allegations and lack of detail as to the categories of services" with respect to the RPS fee claims.  *Mator II*, 2022 WL 1046439, at *7.  The Court held that the allegations about RPS fees relied "on a benchmark without any sufficient factual foundation" and failed to offer a requisite "apples-to-apples comparison."  *Id.*  The Court also noted that Plaintiffs failed to exhaust all investigatory avenues at the pleading stage, as they never even requested the Plan's recordkeeping agreement under 29 U.S.C. § 1024(b)(4).  *Id.*  As to Plaintiffs' share-class allegations, the Court once again held that Plaintiffs cannot plausibly allege a fiduciary breach simply by asserting that WESCO Distribution, Inc. and the

Administrative and Investment Committee for the Plan[1] (together, "WESCO") "chose mutual fund share classes with higher costs even though less expensive class shares of the same funds were available." *Id*. at *8. Plaintiffs' additional allegations that the use of higher-cost share classes was unnecessary to defray recordkeeping and administrative costs "did not sufficiently buttress Plaintiff's imprudence claims," and "Plaintiffs have not addressed whether the retail share class may have offered other benefits." *Id.* None of these deficiencies have been cured.

 **First,** Plaintiffs still do not put forward any factual allegations about the type, scope, or caliber of recordkeeping and administrative services being provided to the WESCO Plan or any of Plaintiffs' proposed comparator plans, nor did Plaintiffs request the WESCO Plan's recordkeeping agreement, as the Court suggested. Instead, they continue to offer only vague and conclusory generalizations that the services offered to most large plans are similar.

**Second,** Plaintiffs have done nothing to change their analysis to ensure they are making an "apples-to-apples" comparison of fees. Rather, they continue to make the same apples-to-oranges comparison, including comparing just *direct* recordkeeping fees of some of their comparator plans to both *direct and indirect* fees for the WESCO Plan. These are the same pleading failures that led the Court to dismiss Plaintiffs' prior complaints. Plaintiffs repeat them.

**Third,** as to their share-class claim, Plaintiffs fail to plead new allegations. Instead, they echo the same categorical argument of breach, insisting that a "retail" share class for some investments is *per se* unreasonable when recordkeeping fees were already allegedly too high.

These myriad deficiencies doom Plaintiffs' primary claim for breach of the duty of prudence. *See, e.g., Renfro v. Unisys Corp.*, 671 F.3d 314, 327 (3d Cir. 2011) (dismissal is

---

[1] As of January 1, 2021, now known as the Benefits Administration Committee and Finance Retirement Committee.

appropriate where, as here, the complaint lacked allegations about process and the court would be "unable to infer from what is alleged that the process was flawed."). With their failure-to-monitor claim being a derivative cause of action, that claim fails as well.

Thus, for the same reasons the Court previously identified, as well as additional reasons discussed below, the Second Amended Complaint fails to state plausible claims. And because Plaintiffs have shown through their repeated failures to cure the deficiencies that they are unable to do so, further leave to amend would be futile, and the case should be dismissed with prejudice.

## II.   FACTUAL BACKGROUND[2]

### A.   Key Features Of The Plan.

WESCO provides its employees with a range of benefits, including the ability to save for retirement through the Plan. The Plan is an individual-account, defined-contribution plan under ERISA, 29 U.S.C. § 1002(34). Second Am. Compl. ("SAC") ¶ 7. In a defined-contribution plan, participants are empowered to select their own investments and investment allocations for their individual retirement accounts from a menu of investment options, tailoring their retirement-investing strategy to suit their own retirement timeline, risk tolerance and other

---

[2] This summary comes from the allegations of the Second Amended Complaint and other materials properly before the Court. *See, e.g.*, *Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006) (a court evaluating a Rule 12(b)(6) motion may consider documents "attached to or submitted with the complaint, and any matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, and items appearing in the record of the case"). As relevant here, the Court may consider the Form 5500s filed with the Department of Labor ("DOL") as discussed in the Second Amended Complaint (SAC ¶¶ 7, 29, 30, 97-98, 103, 106, 147), fund prospectuses, participant disclosures, and Plan recordkeeping agreements/amendments (as also discussed in the SAC ¶ 97 & n.15, n.16, ¶ 133). *See, e.g.*, *Patterson v. Morgan Stanley*, No. 16-6568, 2019 WL 4934834, at *11 (S.D.N.Y. Oct. 7, 2019) (participant fee disclosures); *Hecker v. Deere & Co.*, 556 F.3d 575, 582-83 (7th Cir. 2009) ("*Hecker I*") (fund prospectuses and related materials); *In re Fidelity ERISA Fee Litig.*, 990 F.3d 50, 53-54 (1st Cir. 2021) (recordkeeping contract); *ING Inv. Plan Servs. v. Solberg*, No. 09-01517, 2010 WL 582347, at *1 n.2 (D. Colo. Feb. 16, 2010) (plan services agreements).

preferences.  *See Renfro*, 671 F.3d at 327 ("An ERISA defined contribution plan is designed to offer participants meaningful choices about how to invest their retirement savings.").  Here, the Plan allows employees to save for retirement on a tax-deferred basis, with WESCO adding to those retirement savings through matching contributions.  Between 2015 and 2020, WESCO contributed more than $86 million in employer-matching contributions to Plan participants.[3]

Throughout the putative class period, the Plan has offered a diverse menu of almost 50 different investment options (with at least 25 offered at any given point in time) that cover different asset classes (*e.g.,* stocks, bonds, stable-value options), investment styles (*i.e.*, actively-managed funds and passive "index" funds), and risk-reward profiles.  *See, e.g.,* Exs. 1-6, 2015-2020 404a-5 fee disclosures.  Participants can also select from among many other investment options of their choosing through a self-directed brokerage investment account.  *Id.*

B.    **The Plan's Fees And Expenses.**

Like all 401(k) plans, there are expenses associated with the Plan.  There are investment-management fees, which are "ongoing charges for managing the assets in the investment fund"; there are also administrative fees that encompass the "day-to-day" expenses for "administrative services . . . necessary for administering the plan as a whole," including "plan recordkeeping, accounting, legal and trustee services."[4]

---

[3] WESCO contributed millions each year.  Ex. 7, 2015 Form 5500, Fin. Stmts. at 4 ($9,013,325); Ex. 8, 2016 Form 5500, Fin. Stmts. at 3 ($10,364,792); Ex. 9, 2017 Form 5500, Fin. Stmts. at 3 ($19,896,481); Ex. 10, 2018 Form 5500, Fin. Stmts. at 4 ($31,125,052); Ex. 11, 2019 Form 5500, Fin. Stmts. at 4 ($12,319,253); Ex. 24, 2020 Form 5500 Fin. Stmts. at 5 ($5,061,251).

