IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
PITTSBURGH

ROBERT MATOR AND NANCY MATOR,        )
INDIVIDUALLY AND AS                   )
REPERESENTATIVES OF A CLASS OF        )        2:21-CV-00403-MJH
PARTICIPANTS AND BENEFICIARIES        )
IN AND ON BEHALF OF THE WESCO         )
DISTRIBUTION, INC. RETIREMENT         )
SAVINGS PLAN;                         )
                                      )
            Plaintiffs,

    vs.


WESCO DISTRIBUTION, INC., AND;
THE ADMINISTRATIVE AND
INVESTMENT COMMITTEE FOR
WESCO DISTRIBUTION, INC.
RETIREMENT SAVINGS PLAN, JOHN
AND JANE DOES 1-30,

            Defendants,

OPINION

        Plaintiffs, Robert Mator, and Nancy Mator, Individually and as Representatives of a

Class of Participants and Beneficiaries in and on behalf of the Wesco Distribution, Inc.

Retirement Savings Plan (Plan), bring claims for Breach of Duty under the Employee Retirement

Income Security Act (29 U.S.C. §§ 1001-1461) (ERISA) (Count I).  In addition, at Count II,

Plaintiffs set forth a claim for Failure to Adequately Monitor Other Fiduciaries Under ERISA

(Count II).  Both Counts are asserted against Defendants, Wesco Distribution, Inc., The

Administrative and Investment Committee for Wesco Distribution, Inc. Retirement Savings Plan,

and John and Jane Does 1-30. (ECF No. 63).   Defendants moved to dismiss pursuant to Fed. R.

Civ. P. 12(b)(6).  (ECF No. 66).  The matter is now ripe for consideration.

Upon consideration of Plaintiffs' Second Amended Complaint (ECF No. 63), Defendants' Motion to Dismiss (ECF No. 66), the respective briefs of the parties (ECF Nos. 67, 70, 71), and for the following reasons, Defendants' Motion to Dismiss Pursuant to Fed. R. Civ. 12(b)(6) will be granted.  Plaintiffs' Second Amended Complaint will be dismissed.

I.      Background

Plaintiffs and their putative class bring claims against the Defendants, as ERISA fiduciaries, for not protecting participants and their retirement funds by failing to evaluate fees and monitor costs assessed to the Plan. (ECF No. 63 at ¶¶ 5-6, 8).   Plaintiffs' Second Amended Complaint asserts two claims under ERISA:  1) Breach of Duty of Prudence by selecting a Retirement Plan Service (RPS) provider that charged imprudent and unreasonable fees and offering share class funds with excessive expenses; and 2) Failure to adequately monitor other fiduciaries who were tasked with monitoring and evaluating RPS providers. *Id*. at ¶¶ 154-174.

Plaintiffs' Breach of ERISA duty Count I concerns breaches of Duties of Prudence.  The Duty of Prudence claim avers two components, excessive RPS fees and excessive share class expenses.  Plaintiffs aver that these fees and expenses can reduce of the value of defined contribution plan accounts and that the Plan's fiduciaries have control over these expenses.  *Id*. at ¶¶ 42-43.

Defined contribution plans have two primary methods for payment of recordkeeping and administrative services: "direct" payments from plan assets, and "indirect" revenue sharing payments from plan investments, such as mutual funds.  *Id*. at ¶ 71.  In a direct payment arrangement, the fiduciary contracts with the recordkeeper to obtain services in exchange for a flat annual fee based upon the number of participants for which the recordkeeper will be providing services. *Id*. at ¶ 72. In an indirect revenue sharing payment arrangement, the mutual

fund pays the plan's recordkeeper for providing recordkeeping and administrative services for the fund. *Id*. at ¶ 74.  However, because revenue sharing payments are asset-based, the fees can allegedly grow to unreasonable levels if plan assets grow while the number of participants, and thus the services provided, has not increased at a similar rate. *Id.*  Further, Plaintiffs aver that if plan assets decline, participants in revenue-sharing arrangements will not receive a sustained benefit of paying lower fees, because the recordkeeper will demand that the plan make up the shortfall through additional direct payments. *Id.*

As regards share class expenses, Plaintiffs allege that mutual funds offer their investors different share classes: retail and institutional.  *Id.* at ¶ 64.  Plaintiffs aver that retail share classes are marketed to individuals with small amounts to invest, while institutional share classes are offered to investors with large amounts to invest, as with large retirement plans.  *Id.*   Plaintiffs maintain that retail share classes incur higher fees, such that retail class investors receive lower returns. *Id*.