[4] *See* Dep't of Labor, Understanding Retirement Plan Fees and Expenses at 2, 3 (Sept. 2021), https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/understanding-retirement-plan-fees-and-expenses.pdf (last visited May 17, 2022).

Investment-management fees are expressed in the form of an "expense ratio" for each investment—*i.e.,* a percentage-based deduction against a participant's total assets in the investment.  For instance, a participant who invests $1,000 in a fund with an expense ratio of 0.10% pays an annual fee of $1 ($1,000 x 0.001).   This expense ratio is also sometimes expressed in "basis points," with one basis point equaling 1/100th of 1 percent.   Accordingly, an 0.10% expense ratio is the same as 10 basis points.  *Cf. In re Aetna, Inc. Sec. Litig.*, No. 07-4451, 2009 WL 1619636, at *4 (E.D. Pa. June 9, 2009), *aff'd in part*, 617 F.3d 272 (3d Cir. 2010) (noting that 1.5% is the same as 150 basis points and 1.3% is the same as 130 basis points).

As to recordkeeping and administration fees, plan participants often pay those costs through "revenue sharing" from the investments' expense ratios or as a per-participant fee. Revenue sharing is "an arrangement allowing mutual funds to share a portion of the fees that they collect from investors with entities that provide services to the mutual funds," like recordkeepers.  *See Leimkuehler v. Am. United Life Ins. Co.*, 713 F.3d 905, 907-08 (7th Cir. 2013); *see also* SAC ¶ 74 (stating that in a revenue-sharing arrangement, a mutual fund directs a portion of the expense ratio to the plan's recordkeeper to pay for recordkeeping and administrative services).  For instance, if an investment's expense ratio is 0.75%, the investment manager could pay, or "share," a portion of the 0.75% fee, or "revenue," it collects with the plan's recordkeeper for services it provides.  SAC ¶ 66.

From 2015 until mid-2020, Wells Fargo Bank, N.A. ("Wells Fargo") was the Plan recordkeeper.  SAC ¶ 93.  Recordkeeping and certain other administrative fees were paid by the Plan through an ERISA account funded by revenue sharing.  *Id.* ¶¶ 20, 25 (alleging that Plaintiffs held Plan investments that paid revenue sharing fees); Exs. 12-14, excerpts from 2015, 2017, 2018 Amendments to Wells Fargo Service Agreement Exhibits/Fee Schedules (noting on fee

schedule that administration fees were derived from annual asset-based fees).  Although not all funds in the Plan participated in revenue sharing, certain funds contributed a portion of the investment-management fees to the ERISA account, in percentages ranging from 0.05% to 0.35%.  *See* Exs. 12-14, 2015, 2017, 2018 excerpts from Amendments to Wells Fargo Service Agreement Exhibits/Fee Schedules (in Attachment A, reflecting revenue sharing in "asset based fees paid by fund" column).  Wells Fargo charged recordkeeping fees to the Plan from the ERISA account that were calculated as a percentage of assets under management.  Over time, this percentage was steadily negotiated downward, as reflected in the following chart:

| Date | Previous Recordkeeping Fee | New Recordkeeping Fee |
|---|---|---|
| December 2014 | 14 bps | 11 bps |
| March 2017 | 11 bps | 9.5 bps |
| October 2018 | 9.5 bps | 6 bps |

*See* Exs. 12-15, 2015, 2017, 2018 and 2011 excerpts from Amendments to Wells Fargo Service Agreement Exhibits/Fee Schedules (in Attachment A, reflecting recordkeeping fee in "additional asset based fees" or "asset based wrap fees" columns).  In addition, if overage from revenue-sharing was available beyond the necessary amount to cover Plan-related expenses, the excess was paid back to participants through a credit posted in their Plan accounts.  *See, e.g.*, Exs. 16-17, 2018 and 2019 Rebate Disclosures to Participants.

The Plan changed recordkeepers to Fidelity Investments ("Fidelity") on July 1, 2020.  SAC ¶ 114.  As a result of this change in 2020, participants paid a flat annual recordkeeping fee of $53 per participant.  *Id*.; s*ee also* Ex. 6, 2020 404a-5 fee disclosure at p. B5.  The funds with revenue sharing now fully rebate these revenue-sharing amounts back to the participants on a quarterly basis.  *See* Ex. 18, excerpt from Fidelity Investments Retirement Plan Service Agreement at 5 (describing participant revenue credits).

C.   **Plaintiffs' Claims**.

As with the prior two complaints, the Second Amended Complaint asserts two claims.  In Count I, Plaintiffs allege that WESCO breached its fiduciary duty of prudence under ERISA, 29 U.S.C. § 1104(a)(1)(B), by allowing the Plan to pay excessive RPS fees and failing to offer the least-expensive share classes of certain funds.  SAC ¶¶ 154-167.  In Count II, Plaintiffs allege that WESCO failed to adequately monitor the performance of other fiduciaries.  *Id.* ¶¶ 168-174. Plaintiffs seek to pursue these claims on a classwide basis, on behalf of all participants or beneficiaries in the Plan from March 26, 2015 through the present.  *Id.* ¶ 144.