Plaintiffs allege that Wells Fargo, N.A., the Plan's recordkeeper from 2009 to 2020, was responsible for holding the Plan's assets in trust, tracking participants' contributions, earnings and investment accounts and executing trades as requested by Plan participants.  *Id*. at ¶ 93.  As recordkeeper, Wells Fargo allegedly offered the following services:  Internet access to accounts, transaction processing, quarterly participant statements, participant communications-including Plan investments disclosures and periodic participant newsletters, retirement education services-including various tools, such as Plan website retirement income calculators, telephone support to answer questions or give assistance to Plan participants, and a brokerage window to enable Plan participants to invest in securities outside the Plan. *Id*. at ¶ 94.  Plaintiffs allege that Wells Fargo charged the Plan direct and indirect fees for the recordkeeping and administrative services and

that said fees were excessive compared to other similar-sized plans for similar services. *Id.* at ¶

96. During the Class Period, Plaintiffs aver they paid between $82 and $50 per year for direct

recordkeeping and administrative fees. *Id.* at ¶ 98. Those fees are summarized as follows:

| | Direct Recordkeeping and Administrative Services Compensation Per-Participant Cost (source: Forms 5500) | | | | | | |
|---|---|---|---|---|---|---|---|
| | Plan Year | | | | | | |
| | **2015** | **2016** | **2017** | **2018** | **2019** | **2020** | *Average* |
| Participants | 8,486 | 9,043 | 8,179 | 8,232 | 8,870 | 8,284 | **8,516** |
| Direct Fees | $614,032 | $651,150 | $671,304 | $539,003 | $443,714 | $247,300 | **$564,975** |
| **Direct Per-Participant Fee** | $72 | $72 | $82 | $78 | $50 | $60 | **$66** |

*Id.* at ¶ 97. Plaintiffs aver that mutual fund companies paid indirect fees to Wells Fargo as

follows during the Class Period:

| | Indirect Direct Recordkeeping and Administrative Services Compensation Per-Participant Cost (source: Forms 5500) | | | | | | |
|---|---|---|---|---|---|---|---|
| | Plan Year | | | | | | |
| | **2015** | **2016** | **2017** | **2018** | **2019** | **2020** | *Average* |
| Participants | 8,486 | 9,043 | 8,179 | 8,232 | 8,870 | 8,284 | **8,516** |
| Indirect Fees | $752,446 | $773,658 | $840,637 | $731,513 | $917,662 | $661,665 | **$779,597** |
| **Indirect Per-Participant Fee** | $89 | $85 | $103 | $89 | $103 | $80 | **$91** |

*Id*. at ¶ 98.  During the Class Period, Plaintiffs and Plan participants each paid between $153 and

$185 per year in total retirement plan services expenses as follows:

| | Direct and Indirect Recordkeeping and Administrative Services Compensation Per-Participant Cost (source: Forms 5500) | | | | | | |
|---|---|---|---|---|---|---|---|
| | **Plan Year** | | | | | | |
| | **2015** | **2016** | **2017** | **2018** | **2019** | **2020** | *Average* |
| Per-Participant Fee | $161 | $157 | $185 | $154 | $153 | $110 | **$153** |

*Id*. at ¶ 99.

Plaintiffs allege that other similarly sized plans maintained an average per-participant fee

of $42 and provided the same services as Wells Fargo.  *Id*. at ¶ 101.  Wells Fargo allegedly

received both indirect and direct fees for recordkeeping and administrative fees, for substantially

the same services as the Plan, as follows:

| Plan | Participants | Assets | RPS Total Cost | RPS Price /pp | Recordkeeper |
|---|---|---|---|---|---|
| Rackspace US, Inc. 401(K) Plan | 6,556 | $289,943,564 | $339,238 | $52 | Wells Fargo |
| Kemper Corporation 401(K) Retirement Plan | 6,669 | $554,047,025 | $343,400 | $51 | Wells Fargo |
| **Wesco Distribution, Inc. Retirement Savings Plan (2018)** | **8,562** | **$670,742,749** | **$1,270156** | **$154** | **Wells Fargo** |
| Red Lobster 401(K) Plan | 10,982 | $218,558,000 | $421,521 | $38 | Wells Fargo |
| Jeld-Wen 401(K) Retirement Savings Plan | 12,668 | $280,294,753 | $477,797 | $37 | Wells Fargo |
| Parsons Corporation Retirement Savings Plan | 12,134 | $1,088,067,182 | $526,392 | $43 | Wells Fargo |

*Id*. at ¶ 102. On July 1, 2020, the Plan allegedly switched from Wells Fargo to Fidelity Investments, which charges a per participant fee of $53. *Id*. at ¶ 114.

As regards excess share class expense claims, Plaintiffs aver that the Defendants consistently chose mutual fund share classes with higher operating expenses (retail shares) when identical lower-cost shares (institutional shares) of the same funds were available. *Id*. at ¶ 130. Plaintiffs allege that the selection of higher cost, retail share classes to pay for Plan administrative expenses was not justified in this case, because Wells Fargo was charging higher direct recordkeeping service fees. *Id*. at ¶ 134.