III.   **ARGUMENT**

A.   **Plaintiffs' Amended Complaint Fails To State A Viable Claim Under ERISA**.

In *Hughes v. Northwestern University*, 142 S. Ct. 737 (2022), the Supreme Court confirmed that, to assess whether an ERISA plaintiff plausibly alleges a fiduciary breach, the Court must perform a "context specific" analysis of the complaint's allegations, "[b]ecause the content of the duty of prudence turns on 'the circumstances . . . prevailing' at the time the fiduciary acts."  *Id.* at 742 (quoting *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014).  In doing so as part of the Rule 12(b)(6) analysis, the court "must give due regard *to the range of reasonable judgments* a fiduciary may make."  *Id.* at 742 (emphasis added).  This requires evaluating Plaintiff's "allegations as a whole" to determine if they satisfy the *Iqbal* and *Twombly* pleading standards.  *Id.*; *see also Ashcroft v. Iqbal*, 556 U.S. 663, 678 (2009) (plaintiffs must plead "sufficient factual matter . . . to state a claim to relief that is plausible on its face.").  The Court must disregard allegations that are "no more than conclusions" and thus "not entitled to the assumption of truth."  *Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010).  A complaint's factual allegations must be sufficient to move the claim "beyond the threshold of a plausible claim rather than a possible claim."  *Mator II*, 2022 WL 1046439, at *8; *Mator v.

*Wesco Distribution, Inc.*, No. 21-403, 2021 WL 4523491, at *6 (W.D. Pa. Oct. 4, 2021) ("*Mator I*") (reiterating that a claim "must cross the threshold from possible to probable.").

In the ERISA class-action context, the U.S. Supreme Court has also emphasized that a motion to dismiss is an "important mechanism for weeding out meritless claims[.]" *Dudenhoeffer*, 573 U.S. at 425. "[T]he prospect of discovery in a suit claiming breach of fiduciary duty is ominous" and "elevates the possibility that a plaintiff with a largely groundless claim will simply take up the time of a number of other people, with the right to do so representing an *in terrorem* increment of the settlement value[.]" *PBGC ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.* ("*St. Vincent*"), 712 F.3d 705, 719 (2d Cir. 2013).

> ### 1. ***Plaintiffs Fail To State A Viable Claim For Breach Of ERISA's Duty Of Prudence****.*
>
> #### a. **Plaintiffs' Challenge To The Plan's Administrative And Recordkeeping Fee Structure Fails To State A Viable Claim**.

To state a viable claim for breach of the duty of prudence, Plaintiffs must offer well-pleaded factual allegations demonstrating that WESCO did not act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B). "[A] court assesses a fiduciary's performance by looking at process rather than results, focusing on a fiduciary's conduct in arriving at [a] … decision … and asking whether a fiduciary employed the appropriate methods to investigate and determine the merits of a particular [decision]." *Sweda v. Univ. of Penn.*, 923 F.3d 320, 329 (3d Cir. 2019); *see also Renfro*, 671 F.3d at 322 (emphasizing that ERISA's prudence standard focuses on the decision-making used by a plan's fiduciaries, not the after-the-fact results of that process) (citing *In re Unisys Sav. Plan Litig.*, 74 F.3d 420, 434 (3d Cir.

1996)).  Where ERISA plaintiffs fail to plead any facts regarding the actual process used, they face an even higher burden: they must allege sufficient facts from which the Court can reasonably *infer* that the fiduciaries' process was impermissibly flawed.  *See Renfro*, 671 F.3d at 327 (affirming dismissal of ERISA fiduciary-breach claims because the court was "unable to infer from what is alleged that the process is flawed"); *St. Vincent*, 712 F.3d at 718 (explaining that fiduciary-breach claims survive dismissal only "if the court, based on circumstantial factual allegations, may reasonably infer from what is alleged that the process was flawed").

ERISA does not require fiduciaries "to pick the least costly provider," whether for recordkeeping or any other administrative services, because "[c]ost is only one factor to be considered in selecting a service provider."[5]  In fact, DOL guidance warns fiduciaries they *cannot* "consider fees in a vacuum" because "[t]hey are only one part of the bigger picture, including … the extent and quality of services provided."[6]

In turn, courts have correctly ruled that an ERISA plaintiff's fee-related criticisms of a plan's recordkeeper are meaningless where the complaint is "silent about the services that … participants received" for the challenged fees.  *See Hecker v. Deere & Co.*, 569 F.3d 708, 711 (7th Cir. 2009) ("*Hecker II*") (denying petition for rehearing and affirming Rule 12(b)(6) dismissal of ERISA fiduciary-breach claim for excessive fees); *Forman v. TriHealth, Inc.*, --- F. Supp. 3d ---, 2021 WL 4346764, at *5 (S.D. Ohio Sept. 24, 2021) (dismissing fiduciary-breach

---

[5] *See* Dep't of Labor, Employee Benefits Security Administration, *Tips for Selecting and Monitoring Service Providers for Your Employee Benefit Plan*, https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/fact-sheets/tips-for-selecting-and-monitoring-service-providers.pdf (last visited May 17, 2022).

[6] *See* Dep't of Labor, A Look at 401(k) Plan Fees at 9 (Sept. 2019), https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited May 17, 2022).

claim based on excessive recordkeeping fees where "Plaintiffs did not describe what services the Plan received in exchange for these administrative fees or what services the "comparable 401(k) plans" received in exchange for their less costly fees ), *appeal filed*, No. 21-3977 (6th Cir. Oct. 25, 2021); *Wilcox v. Georgetown Univ.*, No. 18-0422, 2019 WL 132281, at *12 (D.D.C. Jan. 8, 2019) ("Plaintiffs [did] not allege that the currently available investment resources would remain available at their preferred price of $35/year."); *Brown v. Daikin Am., Inc.*, No. 18-cv-11091, 2021 WL 1758898, at *8 (S.D.N.Y. May 4, 2021) (dismissing claim for excessive administrative fees through revenue sharing where complaint did not recognize the services provided by the recordkeeper, and therefore failed to demonstrate the fees were "'so disproportionately large that [they bore] no reasonable relationship to the services rendered'"); *cf. Young v. Gen. Motors Inv. Mgmt. Corp.*, 325 F. App'x 31, 33 (2d Cir. 2009) (affirming dismissal of fiduciary-breach claim where plaintiffs "allege[d] no facts concerning other factors relevant to determining whether a fee is excessive under the circumstances").