Accordingly, Plaintiffs aver that Defendants breached their Duty of Prudence to Plan participants, including Plaintiffs, by failing to employ or follow a prudent process to evaluate the availability of lower RPS fees and to lower costs critically or objectively, by purchasing institutional share classes of certain mutual funds available to the Plan. *Id*. at ¶¶ 158-159.

In their Motion to Dismiss, Defendants argue that Plaintiffs fail to state a viable claim under ERISA. (ECF No. 66). In particular, Defendants maintain that Plaintiffs fail to state claims for breach of ERISA's Duty of Prudence, and for their derivative Failure-to-Monitor claims. *Id*. This will be the Court's third opportunity to evaluate Plaintiffs' claims following its prior dismissals of Plaintiffs' Complaint and Amended Complaint, which granted leave to amend. The parties have cast similar legal arguments and have cited case updates since the Court's April 7, 2022 Opinion. Accordingly, the focus of this Court's analysis will be whether Plaintiffs' Second Amended Complaint has cured the pleading deficiencies identified in this

Court's October 4, 2021 Opinion and Order (ECF No. 43) and its April 7, 2022 Opinion and Order (ECF No. 62).[1]

II.     Standard of Review

When reviewing a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Eid v. Thompson*, 740 F.3d 118, 122 (3d Cir. 2014) (quoting *Phillips v. County of Allegheny*, 515 F.3d 224, 233 (3d Cir.2008)). "To survive a motion to dismiss a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556); *see also Thompson v. Real Estate Mortg. Network*, 748 F.3d 142, 147 (3d Cir. 2014). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. "Factual allegations of a complaint must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. A pleading party need not establish the elements of a *prima facie* case at this stage; the party must only "put forth allegations that 'raise a reasonable expectation that discovery will reveal evidence of the necessary element[s].'" *Fowler v. UPMC Shadyside*, 578 F.3d 203, 213 (3d Cir.2009) (quoting *Graff v. Subbiah Cardiology Associates, Ltd.*, 2008 WL 2312671 (W.D. Pa.

---

[1] To the extent the Second Amended Complaint (ECF No. 63) and Motion to Dismiss (ECF No. 66) overlap the prior pleadings and motions to dismiss, the Court incorporates in this Opinion its analysis and reasoning from its prior Opinions and Orders (ECF Nos. 43 and 62).

June 4, 2008)); *see also Connelly v. Lane Const. Corp.*, 809 F.3d 780, 790 (3d Cir.2016)

("Although a reviewing court now affirmatively disregards a pleading's legal conclusions, it

must still . . . assume all remaining factual allegations to be true, construe those truths in the light

most favorable to the plaintiff, and then draw all reasonable inferences from them.") (citing

*Foglia v. Renal Ventures Mgmt., LLC*, 754 F.3d 153, 154 n. 1 (3d Cir.2014)).

Nonetheless, a court need not credit bald assertions, unwarranted inferences, or legal

conclusions cast in the form of factual averments.  *Morse v. Lower Merion School District*, 132

F.3d 902, 906, n. 8 (3d Cir.1997).  The primary question in deciding a motion to dismiss is not

whether the Plaintiff will ultimately prevail, but rather whether he or she is entitled to offer

evidence to establish the facts alleged in the complaint.  *Maio v. Aetna*, 221 F.3d 472, 482 (3d

Cir.2000).  The purpose of a motion to dismiss is to "streamline [ ] litigation by dispensing with

needless discovery and factfinding."  *Neitzke v. Williams*, 490 U.S. 319, 326–327, (1989).

When a court grants a motion to dismiss, the court "must permit a curative amendment

unless such an amendment would be inequitable or futile." *Great Western Mining & Mineral Co.

v. Fox Rothschild LLP*, 615 F.3d 159, 174 (3d Cir. 2010) (internal quotations omitted). Further,

amendment is inequitable where there is "undue delay, bad faith, dilatory motive, [or] unfair

prejudice." *Grayson v. Mayview State Hosp.*, 293 F.3d 103, 108 (3d Cir. 2002).  Amendment is

futile "where an amended complaint 'would fail to state a claim upon which relief could be

granted.'" *M.U. v. Downingtown High Sch. E.*, 103 F. Supp. 3d 612, 631 (E.D. Pa. 2015)

(quoting *Great Western Mining & Mineral Co.*, 615 F.3d at 175).