Consistent with all of this authority, this Court held in its most recent opinion that because the Amended Complaint (1) relied on comparator "benchmark[s] without any sufficient factual foundation," and (2) "still offer[ed] a mere price tag to price tag comparison, accompanied by conclusory allegations and lack of detail as to the categories of services," Plaintiffs' allegations were insufficient to move the RPS fees claim "beyond the threshold of a plausible claim rather than a possible claim." *Mator II*, 2022 WL 1046439, at *7-8. The Court also suggested that that plaintiffs did not "exhaust[]" their "investigatory avenues at the pleading stage," in large part because they did not seek the Plan's recordkeeping agreement. *Id.* at *7.

In response, Plaintiffs have once again added nothing but window dressing to their prior allegations, hoping to pass off the Second Amended Complaint as comparing WESCO's total

RPS fees to the total RPS fees for comparator plans, and for the same suite and scope of services. A review of their allegations, however, demonstrates that Plaintiffs have once again failed to resolve their pleading deficiencies.

**(i)**      **Conclusory Allegations On Services Are Insufficient.**

Plaintiffs still offer nothing but a price-tag-to-price-tag comparison, unaccompanied by any well-pled allegations about the services provided for the amounts charged.  *See* SAC ¶¶ 102, 106 (chart of purported RPS price tags for alleged comparator plans).  Plaintiffs' allegations about the services offered by Wells Fargo have not changed.  *Compare* SAC ¶ 94, *with* Am. Compl. ¶¶ 94-95.  And Plaintiffs invoke the same generalizations in purporting to contrast the Plan's recordkeeping services with the services of the other plans, presupposing that the comparator recordkeepers all offered "similar or identical services" to those of Wells Fargo, and conversely that Wells Fargo's services were "typical of the services provided to any large defined contribution plan."  *Compare* SAC ¶ 56 (services provided by recordkeepers to large defined contribution plans have been the same since the mid-2000s), ¶ 94 (Wells Fargo's services were typical), ¶ 108 (stating that all comparators "provide identical or similar services" to Wells Fargo); *with* Am. Compl. ¶ 51 (services provided by recordkeepers to large defined contribution plans have been the same since the mid-2000s), ¶ 111 (stating all comparators "offered identical or similar packages of services" to Wells Fargo).  Plaintiffs only change the phrasing of the broad list of services in the comparator paragraph to ensure that it mirrors the phrasing in the list they provided for Wells Fargo in Paragraph 94, but the generality and lack of information on the actual scope and level of service remains the same.  *Compare* SAC ¶ 108, *with* Am. Compl. ¶ 111.  In the end, these are the same conclusory allegations this Court has twice rejected.  As the Court most recently explained, this sort of broad "side by side list

11

comparison does not sufficiently place the Defendants on notice or slide Plaintiffs['] claims from 'possible to plausible.'" *Mator II*, 2022 WL 1046439, at *6.

As this Court has recognized, recordkeeping services are not commoditized. For example, consider Plaintiffs' allegation that all recordkeepers for large plans provide "telephone support." SAC ¶¶ 94, 108. That's true at a certain level of abstraction. But the details matter. It undoubtedly costs less to hire a team of two to provide telephone support than a team of ten, and even less to hire a single person who picks up only when automated systems fail. Is the higher cost worth reducing the anticipated wait times? Reasonable people could disagree, as could prudent fiduciaries. The same is true of other recordkeeping services: it can cost more to communicate more often with participants, or to make available regular live in-person educational seminars versus preprogrammed online content. *See, e.g., Sacerdote v. N.Y. Univ.*, 328 F. Supp. 3d 273, 299 n.55 (S.D.N.Y. 2018) (contrasting one recordkeeper's "'high-touch' service model" that included "a minimum of 150 days per year of on-site education (e.g., one-on-one counseling and/or group meetings)," to another recordkeeper's package of services that did not include "on-site education"), *aff'd*, 9 F.4th 95 (2d Cir. 2021), *cert. denied*, 142 S. Ct. 1112 (2022). There is no way to infer imprudent spending outside the range of reasonableness if the allegations do not explain what the spending purchased. *See, e.g.*, *Hecker II*, 569 F.3d at 711 (explaining that higher fees can be appropriate for "extra services"); *Young*, 325 F. App'x at 33 (affirming dismissal where ERISA "[p]laintiffs fail[ed] to allege that the fees were excessive relative 'to the services rendered'"). Thus, as before, even if Plaintiffs "may have identified two

apples" when it comes to services, "one could be a Honeycrisp and the other a Granny Smith."

*Mator II*, 2022 WL 1046439, at *6. [7]

**(ii)     Plaintiffs Do Not Point To Appropriate Benchmarks On
RPS Fees.**

The plans against which Plaintiffs attempt to compare the WESCO Plan are not facially

"comparable" considering that they are all over the map in terms of participant count and asset

size.  Using the Plan's 2018 statistics, Plaintiffs allege that the Plan had 8,232 participants and

$670 million in assets.  SAC ¶ 98.  In contrast, the alleged comparator plans in 2018 ranged from

4,950 participants to 13,502 participants and ranged from $218 million in assets to **over $2**

**billion**.  *Id.* ¶¶ 102, 106.   Separately, even if these plans were comparable at a baseline level,

Plaintiffs do not allege they are comparing the Plan's RPS fees to all other plans with similar

numbers of participants or asset sizes, or even the average of all other plans of similar sizes.