 III. Discussion

  A.  Duty of Prudence

   1.  Excessive Fees Challenge

Defendants argue that Plaintiffs' Second Amended Complaint continues to offer only conclusory allegations on services and only "window dresses" their prior allegations in comparing WESCO's total RPS fees to the total RPS fees for comparator plans for the same suite and scope of services and fails to cure the Complaint and Amended Complaint's pleading deficiencies.  Defendants contend that Plaintiffs' Second Amended Complaint, as regards allegations concerning the services offered by Wells Fargo, have not changed. (ECF No. 44 at ¶¶ 94-95 and ECF No. 63 at ¶ 94).  Specifically, Defendants argue that Plaintiffs still fail to plead requisite details about the specific type and scope of "services provided" to the WESCO Plan or to any of their proposed comparators.   By way of example, Defendants maintain that Plaintiffs allege that all recordkeepers for large plans provide "telephone support." (ECF No. 63 at ¶¶ 94, 108).  Defendants argue that, while all plans my may provide "telephone support," the Second Amended Complaint's averments only address the service generally, because "it undoubtedly costs less to hire a team of two to provide telephone support than a team of ten, and even less to hire a single person who picks up only when automated systems fail."  (ECF No. 67 at p. 18). Accordingly, Defendants maintain that the Plaintiffs fail to account that a reasonable person or prudent fiduciary could disagree on the value of reduced wait times or reduced costs.

Next, Defendants contend that Plaintiffs do not reference appropriate benchmarks on RPS fees.  Specifically, Defendants note that, accordingly, to the Plan's 2018 statistics, it had 8,232 participants and $670 million in assets. (ECF No. 63 at ¶ 98).  However, Defendants maintain, the alleged comparator plans in 2018 ranged from 4,950 participants to 13,502 participants and ranged from $218 million in assets to over $2 billion. *Id*. ¶¶ 102, 106.  Defendants contend that, even if these plans were comparable at a baseline level, Plaintiffs' allegations do not compare the Plan's RPS fees to all other plans with similar numbers of participants or asset sizes, or the

average of all other plans of similar sizes.  In short, Defendants maintain Plaintiffs again offer

conclusory averments that the recordkeepers of comparator plans "all offered identical or similar

packages of service of the same or similar quality" to those received by the WESCO Plan.  (ECF

No. 63 at ¶ 108).

Defendants further contend that the Second Amended Complaint's source documents

conflict with its averments.  Specifically, Defendants assert that Plaintiffs rely upon the 2018

Forms 5500 as regards the direct fee portions of each "comparable" plan listing service codes

that correspond to different categories of services received from a provider.[2]   However,

according to Defendants, said codes do not capture all the details, nuances, and scope of different

services within a particular code.  Instead, Defendants maintain the 2018 Forms 5500

demonstrate that the services offered by Wells Fargo and other recordkeepers to many of the

comparator plans differ materially from the services that Wells Fargo provided to the WESCO

Plan.[3]  Accordingly, Defendants argue that it would be meaningless to compare the fees

associated with those different types of services.

Next, Defendants argue that, even if Plaintiffs' Second Amended Complaint cures the

factual allegations about the scope and services provided by the alleged comparator plans, the

alleged fees charged are still not "apples to apples" comparisons, because the Second Amended

---

[2] See Dep't of Labor EBSA, 2018 Instructions for Form 5500 at pp. 27, which is available at which is available at: https://www.dol.gov/sites/dolgov/files/EBSA/employers-andadvisers/plan-administration-and-compliance/reporting-and-filing/form-5500/2018-instructions.pdf (last visited August 8, 2022).

[3] WESCO Plan's 2018 Form 5500 lists codes for many different services that Wells Fargo provided to the Plan, including recordkeeping and information management (codes 15 and 64), participant loan processing (code 37), and trustee services (code 21). (ECF No. 67-10  at p. 12). In contrast, the Centerpoint  Plan 2018 Form 5500 demonstrates that two Voya recordkeeping entities provided only recordkeeping and contract administration services (code 64 and 13).  (ECF No. 67-19 at p. 7).

Complaint compares the WESCO Plan, which includes both direct and indirect fees, to some comparator plans that include only direct fees. For example, Defendants contend that, for WESCO, Plaintiffs determined the purported amount of direct fees by multiplying total assets (less loans) indicated in Form 5500s by an "Additional Asset Based Fee" as reflected in the Wells Fargo Agreement, and then dividing by number of year-end plan participants. (ECF No. 63 at ¶ 97 at n. 16). But, for other plans, Plaintiffs averred only the direct fee amount listed in the Form 5500. *Id.* at ¶ 103. Defendants further argue that Plaintiffs have not adequately averred the process for their calculation and that Plaintiffs continue to compare both direct and indirect fees for WESCO with just direct fees for at least some comparators.

In response, Plaintiffs contend that Defendants' arguments require the Court to engage in an improper parsing analysis. Specifically, Plaintiffs argue that they must be allowed to engage in discovery to uncover the type of information allegedly missing from its Complaint, Amended Complaint, and Second Amended Complaint with regards to the Plan's excessive payment of fees. Plaintiffs also claim that the Second Amended Complaint thoroughly sets forth factual allegations about the type, scope, and caliber of services provided to the Plan as well as those provided by other recordkeepers. Specifically, Plaintiffs maintain that the Second Amended Complaint details the type and scope of recordkeeping and administrative services offered by the Plan's recordkeeper, Wells Fargo, as follows:

> [H]olding the Plan's assets in trust, tracking contributions, earnings and investments for the participants' accounts and executing trades requested by Plan participants…. Internet access to [Plan participants'] accounts through the Plan website maintained by Wells Fargo; transaction processing (buying and selling Plan investments); quarterly participant statements; participant communications, including Plan investment disclosures and periodic participant newsletters; retirement education services, including various tools such as retirement income calculators available on the Plan website; and a telephone support to answer questions or give assistance to Plan participants. Wells Fargo also offered a

11

brokerage window that allowed Plan participants to invest in securities that were not Plan investment options.