---

[7] Moreover, as Defendants previously explained, not only are Plaintiffs' allegations on RPS services conclusory, they also conflict with the Second Amended Complaint's own source documents.  The 2018 Forms 5500 that Plaintiffs relied upon for the direct fee portions of each "comparable" plan list service codes that correspond to different categories of services received from a provider.  *See* Dep't of Labor EBSA, 2018 Instructions for Form 5500 at pp. 27, which is available at which is available at: https://www.dol.gov/sites/dolgov/files/EBSA/employers-and-advisers/plan-administration-and-compliance/reporting-and-filing/form-5500/2018-instructions.pdf (last visited May 17, 2022).  As discussed at length in Defendants' prior briefing, *see* Dkt. 49 at pp. 11-12, Dkt. 51 at 7-8, these codes are not dispositive and do not capture all the details and nuances of different services within a particular code—or the scope of those services—but they are sufficient to demonstrate that the services offered by Wells Fargo and other recordkeepers to many of the "so-called" comparator plans differ materially from the services that Wells Fargo provided to the WESCO Plan.  For example, the WESCO Plan's 2018 Form 5500 lists codes for many different services that Wells Fargo provided to the Plan, including recordkeeping and information management (codes 15 and 64), participant loan processing (code 37), and trustee services (code 21) to name just a few.  Ex. 10 (2018 WESCO Form 5500, Sch. C at p.3).  In contrast, the 2018 Form 5500 for the Centerpoint Plan shows that two Voya recordkeeping entities provided *only* recordkeeping and contract administration services (code 64 and 13).  Ex. 19 (2018 Centerpoint Plan Form 5500, Sch. C at p.3).  As such, any comparison of the fees associated with those different types of services is meaningless.

13

Considering there are *thousands* of retirement plans in the marketplace with similar asset sizes and numbers of participants, Plaintiffs' smattering of a handful of plans cannot serve as a meaningful fee benchmark or create an inference of imprudence.  *See, e.g.*, *Albert v. Oshkosh Corp.*, No. 20-901, 2021 WL 3932029, at *5 (E.D. Wis. Sept. 2, 2021) ("[T]he mere existence of purportedly lower fees paid by other plans says nothing about the reasonableness of the Plan's fee."), *appeal filed*, No. 21-2789 (7th Cir. Oct. 1, 2021).[8]

Apart from the alleged comparator plans, Plaintiffs also continue to rely on fee amounts derived from the NEPC survey (SAC ¶ 113), despite the Court's explicit rejection of that survey as a useful or appropriate benchmark.  As this Court held, the 2019 NEPC survey is an "incongruent" comparison and irrelevant benchmark for fee amounts because it "does not contain any information about the services provided to the surveyed plans." *Mator II*, 2022 WL 1046439, at *7.  In fact, the survey specifically contains the following disclaimer that underlies the Court's rejection: "All plans are not created equal. Higher (or lower) record keeping fees are a function of plan size and complexity, and the *package of services* the plan sponsor has contracted for. … operational complexity and *service levels drive meaningful differentiation in price*."  *See* NEPC 2019 Defined Contribution Progress Report at p. 10 (emphases added).[9]

None of Plaintiffs' comparisons of RPS fees allegedly paid by other plans for different services can create a "plausibility that Defendants' acted imprudently."  *Mator I*, 2021 WL 4523491, at *7; *see also Daikin Am.*, 2021 WL 1758898, at *8 (finding plaintiff's comparison

---

[8] As of September 30, 2021, there were approximately 600,000 401(k) plans in the United States. *See* https://www.ici.org/401k at 1 (last visited May 17, 2022).

[9] The survey is available at: https://cdn2.hubspot.net/hubfs/2529352/2019%20DC%20Plan%20and%20Fee%20Survey%20(progress%20report)/2019%20NEPC%20DC%20Plan%20Progress%20Report.pdf.

between John Hancock's "excessive administrati[on] fees" and fees received by alternative recordkeepers was "illusory" because "as it pertained to the Plan, John Hancock was not only an administrative services provider, but also an investment manager for several of the Plan's investment funds."); *Young*, 325 F. App'x at 33 (affirming dismissal where "[p]laintiffs fail[ed] to allege that the fees were excessive *relative to the services rendered*") (emphasis added).[10]

**(iii)** **Plaintiffs Make Apples-To-Oranges Comparisons By Different Calculations of Fees.**

Even if Plaintiffs had cured their failure to plead sufficient factual allegations about the type and scope of services and identified appropriate comparator plans, the Second Amended Complaint's alleged fee amounts themselves are still not "apples to apples" for several different reasons. As an initial matter, Plaintiffs admit that they calculate direct fees differently for WESCO than for other Plans. For WESCO, Plaintiffs determine the purported amount of direct fees derived by multiplying total assets (less loans) indicated in Form 5500s by "Additional Asset Based Fee" bps reflected in the Wells Fargo Agreement, and then dividing by number of year-end plan participants. SAC ¶ 97 n.16. In contrast, for other plans, Plaintiffs just use the direct fee amount listed in the Form 5500. SAC ¶ 103. Plaintiffs further explain that for the WESCO Plan they add this "direct fee" number to "indirect fees" calculated by multiplying year-