(ECF No. 63 at ¶¶ 93, 94).   Plaintiffs also contend that the Second Amended Complaint alleges that other record keepers "provided identical or similar services of the same quality…as those provided by Wells Fargo" including:

> Holding plan assets in trust; tracking contributions, earnings and investments for the participants' accounts; executing trades requested by plan participants; Internet access to accounts through the plan websites maintained by the recordkeeper; transaction processing (buying and selling plan investments); quarterly participant statements; participant communications, including plan investment disclosures and periodic participant newsletters; retirement education services, including various tools such as retirement income calculators available on the plan websites; telephone support to answer questions or give assistance to plan participants; and a brokerage window that allowed plan participants to invest in securities that were not plan investment options.

*Id*. at ¶¶105, 108.  Further, Plaintiffs argue that the Second Amended Complaint alleges that:

> For large plans with greater than 5,000 participants, like the Plan, any minor variations in the way that these [recordkeeping] services are delivered have no material impact on the fees charged by recordkeepers to deliver the services. That fact is confirmed by the practice of all service providers quoting fees on a per-participant basis without regard for any individual differences in services requested–which are treated by the service providers as largely immaterial because they are, in fact, inconsequential to recordkeepers from a cost perspective.

*Id*.  ¶ 54. Plaintiffs contend that Defendants have not provided any information that Wells Fargo provided unique or superior services that would justify the excessive fees charged.  Finally, Plaintiffs maintain that they have alleged that comparable plans charged lower total recordkeeping fees on an "apples to apples" basis.

As with Complaint and Amended Complaint, the parties have competing legal arguments on whether the Second Amended Complaint meets the applicable pleading standard for an ERISA breach of fiduciary duty claim.  Because plaintiffs in an ERISA claim may not always have access to the information necessary to support their claim, courts have evaluated the

pleadings in ERISA claims with special scrutiny. In *Sweda v. Univ. of Pa.*, 923 F.3d 320, 328

(2019), the Third Circuit declined to extend the rigors of *Twombly*'s antitrust pleading rule to

breach of fiduciary claims under ERISA, because "'[r]equiring a plaintiff to rule out every

possible lawful explanation for the conduct he challenges would invert the principle that the

complaint is construed most favorably to the nonmoving party.'" *Id.* at 326 (quoting *Braden v.

Wal-Mart Stores, Inc.*, 588 F.3d 585, 597 (8th Cir. 2009)).  Rather, under *Sweda*, the Third

Circuit instructs that, complaints alleging ERISA breach of fiduciary duty claims, should be

evaluated, in three steps, as follows:

> First, [the Court] will note the elements of a claim; second, [the Court] will identify
> allegations that are conclusory and therefore not assumed to be true, and; third,
> accepting the factual allegations as true, [the Court] will view them and reasonable
> inferences drawn from them in the light most favorable to [the Plaintiffs] to decide
> whether "they plausibly give rise to an entitlement to relief." *Connelly v. Lane
> Constr. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016) (quoting *Iqbal*, 556 U.S. at 679,
> 129 S.Ct. 1937). Pleadings that establish only a mere possibility of misconduct do
> not show entitlement to relief.

*Id.* at 326 (some citations omitted).   Thus, "[t]he complaint should not be 'parsed piece by piece

to determine whether each allegation, in isolation, is plausible.'" *Sweda*, 923 F.3d at 331

(quoting *Braden*, 588 F.3d at 594). "[B]ecause participants usually do not have direct evidence

of how fiduciaries reached their decisions, the complaint need only provide an inference of

mismanagement by 'circumstantial evidence,' rather than 'direct' allegations of matters observed

firsthand." *Singer v. Barnabas Health, Inc.*, Civ. No. 20-13119, 2021 WL 1399870 at *5, 2021

U.S. Dist. LEXIS 72282 at *13 (D.N.J. Apr. 13, 2021) (quoting *Sweda*, 923 F.3d at 332).  That

said, allegations must cross "the threshold from possible to probable." *Johnson v. PNC Fin.

Servs. Grp., Inc.*, 2:20-CV-01493-CCW, 2021 WL 3417843, at *4 (W.D. Pa. Aug. 3, 2021)

("*Johnson I*").