---

[10] Plaintiffs also continue to plead that WESCO breached its duty of prudence because it allegedly did not conduct an RFP and/or obtain competitive quotes for recordkeeping services, at least until 2019. SAC ¶ 122. As previously explained in response to the same allegation in the original and Amended Complaint, "nothing in ERISA compels periodic competitive bidding." *White v. Chevron Corp.*, No. 16-cv-0793, 2016 WL 4502808, at *14 (N.D. Cal, Aug. 29, 2016) ("*White I*"); *see also, e.g., Matney v. Barrick Gold of N. Am., Inc.*, No. 20-275, 2022 WL 1186532, at *12 (D. Utah Apr. 21, 2022) (rejecting fiduciary-breach claim on recordkeeping fees: "nothing in ERISA requires a fiduciary to obtain competitive bids at any regular interval"); *Del Castillo v. Cmty. Child Care Council of Santa Clara Cty., Inc.*, No. 17-cv-07243, 2019 WL 6841222, at *5 (N.D. Cal. Dec. 16, 2019) ("T[he] absence of competitive bidding or RFP process … does not support Plaintiffs' allegations that the [plan fiduciaries] acted imprudently").

end assets in each mutual fund by the percentage of "Asset Based Fees Paid by Fund."  SAC ¶ 98 n.19, ¶ 99.[11]  Plaintiffs cannot duplicate this process for most of the other comparators because no revenue-sharing rates were disclosed in the financial statements attached to the Form 5500s on which they claim to rely.  *See, e.g.*, Exs. 20-23 (Carlisle 2018 Form 5500, HealthFirst 2018 Form 5000, Rackspace 2018 Form 5500, Boston 2018 Form 5500).  While Plaintiffs allege that they are "using publicly available revenue sharing rates" for these other plans, SAC ¶ 103, they do not explain where or how those rates for other plans are "publicly available."  Especially given the Court's legitimate concerns and criticisms of Plaintiffs' calculations in past pleadings, Plaintiffs needed to have shown their work to demonstrate plausibility.

More importantly, Plaintiffs also continue to compare both *direct and indirect* fees for the WESCO Plan to just *direct* fees for at least some of the comparators—something this Court specifically held could not support a plausible claim.  *Mator I*, 2021 WL 4523491, at *7.  For example, the amount for the Edward-Elmhurst plan is only the "direct compensation" paid to the recordkeeper as set forth on the plan's Form 5500, even though the same Form 5500 shows the

---

[11] This reflects a fundamental misunderstanding of the Wells Fargo recordkeeping agreement, as previously explained in Defendants Reply on the Motion to Dismiss the Amended Complaint.  *See* Dkt. 51 at p. 9 n.5.  To recap, Plaintiffs are double-counting fees because the Plan's participants did not pay any "direct" fees to Wells Fargo, as confirmed by the absence of any such fees in the participant disclosures that all participants received.  *See* Exs. 1-5.  Rather, for the Plan-wide services relevant to the fees at issue here, Wells Fargo received only an "indirect" fee on the Plan's total assets each year: the basis-point charge in the "Additional Asset Based Fees" column of the agreements, which was collected via revenue sharing fees on certain only funds as shown in the "Asset Based Fees Paid By Fund" column.  *See* Exs. 12-15.  Those investment-by-investment fees generated a pool of revenue from which the Plan paid Wells Fargo's total Plan-wide asset-based fee, rebating back any excess amounts to participants.  *See* Exs. 16-17.  But assuming these allegations were true for purposes of this Rule 12(b)(6) motion, Plaintiffs' Second Amended Complaint still fails to create any inference of imprudence for the reasons WESCO has explained.

recordkeeper also received indirect compensation.  *Compare* SAC ¶ 106 *with* Ex. 25 (Edward-Elmshurst 2018 Form 5500).  The same is true of a new comparator Plaintiffs added: the Red Lobster 401(K) Plan.  *Compare* SAC ¶ 106, *with* Ex. 26 (Red Lobster 2018 Form 5500).

Plaintiffs likely will claim, as they have for the Edward-Elmhurst plan previously, that they failed to include indirect compensation for these plans because they rebated certain excess revenue sharing funds to participants.  But the same is true of the WESCO Plan.  *See* Exs. 16-17, 2018 & 2019 Rebate Disclosures.  Moreover, as to Red Lobster, the Financial Statement specifically states that although Wells Fargo remits excess revenue sharing amounts "[d]uring 2018, *there were no excess amounts*."  Ex. 26, Red Lobster 2018 Form 5500, Financial Statement at p.10.   So, even accepting the general premise of Plaintiffs' likely rejoinder, it is still inconsistent and implausible for Plaintiffs to *include* indirect compensation when calculating fees for the WESCO Plan, while *excluding* it for the Red Lobster plan in 2018—a year when Red Lobster specifically stated that no revenue sharing amounts were rebated.

### (iv)     Plaintiffs Made No Attempt to Exhaust Investigatory Avenues Available To Them At the Pleadings Stage.

Finally, Plaintiffs did not heed the Court's suggestion to exhaust their investigatory avenues.  Instead, they thumb their nose at the idea and insist they are not required to do so.  SAC ¶ 15 n.4 (asserting that "[n]either the statutes nor case law require Plaintiffs to request information from Defendants … before bringing an action").  Beyond that, Plaintiffs surmise that they would not have been able to obtain the Wells Fargo recordkeeping agreement pursuant to ERISA Section 104(b)(4), 29 U.S.C. § 1024(b)(4), because the statute only speaks of the "latest updated" plan documents, which they say would be the agreement with Fidelity, not Wells Fargo.  SAC ¶ 15 n.4.  But even if true, Plaintiffs did not request the Fidelity agreement either.  And considering that Plaintiffs allege that the Plan's participants "received the same services

from Fidelity that they had previously received from Wells Fargo" (SAC ¶ 114), one would have expected them to pursue more details about Fidelity's services, instead of repeating the same generalizations that have doomed their claims from the start. They did not do so. *Mator II*, 2022 WL 1046439, at *7 ("[N]either Plaintiffs nor their counsel have endeavored to obtain the recordkeeping agreement and include any relevant factual allegations regarding the same.").

For all these reasons, Plaintiffs' criticisms of the Plan's alleged RPS fees still fail to create any plausible inference that WESCO's fiduciary process was imprudent. *See, e.g.*, *White v. Chevron Corp.*, 752 F. App'x 453, 455 (9th Cir. 2018) ("*White III*") (affirming dismissal where "the allegations showed only that [the fiduciaries] could have … sought lower fees[.]").