First, the elements of a claim for breach of fiduciary duty under ERISA are: "'(1) a plan fiduciary (2) breaches an ERISA-imposed duty (3) causing a loss to the plan.'" *Sweda v. Univ. of Pa.*, 923 F.3d 320, 328 (2019) (quoting *Leckey v. Stefano*, 501 F.3d 212, 225–26 (3d Cir. 2007)). Defendants' Motion to Dismiss centers on the second element, namely whether the Amended Complaint adequately pleads a breach of an ERISA-imposed duty.   Here, said duty is the Duty of Prudence for plan fiduciaries. Under ERISA, "a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B). As such, in addition to monitoring a plan's investment options, "[f]iduciaries must also understand and monitor plan expenses" because " '[e]xpenses, such as management or administrative fees, can sometimes significantly reduce the value of an account in a defined-contribution plan' by decreasing its immediate value, and by depriving the participant of the prospective value of funds that would have continued to grow if not taken out in fees." *Sweda*, 923 F.3d at 328 (quoting *Tibble v. Edison Int'l*, 575 U.S. 523, 135 S. Ct. 1823, 1826, 191 L.Ed.2d 795 (2015)).

While specific combinations of facts that may give rise to an inference of recordkeeping imprudence will vary from case to case, courts have looked to factors such as whether a plan engages in competitive bidding for recordkeeping services, uses one or more recordkeepers, leverages its size to obtain reduced fees, and whether plaintiffs provide a "meaningful benchmark" from which to measure a fiduciary's alleged imprudence. *See, e.g., Pinnell v. Teva Pharms. USA, Inc.*, Civil Action No. 19-5738, 2020 WL 1531870, 2020 U.S. Dist. LEXIS 55617 (E.D. Pa. Mar. 31, 2020).  Next, the Court must eliminate conclusory allegations from the

Complaint.  Finally, the Court will take any factual allegations as true and will view them and reasonable inferences drawn from them in the light most favorable to Plaintiffs.

This Court dismissed the Excessive Fees Challenge in Plaintiffs' original Complaint and Amended Complaint, holding that the Amended Complaint averred "primarily a price tag to price tag comparison of Wells Fargo's and alleged comparator plans' recordkeeping services." (ECF No. 62 at p. 13).   Further, the Court noted that "[p]laintiffs did not allege the complete nature and scope of services provided by the alleged comparator plans" and relied "on generalized allegations with regard to these services."  *Id*.  In particular, the Court held that  "a side by side list comparison does not sufficiently place the Defendants on notice or slide Plaintiffs claim from 'possible to plausible.' *Id*.

After careful review of the Second Amended Complaint, the Court concludes that Plaintiffs have not cured the previously identified pleading deficiencies. Under the Plaintiffs' reasoning, bare allegations regarding the difference in recordkeeping fees and conclusory allegations regarding corresponding services would open the door to discovery and protracted litigation.   However, such a rule does not mesh with the standards set forth by the Supreme Court, which directs courts to apply "careful, context-sensitive scrutiny of" ERISA fiduciary-breach claims to "divide the plausible sheep from the meritless goats." *Hughes v. Northwestern University*, 142 S. Ct. 737, 742 (2022); see also *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014).   The Second Amended Complaint does not address the "address the types or levels of services that any plan contracted to receive," and its purported "side by side list comparison" does not suffice.  (ECF No. 62 at p. 13).   Plaintiffs' allegations, regarding services, do little more than rearrange and rephrase prior iterations of their claims from the Complaint and Amended Complaint.  Such does not cure the core deficiencies with regard to this Court's

15

expectations when it granted the Plaintiffs leave to amend.   As aptly noted by Defendants, Plaintiffs purported side by side comparison does not account for the quality of services.  Such allegations are too generalized and speculative to move into the realm of the plausible.

At the pleading stage, Plaintiffs have presented nothing beyond conclusory allegations regarding services with no particularity as to the quality of the services that Plain participants received.  Because Plaintiffs allegations depend on a price tag to price tag comparison, the Second Amended Complaint should contain sufficient details regarding services.  Without such allegations, the Plaintiffs have engaged in a speculative fishing expedition without a plausible factual basis.  Neither the Second Amended Complaint nor Plaintiffs' arguments articulate what particular discovery would assist the parties and Court in the assessment of Well Fargo's services and its comparators.  If the Court permitted only a price tag to price tag allegation, without more factual support, to proceed, ERISA plaintiffs could advance litigation on a mere averment of a monetary difference.  *See, e.g., CommonSpirit Health*, 37 F.4th at 1169 ("Smith has failed 'to allege that the fees were excessive relative to the services (quoting *Young v. Gen. Motors Inv. Mgmt. Corp.*, 325 F. App'x 31, 33 (2d Cir. 2009)); *Riley v. Olin Corp.*, 2022 WL 2208953 at *4 (E.D. Mo. June 21, 2022) ("[P]laintiff must plead that the administrative fees are excessive in relation to the specific services the recordkeeper provided to the specific plan at issue."); *Perkins v. United Surgical Partners Int'l Inc.*, 2022 WL 824839, at *6 (N.D. Tex. Mar. 18, 2022) (same and noting that comparison of fees to those in NEPC report was insufficient); *Morales v. Capital One Fin. Corp.*, No. 21-1454, Dkt. 42 (Order) (E.D. Va. May 27, 2022) (dismissing RPS fee claims because allegation that "there are other plans referenced that have less expensive recordkeeping fees" is not enough to state a viable claim).