### b. Plaintiffs' Preference For Lower-Cost Share Classes Of Certain Funds Fails To State A Viable Claim.

For the third time, Plaintiffs invoke the monolithic proposition that the WESCO Plan must have used an imprudent process because the Plan allegedly did not always utilize the lowest-cost share classes for certain investments options. SAC ¶ 137. But as this Court has repeatedly held, Plaintiffs' allegation that Defendants imprudently "chose mutual fund share classes with higher costs even though less expensive class shares of the same funds were available" is not enough to state a claim. *Mator II*, 2022 WL 1046439, at *8; *Mator I*, 2021 WL 4523491, at *7 (collecting cases).

Among other reasons, this is because higher-cost share classes can have other benefits. For instance, the incremental differences in expense ratios in higher-cost share classes are generally used toward revenue sharing to pay for recordkeeping that would otherwise have to be paid directly by participants. *See, e.g.*, *White v. Chevron Corp.*, No. 16-cv-0793, 2017 WL 2352137, at *14 (N.D. Cal, May 31, 2017) ("*White II*"), *aff'd*, 752 F. App'x 453 (9th Cir. 2018) (recognizing that a fiduciary used retail share class funds to "pa[y] the Plan's recordkeeping

expenses"). In such circumstances, the effect is that the "higher-cost" share class, which pays more in revenue sharing, ends up costing less than the "lower-cost" share class. *See id.*[12]

Plaintiffs tacitly acknowledge this as a benefit of higher-cost share classes, but as they did before, Plaintiffs again allege that their use was not appropriate here because RPS fees were allegedly already too high. Thus, according to Plaintiffs, it was unreasonable and unnecessary for Defendants to use share classes with higher revenue sharing to pay any recordkeeping fees. *Compare* SAC ¶¶ 135-36, 139 *with* Am. Comp. ¶ 134 and Compl. ¶¶ 25, 30, 129-131. However, in its most recent ruling, this Court held that this specific allegation "d[id] not sufficiently buttress Plaintiff's imprudence claims" so as to take the allegations from possible to plausible. *Mator II*, 2022 WL 1046439, at *2, *8 (summarizing Plaintiffs' prior allegations that "higher cost, retail share classes to pay for Plan administrative expenses was not justified in this case, because Wells Fargo was charging higher direct recordkeeping service fees").

The Court held that to state a claim Plaintiffs had to address "whether the retail share class may have offered other benefits." *Id.* at *8. This is consistent with the Supreme Court's recent instruction that when evaluating the sufficiency of an ERISA breach of fiduciary duty claim, the court "must give due regard *to the range of reasonable judgments* a fiduciary may make." *Hughes*, 142 S. Ct. at 742 (emphasis added). Plaintiffs still ignore that issue. For

---

[12] Here, all of the so-called "higher cost" funds surrounding Plaintiffs' claim generated revenue sharing that was either used to cover administrative and recordkeeping expenses prior to June 2020, or rebated back to participants in their entirety in the form of revenue credits. *See* Exs. 12-14, 2015, 2017, 2018 Amendment to Wells Fargo Service Agreement Exhibits/Fee Schedules (in Attachment A, reflecting revenue sharing in "asset based fees paid by fund" column); Ex. 18, excerpt from Fidelity Investments Retirement Plan Service Agreement at 4, 5 (describing participant revenue credits that rebated revenue sharing amounts). Courts have granted Rule 12(b)(6) motions to dismiss share class claims in similar circumstances. *See Matney*, 2022 WL 1186532, at *7 (dismissing share class claims because, *inter alia*, after taking account of the revenue sharing credited back by the selected share class, the expense ratio was actually lower).

example, they did not address the other "inherent trade-offs between retail and institutional share classes," like "greater liquidity normally offered by retail share classes." *Daikin Am.*, 2021 WL 1758898, at *7 ("[T]he mere fact that Daikin selected retail share classes for certain investment options in the Plan does not establish a breach of fiduciary duty under ERISA."); *see also Kurtz v. Vail Corp.*, 511 F. Supp. 3d 1185, 1199 (D. Colo. 2021) ("Alleging only the inclusion of more expensive share classes is not enough" to show a fiduciary breach."); *Matney*, 2022 WL 1186532, at *7 (dismissing share class claims where plaintiff alleged that there was no difference between the share classes other than cost because, *inter alia*, "alleging only the inclusion of more expensive share classes is not enough to suggest imprudence").  Instead, Plaintiffs just rehashed the same allegations as the prior two iterations of the complaint.  *Compare, e.g.*, Am. Compl. ¶ 124 ("There is no difference between share classes other than cost, the funds hold identical investments and have the same manger), *with* SAC ¶ 129 ("The share classes have identical portfolio managers, underlying investments and asset allocation and differ only in cost").

Plaintiffs have once again failed to aver some "non-conclusory factual basis that reaches beyond the threshold of a plausible claim rather than a possible claim." *Mator II*, 2022 WL 1046439, at *8.  As such, the Court should reach the same result and dismiss this share class claim as implausible and legally insufficient.

### c. *Sweda* Still Does Not Save Plaintiffs' Claim.

This Court has twice recognized that *Sweda* does not automatically greenlight Plaintiff's claims of fiduciary breach.  *Mator II*, 2022 WL 1046439, at *8 ("Although Plaintiffs have continued to attempt to suggest that a more lax pleading standard should be applied to their Complaint, *Sweda* still supports that the sound principles from *Twombly/Iqbal* remain."); *Mator I*, 2021 WL 4523491, at *7 (same).  To the extent Plaintiffs continue to suggest that *Sweda* dooms this motion or gives them a free pass toward a lower pleading standard, they are wrong

for all the reasons discussed in Defendants' prior briefs.  *See* Dkt. 28 at pp. 16-18; Dkt. 36 at pp. 9-10; Dkt. 49 at p. 20-22; Dkt. 51 at p.2-3.