Likewise, the alleged comparator plans face the same deficiencies as before.   The comparator plans do not match the Plan relative to number of participants or asset sizes, or the average of all other plans of similar sizes.   The Second Amended Complaint avers the comparators as follows:

| Plan | Participants | Assets | RPS Total Cost | RPS Price/ pp | Recordkeeper |
|---|---|---|---|---|---|
| Healthfirst Profit Sharing 401(K) Plan | 4,950 | $234,755,239 | $201,889 | $41 | Vanguard |
| Genesis Health System Retirement Savings Plan | 6,260 | $231,793,794 | $325,894 | $52 | Transamerica |
| Flowserve Corporation Retirement Savings Plan | 6,395 | $892,435,613 | $263,380 | $41 | T. Rowe Price |
| St. Luke's Health Network 403(B) Plan | 7,142 | $241,600,647 | $333,578 | $47 | Transamerica |
| Memorial Health System Defined Contribution Retirement Savings Plan | 7,318 | $221,242,194 | $385,754 | $53 | Transamerica |
| The Boston Consulting Group, Inc. Employees' Savings Plan And Profit Sharing Retirement | 8,067 | $894,454,060 | $336,660 | $42 | Vanguard |
| **Wesco Distribution, Inc. Retirement Savings Plan (2018)** | **8,562** | **$670,742,749** | **$1,270156** | **$154** | **Wells Fargo** |
| Children's Medical Center Of Dallas Employee Savings Plan 403(B) | 9,356 | $349,335,673 | $337,416 | $36 | Fidelity |
| Ralph Lauren Corporation 401(K) Plan | 9,389 | $552,586,935 | $290,066 | $31 | T. Rowe Price |
| Centerpoint Energy Savings Plan | 9,802 | $2,108,802,293 | $442,946 | $45 | Voya |
| Edward- Elmhurst Healthcare Retirement Savings Plan | 10,263 | $618,238,970 | $446,836 | $44 | Fidelity |
| Fortive Retirement Savings Plan | 13,502 | $1,297,404,611 | $472,673 | $35 | Fidelity |

(ECF No. 63 at ¶ 106).   As noted by Defendants, the so-called comparators range from 4,950 participants to 13,502 participants and ranged from $218 million in assets to over $2 billion.

Such disparities raise serious doubt as to plausibility of how the purported comparator plans are indeed comparable.  Even if these comparators had similar assets or participants, an examination of the 2018 Form 5500 for at least one comparator, Centerpoint/Voya, did not have the same list codes relative to services as Wells Fargo did for the Plan.

As regards Plaintiffs' procedures in their calculations for the comparators, an examination of Plaintiffs' methods reveals several flaws that cast doubt on the premise that the Second Amended Complaints alleged "apples to apples" comparison.   In calculating the WESCO plan fees, Plaintiffs derived the purported amount of direct fees by multiplying total assets (less loans) indicated in Form 5500s by "Additional Asset Based Fee" as reflected in the Wells Fargo Agreement, and then dividing by number of year-end plan participants.  (ECF No. 63 at ¶ 97 at n. 16).  Whereas, for other plans, Plaintiffs only allege the direct fee amount listed in the Form 5500.  *Id*. at ¶ 103. For example, the amount for the Edward-Elmhurst plan is only the "direct compensation" paid to the recordkeeper as set forth on the plan's Form 5500, even though the same Form 5500 shows the recordkeeper also received indirect compensation. *Cf.* ECF No. 63 at ¶ 106 with ECF No. 67-25.  Moreover, Red Lobster, which also utilized Wells Fargo, specifically states in its 2018 Form 5500 the Financial Statement that although Wells Fargo remits excess revenue sharing amounts "[d]uring 2018, there were no excess amounts." (ECF No.  67-26 at p. 35).  Therefore, under this premise, it is clear that Plaintiffs have inconsistently included indirect compensation when calculating fees for the WESCO Plan, while excluding it for the Red Lobster plan in 2018, a year when Red Lobster specifically stated that no revenue sharing amounts were rebated.  While Plaintiffs have argued that Defendants are asking this Court to improperly parse their Second Amended Complaint, such arguments have been consistently rejected.   See, e.g. *Smith v. CommonSpirit Health*, 37 F.4th 1160 (6th Cir. 2022);