### 2. *Plaintiffs' Derivative Failure-To-Monitor Claims Fails.*

In Count II, Plaintiffs once again claim that WESCO breached its fiduciary duties by failing to monitor the individuals responsible for overseeing the Plan's RPS fees and failing to monitor the process by which the Plan investigated the availability of lower-cost share classes of certain mutual funds.  SAC ¶¶ 168-174.  As this Court has recognized, this claim is derivative of Plaintiffs' primary claim in Count I and fails along with it.  *See, e.g.*, *Mator II*, 2022 WL 1046439, at *9; *Mator I*, 2021 WL 4523491, at *8; *Edgar v. Avaya, Inc.*, 503 F.3d 340, 349 n.15 (3d Cir. 2007), *abrogated on other grounds by Dudenhoeffer*, 573 U.S. 409 (2014); *Spear v. Fenkell*, No. 13-02391, 2015 WL 3643571, at *22 (E.D. Pa. June 12, 2015) ("To the extent that the underlying fiduciary violation claims have been dismissed, the derivative failure to monitor claim will be dismissed[.]"); *Johnson v. Radian Grp., Inc.*, No. 08-2007, 2010 WL 2136562, at *14 (E.D. Pa. May 26, 2010) (similar).  In addition, Plaintiffs' failure-to-monitor claim separately fails on the basis that it rests on nothing but legal conclusions, as Plaintiffs "do[] not allege facts about [WESCO's] actual monitoring process and its specific shortcomings." *Nicolas v. Trs. Of Princeton Univ.*, No. 17–3695, 2017 WL 4455897, at *5 (D.N.J. 2017) (dismissing similar failure-to-monitor allegations on these grounds).

### B. Plaintiffs' Second Amended Complaint Should Be Dismissed With Prejudice.

Among the reasons for denial of leave to file an amended complaint are "repeated failure to cure deficiencies by amendments previously allowed" and "futility of amendment."  *Foman v. Davis*, 371 U.S. 178, 182 (1962); *see also Grayson v. Mayview State Hosp.*, 293 F.3d 103, 108 (3d Cir. 2002) (noting that grounds for granting motion to dismiss with prejudice and without leave to amend include where an amendment would be inequitable or futile); *Nat'l Credit Union*

*Admin. Bd. v. U.S. Bank Nat'l Ass'n*, 898 F.3d 243, 257-58 (2d Cir. 2018) (affirming denial of leave to supplement dismissed second amended complaint and holding that a "busy district court need not allow itself to be imposed upon" by yet another amendment when the "plaintiff was aware of the deficiencies in his complaint when he first amended").

Here, Plaintiffs have now had two opportunities to amend their complaint, but have filed a third complaint with the same deficiencies previously pointed out.  In such circumstances, the Third Circuit has affirmed dismissal without leave to amend on the basis that granting additional leave to amend would be futile and/or inequitable.  *See, e.g., Krantz v. Prudential Invs.*, 305 F.3d 140, 144-45 (3d Cir. 2002) (affirming denial of leave to amend previously amended complaint and explaining that a district court "has discretion to deny a plaintiff leave to amend where the plaintiff was put on notice as to the deficiencies in his complaint, but chose not to resolve them."); *Ca. Public Employees' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 163, 165 (3d Cir. 2004) (affirming denial of leave to amend inadequately pleaded allegations a third time where plaintiffs "had already been given ample opportunity to state a cognizable cause of action" and plaintiffs disregarded "clear guidance the District Court afforded" on the necessary changes).[13]

## IV.   CONCLUSION

Like the first two Complaints, the Second Amended Complaint fails to allege any facts to plausibly demonstrate that WESCO's fiduciary process was imprudent.  Consequently, Plaintiffs' claims fail, and the Court should dismiss this action in full and with prejudice.

---

[13] *See also*, e.g., *Franks v. Food Ingredients Int'l, Inc.*, No. 09-3649, 2010 WL 3046416, at *8 (E.D. Pa. July 30, 2010) (denying leave to amend as defendants should not be required to respond yet a third time to a new complaint); *In re Eaton Vance Mut. Funds Fee Litig.*, 380 F. Supp. 2d 222, 242 (S.D.N.Y. 2005) (denying leave to amend where the plaintiffs already had had two opportunities to cure the defects in their complaints and failed to do so), *aff'd sub nom. Bellikoff v. Eaton Vance Corp.*, 481 F.3d 110, 118 (2d Cir. 2007) (per curiam).

Dated: May 19, 2022

*s/ Stephanie R. Reiss*

Stephanie R. Reiss
MORGAN, LEWIS & BOCKIUS LLP
One Oxford Centre, 32nd Fl.
Pittsburgh, PA 15219-6401
Telephone: 412.560.3378
Fax:  412.560.7001
stephanie.reiss@morganlewis.com

Deborah S. Davidson (*pro hac vice*)
MORGAN, LEWIS & BOCKIUS LLP
110 North Wacker Drive,
Chicago, IL 60606
Telephone:  312. 324.1000
Fax:  312.324.1001
Deborah.davidson@morganlewis.com

Matthew J. Sharbaugh (*pro hac vice*)
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, N.W.
Washington, DC 20004
Telephone:  202.739.5623
Fax:  202.739.3001
matthew.sharbaugh@morganlewis.com

*Attorneys for Defendants*

**<u>CERTIFICATE OF SERVICE</u>**

I, Stephanie R. Reiss, hereby certify that on this 19th day of May 2022, a true and correct copy of the foregoing Memorandum of Law in Support of Defendants' Motion to Dismiss the Second Amended Complaint was served upon all counsel of record via the ECF system.

<u>*/s/ Stephanie R. Reiss*</u>
Stephanie R. Reiss