*Riley v. Olin Corp.*, No. 21-1328, 2022 WL 2208953, at *4-5 (E.D. Mo. June 21, 2022) (dismissing excessive RPS fee claims); *Morales v. Capital One Fin. Corp.*, No. 21-1454, Dkt. 42 (Order) (E.D. Va. May 27, 2022) (dismissing excessive RPS fee claims); *Matney v. Barrick Gold of N. Am., Inc.*, No. 20- 275, 2022 WL 1186532, at *7, *12 (D. Utah Apr. 21, 2022), appeal filed, No. 22-4045 (10th Cir. May 20, 2022) (dismissing excessive RPS fee and share-class claims); *Perkins v. United Surgical Partners Int'l Inc.*, No. 21-973, 2022 WL 824839, at *6 (N.D. Tex. Mar. 18, 2022) (dismissing claims for excessive RPS fees). Therefore, without pleading additional details as to fee structures and services provided, Plaintiffs' Second Amended Complaint only infers a possibility but not a plausibility that Defendants acted imprudently.

Accordingly, Defendants' Motion to Dismiss, as regards Count I's excessive RPS fee claim, will be granted.

### 2.   Lower-Cost Share Classes

Defendants maintain that the Second Amended Complaint fails to cure the legal deficiencies surrounding their share-class claim. Plaintiffs argue they have plausibly alleged that Defendants imprudently caused the plan to pay for higher-cost share classes when identical lower-cost share classes were available. In response, Defendants contend Plaintiffs' allegations regarding share classes are virtually identical to those in the First Amended Complaint and remain firmly grounded on the inflexible proposition that offering more expensive share classes, even where they may offer greater revenue sharing, is *per se* imprudent. *See* ECF No. 63 at ¶¶ 135-36, 139; ECF No. 44 at ¶ 134; and ECF No. 1 at ¶¶ 25, 30, 129-131.   Specifically, Defendants argue that Plaintiffs fail to identify any new allegations in support of their share-class claims in the Second Amended Complaint.   Instead, Defendants maintain Plaintiffs are seeking a reversal of this Court's prior holding.   In its prior holding, this Court determined that Plaintiffs'

Amended Complaint offered "conclusory and insufficient facts to support that Defendants' choice of such share classes breached their [d]uty of [p]rudence," such that Plaintiffs failed to state any plausible claim in their share-class allegations. *Mator II*, 2022 WL 1046439, at *8. Plaintiffs do not refute that they have re-raised the same arguments.

Here, a careful review of the Second Amended Complaint, the Court agrees that Defendants' arguments are well taken.  Plaintiffs offer no new allegations regarding their share-class claims.  Therefore, the Court will again reiterate its prior analyses and conclusions with regard to Count I, share class claims. Accordingly, Defendants' Motion to Dismiss, as regards Plaintiffs' share class claim under Count I, will be granted.   Count I of Plaintiffs' Complaint will be dismissed.

> B.  Failure to Monitor Claim (Count II)

Finally, Defendants again argue that Plaintiffs' Count II Failure-To-Monitor claim fails as a matter of law because it is derivative of Plaintiffs' Count I breach of fiduciary claims. Plaintiffs again respond that they have sufficiently pleaded breach of fiduciary claims at Count I, such that Defendants' Motion to Dismiss Count II should be denied.  Courts have held that derivative claims, such as failure to monitor, cannot survive without a sufficiently pleaded underlying breach of fiduciary duty claim.  *See Scalia v. WPN Corp.*, 417 F.Supp.3d 658, 669 (W.D. Pa. 2019) (citing *In re Allergan ERISA Litig.*, 2018 WL 8415676, at *7 (D. N.J. July 2, 2018); *Rinehart v. Lehman Bros. Holdings Inc.*, 817 F.3d 56, 68 (2d Cir. 2016)).  Therefore, because Plaintiffs' underlying claims at Count I will be dismissed, their derivative failure to monitor derivative claim at Count II fails.

Accordingly, Defendants' Motion to Dismiss Count II will be granted.

> C.  Amendment Futility

While Plaintiffs have not requested leave to amend, the Court will briefly address the dismissal of Plaintiffs' Second Amended Complaint.  As noted above, the Second Amended Complaint is Plaintiffs' third attempt to state a plausible claim under ERISA. Despite 54 pages and 174 paragraphs, the Second Amended Complaint primarily leans on legal conclusions that read like a legal primer on ERISA fiduciary duties.  However, such does not substitute for sufficient factual allegations to satisfy either the *Twombly/Iqbal* or *Sweda* standard.  As Plaintiffs have had three bites of the apple, granting any further leave to amend would be inequitable. As such, no leave to amend will be granted.

Accordingly, the Court will grant Defendants' Motion to Dismiss.  Plaintiffs' Second Amended Complaint will be dismissed.  A separate order will follow.

DATED this 18th day of August, 2022.

BY THE COURT:

MARILYN J. HORAN
United States District Judge